**PURCHASE AND SALE AGREEMENT**
**WITHOUT RECOURSE**

Dated as of March 28, 2016

AXIS CAPITAL, INC.

Seller

and

TCF EQUIPMENT FINANCE, A DIVISION OF TCF NATIONAL BANK

Purchaser

## EXHIBITS AND SCHEDULES

| | |
|---|---|
| Schedule 1 | Initial Contract Schedule |
| Schedule 2 | Documents to be Delivered to TCFEF On or Prior to the Closing Date |
| Schedule 3 | Wire Transfer Instructions |

| | |
|---|---|
| Exhibit A | Contract Forms |
| Exhibit B | Contract Eligibility Criteria |
| Exhibit C | Notice of Assignment |
| Exhibit D | Form of Supplemental Conveyance |
| Exhibit E-1 | Form of Closing Date Certificate |
| Exhibit E-2 | Form of Addition Date Certificate |
| Exhibit F | Jurisdiction of Organization; Location(s) of Records; Identification Numbers |
| Exhibit G | Form of Reconveyance |
| Exhibit H | Form of Reports |

THIS PURCHASE AND SALE AGREEMENT, dated as of March 28, 2016, (this "Agreement"), is between Axis Capital, Inc., a Nebraska corporation (together with its successors and assigns, "Seller"), and TCF EQUIPMENT FINANCE, A DIVISION OF TCF NATIONAL BANK, a national banking association, as Purchaser (together with its successors and assigns, "TCFEF").

## PRELIMINARY STATEMENTS

WHEREAS, Seller desires to sell to TCFEF and TCFEF desires to purchase from Seller, in each case from time to time on the terms and conditions set forth in this Agreement, certain commercial equipment leases and financing agreements originated or acquired by Seller;

NOW, THEREFORE, in consideration of the mutual agreements herein contained, each party agrees as follows:

## ARTICLE I
## DEFINITIONS

Definitions. As used in this Agreement, the following terms shall have the following meanings:

"Addition Date" means, with respect to any additional purchase described in Section 2.2, the Addition Date specified in the related Supplemental Conveyance.

"Additional Collateral" means, with respect to any Purchased Contract, any personal property in which the Seller has received a security interest or lien other than the Equipment leased, sold or financed under such Contract to support the obligations of the Obligor under such Contract; provided, however, that the Additional Collateral shall not include any personal property in which Seller has received a security interest or lien solely by virtue of a cross-collateralization provision included in any Purchased Contract.

"Additional Contracts" means, with respect to any additional purchase described in Section 2.2, the Additional Contracts identified in the related Supplemental Conveyance; provided, however, that the Additional Contracts shall not include any Additional Contract repurchased by Seller pursuant to Section 3.2.

"Additional Cut-Off Date" means, with respect to any additional purchase described in Section 2.2, the Additional Cut-Off Date specified in the related Supplemental Conveyance.

"Additional Purchase Amount" has the meaning set forth in Section 2.3.

"Additional Purchased Assets" means, with respect to any additional purchase described in Section 2.2, the Additional Purchased Assets identified in the related Supplemental Conveyance.

"Adverse Claim" means a lien, security interest, charge, encumbrance or other right or claim in, of or on any Person's assets or properties in favor of any other Person other than the rights of an Obligor created by a Contract.

- 1 -

"Affiliate" means, with respect to any Person, any other Person directly or indirectly controlling, controlled by or under direct or indirect common control with such Person or any Subsidiary of such Person; provided, however, that a Person shall be deemed to control another Person if the controlling Person owns 51% or more of any class of voting securities of the controlled Person or possesses, directly or indirectly, the power to direct or cause the direction of the management or policies of the controlled Person, whether through ownership of stock, by contract or otherwise.

"Broker" means a Person that either originates and assigns to Seller one or more Purchased Contracts or receives a fee from Seller in connection with Seller's origination of one or more Purchased Contracts.

"Business Day" means any day on which banks are not authorized or required to close in Minneapolis, Minnesota, New York, New York, or Grand Island, Nebraska.

"Closing Date" means March 28, 2016.

"Collections" means all cash collections and other cash proceeds received with respect to the Purchased Contracts, including, without limitation, all Scheduled Payments, Prepayments and Recoveries; provided, however, that Collections shall not include any Excluded Amounts.

"Contract" means one or more related agreements under which Seller leases or finances equipment or other personal property to a commercial obligor, including, without limitation, the agreements attached as Exhibit A.

"Contract Balance" means, with respect to any Purchased Contract as of any date, the sum of (i) the present value (calculated as of such date) of the remaining Scheduled Payments due under such Purchased Contract on or after such date (discounted monthly at the applicable Discount Rate); plus (ii) the present value (calculated as of such date) of the booked residual position purchased by TCFEF (if any) as shown in the applicable schedule for the Purchased Contracts (Schedule 1 for the Initial Contracts) discounted monthly at the applicable Discount Rate; plus (iii) all Scheduled Payments due under such Purchased Contract before such date but not remitted to TCFEF on or before such date; plus (iv) all other amounts due under such Purchased Contract before such date but not remitted to TCFEF on or before such date; provided, however, that the amount described in clause (i) above shall be calculated by discounting the related Scheduled Payments on a monthly basis using a 30-day month and a 360-day year.

"Contract Pool" means a pool of Purchased Contracts consisting of (i) the Initial Contracts or (ii) the Additional Contracts identified in a particular Supplemental Conveyance.

"Cut-Off Date" means (i) when used with respect to an Initial Contract, the Initial Cut-Off Date, and (ii) when used with respect to an Additional Contract, the related Additional Cut-Off Date.

"Defaulted Contract" means a Purchased Contract (i) under which the related Obligor has failed to make one or more Scheduled Payments for 90 or more days or (ii) as to which the related Equipment has been repossessed as a result of a default under such Purchased Contract or which has been identified by the Servicer as uncollectible or (iii) under which (y) the related Obligor

becomes subject to an Insolvency Proceeding and (z) the related Obligor has failed to make one or more Schedule Payments for 30 or more days.

"Delinquent Contract" means a Purchased Contract under which the related Obligor has failed to make one or more Scheduled Payments for thirty-one (31) or more days.

"Delinquency Percentage" means, for any month, the percentage equivalent of a fraction, the numerator of which is the aggregate Scheduled Payments unpaid as of the last Business Day of such month for all Purchased Contracts (other than Purchased Contracts previously repurchased by Seller pursuant to Section 3.2) that were Delinquent Contracts as of such last Business Day and the denominator of which is the aggregate Scheduled Payments unpaid as of the last Business Day for all Purchased Contracts (other than Purchased Contracts previously repurchased by Seller pursuant to Section 3.2).

"Discount Rate" means (i) for each Initial Contract, 3.75%, and (ii) for each Additional Contract identified in any Supplemental Conveyance, the Discount Rate specified in such Supplemental Conveyance.

"Eligible Contract" means a Contract that meets the eligibility criteria set forth on Exhibit B.

"Equipment" means the equipment and other personal property sold, leased or financed under a Contract and all upgrades, additions, replacements, substitutions, parts, accessories or attachments to or for such equipment or other personal property.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended from time to time.

"Excluded Amounts" means (i) all amounts due or to become due under any Purchased Contract in respect of sales taxes, use taxes, stamp taxes, personal property taxes or other similar federal, state or local taxes or assessments (including any related interest, penalties, fees or charges) and (ii) all amounts due or to become due under any Purchased Contract in respect of insurance premiums relating to insurance obtained by Seller.

"Initial Contracts" has the meaning set forth in Section 2.1; provided, however, that the Initial Contracts shall not include any Initial Contract repurchased by Seller pursuant to Section 3.2

"Initial Cut-Off Date" means April 1, 2016.

"Initial Purchase Amount" has the meaning set forth in Section 2.3.

"Initial Purchased Assets" has the meaning set forth in Section 2.1.

"Insolvency Proceeding" means, with respect to any Person, such Person consents to the appointment of a conservator or receiver or liquidator in any insolvency, readjustment of debt, marshaling of assets and liabilities or similar proceedings of or relating to such Person or of or relating to all or substantially all of its property, or a decree or order of a court or agency or

- 3 -

supervisory authority having jurisdiction in the premises for the appointment of a conservator or receiver or liquidator in any insolvency, readjustment of debt, marshaling of assets and liabilities or similar proceedings, or for the winding-up or liquidation of its affairs, shall have been entered against such Person, or such Person shall admit in writing its inability to pay its debts generally as they become due, or such Person shall file a petition to take advantage of any applicable bankruptcy, insolvency or reorganization statute, or make an assignment for the benefit of its creditors.

"Insurance Proceeds" means all amounts received by Seller under any insurance policy covering physical damage to or loss of the Equipment or the Additional Collateral.

"Material Adverse Effect" means a material adverse effect on (i) the financial condition or operations of Seller, (ii) the ability of Seller to perform its obligations under this Agreement or any other Transaction Document, (iii) the legality, validity or enforceability of this Agreement or any other Transaction Document, (iv) the interest of TCFEF in the Purchased Contracts or the other Purchased Assets or (v) the collectibility of the Purchased Contracts.

"Notice of Assignment" means a notice of the assignment to TCFEF substantially in the form attached as Exhibit C.

"Obligor" means a Person obligated to make payments under a Contract.

"Person" means an individual, partnership, corporation (including a business trust), joint stock company, trust, unincorporated association, limited liability company, joint venture or other entity, or a government or any political subdivision or agency thereof.

"Personal Property Taxes" has the meaning set forth in Section 6.2(g).

"Prepayments" means all partial or full prepayments made on any Purchased Contract, including, without limitation, all or any portion of any Scheduled Payment which Seller has received, and has permitted the related Obligor to make, in advance of its scheduled due date.

"Purchased Assets" means the Initial Purchased Assets and any Additional Purchased Assets.

"Purchased Contract" means the Initial Contracts and any Additional Contracts.

"Records" means, with respect to any Purchased Contract, the Contract, the Supporting Documents, all documents, instruments, and financing statements related to and/or delivered to Seller in connection with the foregoing, and the payment history relating to such Purchased Contract or the related Obligor.

"Recoveries" means all amounts received with respect to any Contract following the declaration of a default, including, without limitation, any and all cash proceeds or rents realized from the sale, lease, re-lease or refinancing of the related Equipment following repossession and any and all Insurance Proceeds received with respect to the related Equipment.

- 4 -

"Remittance Date" means Wednesday of each week (or if a Wednesday is not a Business Day, the next succeeding Business Day), commencing April 6, 2016.

"Reporting Date" means the 20th day of each month, commencing April, 2016.

"Sales and Use Taxes" has the meaning set forth in Section 6.2(g).

"Servicer" has the meaning set forth in Section 6.1(a).

"Servicer Default" has the meaning set forth in Section 6.6.

"Scheduled Payments" means the periodic payments scheduled to be made under a Purchased Contract on or after the related Cut-Off Date as shown in the applicable schedule of Purchased Contracts (Schedule 1 for the Initial Contracts).

"Subsidiary" means, with respect to any Person, (i) any corporation more than 50% of the outstanding securities having ordinary voting power of which shall at the time be owned or controlled, directly or indirectly, by such Person or by one or more of its Subsidiaries or by such Person and one or more of its Subsidiaries, (ii) any partnership, association, limited liability company, joint venture or similar business organization more than 50% of the ownership interests having ordinary voting power of which shall at the time be so owned or controlled and (iii) any other Person that is required to be consolidated with such Person under generally accepted accounting principles.

"Supplemental Conveyance" has the meaning set forth in Section 2.2.

"Supporting Documents" means all guaranties and other contracts or arrangements securing or supporting payment of any Purchased Contract or covering the Equipment or Additional Collateral under any Purchased Contract.

"Taxes" has the meaning set forth in Section 6.2(g).

"TCFEF" has the meaning set forth in the preamble to this Agreement.

"Transaction Documents" means, collectively, this Agreement, each Supplemental Conveyance, each Purchased Contract and Supporting Documents, and all other instruments, documents and agreements executed and delivered by Seller or TCFEF in connection with this Agreement.

"UCC" means the Uniform Commercial Code as in effect from time to time in the State of Nebraska; provided, however, that if, by reason of mandatory provisions of law, the perfection, the effect of perfection or non-perfection or the priority of a security interest is governed by the Uniform Commercial Code as in effect in any other jurisdiction, UCC shall mean the Uniform Commercial Code as in effect in such other jurisdiction for purposes of the provisions hereof relating to such perfection, the effect of such perfection or non-perfection or such priority.

- 5 -

"Vendor" means a dealer or manufacturer of the Equipment leased, sold or financed under a Purchased Contract including, without limitation, any dealer or manufacturer that originates and assigns to Seller one or more Purchased Contracts.

## ARTICLE II
### PURCHASE TERMS

Section 2.1    Initial Purchase.  Seller hereby sells, transfers, assigns, sets-over, and otherwise conveys to TCFEF, without recourse except as provided herein, all right, title and interest of Seller in, to and under the following property, whether now existing or hereafter created or acquired (collectively, the "Initial Purchased Assets"):

(a)  the Contracts identified on Schedule 1 (collectively, the "Initial Contracts");

(b)  all amounts due on or after the Initial Cut-Off Date under the Initial Contracts and all Collections with respect to such amounts;

(c)  all Equipment leased or financed under the Initial Contracts and all proceeds of such Equipment (including, without limitation, all proceeds received on or after the earlier of the Initial Cut-Off Date or the Closing Date in connection with any sale or other disposition of such Equipment and all Insurance Proceeds received on or after the earlier of the Initial Cut-Off Date or the Closing Date with respect to such Equipment);

(d)  all Records related to the Initial Contracts;

(e)  all Additional Collateral under or supporting payment for the Initial Contracts and all amounts received with respect to such Additional Collateral on or after the Initial Cut-Off Date;

(f)  all Supporting Documents for the Initial Contracts and all amounts received with respect to such Supporting Documents on or after the Initial Cut-Off Date;

(g)  all proceeds and rights to proceeds under any insurance policies covering the Equipment under the Initial Contracts and all rights as an additional insured under any insurance policy required by the Initial Contracts;

(h)  all rights to take any legal or equitable action and exercise all remedies with respect to the foregoing agreements either in the name of TCFEF or in the name of Seller; provided that TCFEF shall not commence any litigation in the name of Seller without first obtaining Seller's consent which consent will not be unreasonably withheld, conditioned or delayed; and

(i)  all proceeds of the foregoing.

Section 2.2    Additional Purchases.  Seller may, from time to time after the Closing Date, offer to sell, transfer, assign, set-over, and otherwise convey to TCFEF, without recourse except as provided herein or in any related Supplemental Conveyance, all right, title and interest of Seller in, to and under a portfolio of specified Contracts.  TCFEF may, in its absolute and sole

- 6 -

discretion, accept or reject such offer. If TCFEF accepts such offer, Seller shall execute and deliver to TCFEF a supplemental conveyance substantially in the form of Exhibit D (the "Supplemental Conveyance") evidencing the sale of such Contracts and the related assets identified in such Supplemental Conveyance.

Section 2.3    Purchase Amount. The amount to be paid for the Initial Purchased Assets (the "Initial Purchase Amount") shall be $1,844,234.18. TCFEF shall pay the Initial Purchase Amount to Seller on the Closing Date in immediately available funds in accordance with the wire transfer instructions set forth on Schedule 3. The amount to be paid for any Additional Purchased Assets (each, an "Additional Purchase Amount") shall equal the Additional Purchase Amount specified in the related Supplemental Conveyance. TCFEF shall pay each Additional Purchase Amount to Seller on the related Addition Date in immediately available funds in accordance with the wire transfer instructions set forth set forth on Schedule 3 (or in accordance with such other wire transfer instructions as may be set forth in a schedule to the related Supplemental Conveyance).

Section 2.4    Notice of Assignment - Obligors. The parties agree that the sale of the Initial Purchased Assets and unless otherwise agreed by the parties, each sale of Additional Purchased Assets shall be without notice to each Obligor. On or before the Closing Date or the Addition Date, as applicable, Seller shall deliver to TCFEF an executed but undated Notice of Assignment for each Initial Contract or Additional Contract, as applicable, duly executed by Seller. TCFEF shall not send a Notice of Assignment to an Obligor except as provided in Section 6.1.

Section 2.5    Intentionally Omitted.

Section 2.6    UCC Filing - Seller. Seller hereby irrevocably authorizes TCFEF to record and file UCC financing statements (and continuation statements with respect to such financing statements when applicable) covering the Initial Purchased Assets and the Additional Purchased Assets in such manner, at such time and in such jurisdictions as TCFEF deems appropriate which financing statements shall name Seller as Debtor (Seller) and TCFEF as Secured Party (Buyer).

Section 2.7    Marking and Delivery of Records. In connection with the sale of the Initial Purchased Assets and each sale of Additional Purchased Assets, Seller shall, after receipt of the Initial Purchase Amount on the Closing Date or receipt of the Additional Purchase Price on the Addition Date, as applicable, and at its expense, indicate clearly and unambiguously in its hard files and computer files that it has sold the Initial Purchased Assets and the Additional Purchased Assets, as applicable, to TCFEF pursuant to this Agreement and shall deliver to TCFEF a computer file or microfiche list containing a true and complete list of the Initial Contracts or Additional Contracts, as applicable, and such other information related to such Contracts as TCFEF may reasonably request. Each such file or list is hereby incorporated into and made a part of this Agreement. In addition, Seller shall, at its expense, within ten (10) Business Days after receipt of the Initial Purchase Price deliver to TCFEF all originals of each of the Initial Contracts, all Supporting Documents therefore, and all Records related thereto and within ten (10) Business Days after receipt of the Additional Purchase Price deliver to TCFEF

- 7 -

all originals of each of the Additional Contracts, all Supporting Documents therefore, and all Records related thereto, provided, however, that, if a Purchased Contract consists of a master agreement and a schedule which incorporates the terms of the master agreement and Seller is prohibited by contract from delivering the original of such master agreement to TCFEF, Seller may deliver to TCFEF the original of such schedule and a certified copy of such master agreement and provided further that TCFEF may agree that certain Records are not required to be delivered at the Closing Date or Addition Date, as applicable, but may be delivered at a later time.

Section 2.8    UCC Filings - Obligors.  In connection with the sale of the Initial Purchased Assets and each sale of Additional Purchased Assets, Seller shall, on or before the Closing Date or Addition Date, as applicable, and at its expense, deliver to TCFEF a filed-stamped copy of the UCC-1 financing statement, if any, filed on the Obligor under Initial Contracts or Additional Contracts (as applicable) showing Seller or an agent of Seller as the secured party of record and the Equipment and any Additional Collateral subject to such Purchased Contract as the collateral.  Seller hereby authorizes TCFEF to amend all such UCC-1 financing statements from time to time and in such manner as TCFEF deems appropriate, including amending to show TCFEF as the secured party of record, provided that TCFEF is not required to amend such financing statements to reflect that it is secured party of record and TCFEF shall have all rights of secured party under such financing statements even absent such amendment.  TCFEF acknowledges that Seller has filed UCC-1 financing statements only with respect to such Equipment and/or Additional Collateral, as the case may be, in which Seller's security interest is be perfected through such filing.

Section 2.9    Certificates of Title.  In connection with the sale of the Initial Purchased Assets and each sale of Additional Purchased Assets, Seller shall, on or before the Closing Date or Addition Date, as applicable, and at its expense, deliver to TCFEF with respect to all titled Equipment included in such purchase either: (i) the original Certificate of Title showing either Seller or the applicable Obligor as owner; or (ii) if Seller is lien holder and the original Certificate of Title is in the possession of the related Obligor, the original lien card issued by the appropriate governmental entity showing Seller as first lien holder.  In addition, Seller shall, on or before the Closing Date or Addition Date, as applicable, deliver to TCFEF one or more original executed powers of attorney in form and substance acceptable to TCFEF granting TCFEF's designated agent the irrevocable power to act as agent and attorney-in-fact for and on behalf of Seller in all matters pertaining to the titling, sale and transfer of ownership, transferring or recording a lien and applying for an original or duplicate certificate of title for the titled Equipment.  Seller agrees to provide TCFEF with additional original powers of attorney covering the titled Equipment if requested by TCFEF.  Seller shall pay all of TCFEF's out of pocket costs, excluding attorneys' fees, in amending, reregistering, transferring or recording its ownership or lien status on any certificate of title or lien card and obtaining any replacement or duplicate certificate of title or lien card as may be necessary or appropriate to reflect TCFEF's interest in any such Equipment within ten (10) days after receipt of an invoice from TCFEF setting forth such amounts.

Section 2.10  Security Deposits.  In connection with the sale of the Initial Purchased Assets and each sale of Additional Purchased Assets, Seller shall remit to TCFEF on the

- 8 -

Closing Date or Addition Date, as applicable, any security deposit received by Seller with respect to any Initial Contract or Additional Contract, as applicable.

Section 2.11    Certificates of Insurance.  In connection with the sale of the Initial Purchased Assets, Seller shall, at its expense, within forty (40) Business Days after receipt of the Original Purchase Price, provide or cause to be provided to TCFEF, evidence of insurance from each Obligor naming Seller and its successors and/or assigns as Additional Insured and Loss Payee for the amounts and types of coverage required by the respective Purchased Contract.

Section 2.12    Officer's Certificate.  In connection with the sale of the Initial Purchased Assets and each sale of Additional Purchased Assets, Seller shall deliver to TCFEF a certificate substantially in the form of Exhibit E-1 (Initial Purchase) or Exhibit E-2 (Additional Purchase), duly executed by an authorized officer of Seller.

Section 2.13    Grant of Security Interest.  Seller and TCFEF intend that each conveyance of Purchased Contracts and other Purchased Assets pursuant to Section 2.1 or any Supplemental Conveyance constitute a sale, and not a secured borrowing, for all purposes, including for accounting purposes.  If and to the extent that, notwithstanding such intent, any conveyance pursuant to Section 2.1 or any Supplemental Conveyance is not deemed to constitute a sale, Seller hereby grants to TCFEF a security interest in all right, title and interest of Seller in, to and under the Initial Purchased Assets and all Additional Purchased Assets, in each case whether now owned and existing or hereafter created or acquired, which security interest shall secure the performance of all of Seller's obligations under this Agreement and the other Transaction Documents, including, without limitation, Seller's obligation to repurchase any Purchased Contract upon the breach of certain representations or warranties in accordance with Section 3.2 and Seller's obligation to indemnify TCFEF and other Indemnified Parties against certain Indemnified Amounts in accordance with Section 7.1.  If Seller shall fail to perform any of its obligations under this Agreement or any other Transaction Document, TCFEF shall have, in addition to all other rights and remedies available under this Agreement or any other Transaction Document, all other rights and remedies available under the UCC or otherwise available at law or in equity.  If a court or other governmental authority determines that TCFEF holds a security interest in the Initial Purchased Assets or the Additional Purchased Assets, then such security interest shall secure a claim against Seller in an amount equal to the Aggregate Contract Balance of each Contract Pool as of the date of such determination plus all other amounts due and owing by Seller under this Agreement, including all Indemnified Amounts.

**ARTICLE III**
**REPRESENTATIONS AND WARRANTIES**

Section 3.1.    Representations and Warranties of Seller.  Seller hereby represents and warrants to TCFEF, as of the Closing Date and as of each Addition Date, that:

(a) Existence and Power.  Seller is a corporation duly organized, validly existing and in good standing under the laws of its state of organization and has all organizational power and all governmental licenses, authorizations, consents and approvals required to carry on its business in each jurisdiction in which its business is conducted, except where the failure to obtain such governmental license, authorization, consent or

- 9 -

approval could not reasonably be expected to have a Material Adverse Effect.

(b) <u>No Conflict</u>. The execution, delivery and performance by Seller of this Agreement and each other Transaction Document and the use by Seller of the Initial Purchase Amount and each Additional Purchase Amount are within its organizational powers, have been duly authorized by all necessary organizational action, do not contravene or violate (i) its articles of organization or operating agreement, (ii) any law, rule or regulation applicable to it, (iii) any restrictions under any agreement, contract or instrument to which it is a party or by which it or any of its property is bound, or (iv) any order, writ, judgment, award, injunction or decree binding on or affecting it or its property, and do not result in the creation or imposition of any Adverse Claim on assets of Seller or its Subsidiaries (except as created hereunder), and no transaction contemplated hereby requires compliance with any bulk sales act or similar law. This Agreement and each other Transaction Document have been duly executed and delivered by Seller.

(c) <u>Governmental Authorization</u>. No authorization or approval or other action by, and no notice to or filing with, any governmental authority or regulatory body is required for the due execution, delivery and performance by Seller of this Agreement or any other Transaction Document.

(d) <u>Binding Effect</u>. This Agreement and each other Transaction Document constitute the legal, valid and binding obligations of Seller enforceable against Seller in accordance with their respective terms.

(e) <u>Accuracy of Information</u>. All information heretofore furnished by Seller to TCFEF for purposes of or in connection with this Agreement, any of the other Transaction Documents or any transaction contemplated hereby or thereby is, and all such information hereafter furnished by Seller to TCFEF will be, true and accurate in every material respect on the date such information is stated or certified and does not and will not contain any material misstatement of fact or omit to state a material fact or any fact necessary to make the statements contained therein not misleading.

(f) <u>Use of Proceeds</u>. Seller will not use the Initial Purchase Amount or any Additional Purchase Amount (i) for a purpose which violates, or would be inconsistent with, Regulation T, U or X promulgated by the Board of Governors of the Federal Reserve System from time to time or (ii) to acquire any security in any transaction which is subject to Section 13 or 14 of the Securities Exchange Act of 1934, as amended.

(g) <u>Good Title; Perfection</u>.

   i.    Immediately prior to the sale of the Initial Contracts and the other Initial Purchased Assets to TCFEF pursuant to this Agreement, Seller was the legal and beneficial owner of the Initial Purchased Assets in each case free and clears of any Adverse Claim. This Agreement is effective to convey to TCFEF legal and equitable title to each Initial Contract and each other Initial Purchased Asset free

and clear of any Adverse Claim; provided, however, that if an Initial Contract is, or is determined to be, an installment sale or loan, Seller has a first priority, perfected security interest in the Equipment subject thereto and all financing statements or other similar instruments or documents necessary under the UCC (or any comparable law) to convey such title or to perfect such security interest have been duly filed and are in effect.

ii. Immediately prior to the sale of any Additional Contracts and any other Additional Purchased Assets to TCFEF pursuant to a Supplemental Conveyance, Seller was the legal and beneficial owner of such Additional Purchased Assets, in each case free and clear of any Adverse Claim. Each Supplemental Conveyance is effective to convey to TCFEF legal and equitable title to each related Additional Contract and each other related Additional Purchased Asset free and clear of any Adverse Claim; provided, however, that if an Additional Contract is, or is determined to be, an installment sale or loan, Seller has a first priority, perfected security interest in the Equipment subject thereto and all financing statements or other similar instruments or documents necessary under the UCC (or any comparable law) to convey such title or to perfect such security interest have been duly filed and are in effect.

(h) Jurisdiction of Organization; Principal Place of Business; Location(s) of Records; Identification Numbers. The jurisdiction of organization of Seller is correctly set forth on Exhibit F. The principal place of business and chief executive office of Seller and the offices where Seller keeps all its Records are located at the address(es) listed on Exhibit F or such other locations notified to TCFEF in accordance with Section 5.2(a) in jurisdictions where all action required by Section 5.2(a) has been taken and completed. Seller's Federal Employer Identification Number and organizational identification number are correctly set forth on Exhibit F.

(i) Names. The exact legal name of Seller is as set forth on the signature page of this Agreement. In the past five years, Seller has not used any legal name, trade name or assumed name other than the name in which it has executed this Agreement, Axis Title, LLC and Amur Incorporated.

(j) Actions; Suits. There are no actions, suits, proceedings or investigations pending, or, to the best of Seller's knowledge after due inquiry, threatened, against or affecting Seller or any of its properties before any court, regulatory body, administrative agency, arbitrator or other tribunal or governmental authority that could reasonably be expected to have a Material Adverse Effect.

(k) Not a Holding Company or an Investment Company. Seller is not a "holding company" or a "subsidiary holding company" of a "holding company" within the meaning of the Public Utility Holding Company Act of 1935, as amended, or any successor statute. Seller is not an "investment company" within the meaning of the Investment Company Act of 1940, as amended, or any successor statute.

- 11 -

(l) <u>Compliance with Law</u>.  Seller has complied in all respects with all applicable laws, rules, regulations, orders, writs, judgments, injunctions, decrees or awards to which it may be subject.  Each Purchased Contract complies in all respects with all laws, rules and regulations applicable thereto (including, without limitation, laws, rules and regulations relating to truth in lending, fair credit billing, fair credit reporting, equal credit opportunity, fair debt collection practices, usury and privacy).

(m) <u>No Preference</u>.  Seller has received reasonably equivalent value from TCFEF in consideration for each Purchased Contract sold to TCFEF pursuant to this Agreement, and no such sale was made for or on account of an antecedent debt or is otherwise avoidable.

(n) <u>Enforceability of Purchased Contracts and Supporting Documents</u>.  Each Purchased Contract is effective to create, and has created, a legal, valid and binding obligation of the related Obligor to pay all amounts due or to become due under such Purchased Contract, enforceable against such Obligor in accordance with its terms, and, to Seller's knowledge, subject to no offset, counterclaim or other defense, except that such enforcement may be limited by applicable bankruptcy, insolvency, reorganization or other similar laws relating to or limiting creditors' rights generally.  Each Supporting Document has created, a legal, valid and binding obligation of the guarantor or other Person named in such Supporting Document and is enforceable against such Person in accordance with its terms, and, to Seller's knowledge, subject to no offset, counterclaim or other defense, except that such enforcement may be limited by applicable bankruptcy, insolvency, reorganization or other similar laws relating to or limiting creditors' rights generally.

(o) <u>Eligible Contracts</u>.  Each Initial Contract was an Eligible Contract on the Closing Date.  Each Additional Contract was an Eligible Contract on the related Addition Date.

(p) <u>Origination and Assignments</u>.  Except for Purchased Contracts assigned to Seller by KMH Systems, Inc., Alliance Capital Resources, Inc. or other third parties agreed to in writing by Seller and TCFEF from time to time, each Purchased Contract was originated in Seller's name and Seller is currently invoicing and otherwise servicing such Purchased Contracts in its name.

(q) <u>No Sharing</u>.  Any and all fees, commissions, or other amounts owed to any Broker, Vendor or other Person with respect to the Purchased Assets have been paid and no Broker, Vendor or any Person has any residual interest in or contractual right to participate in the proceeds of any Purchased Assets.

(r) <u>No Cross-Collateral</u>.  Seller has assigned to TCFEF all of its right, title and interest in the Equipment leased or financed under the Purchased Contracts and the Additional Collateral for the Purchased Contracts and neither Seller nor any Person claiming by or through Seller (including any other assignee of Seller) has any rights or interest in such Equipment or Additional Collateral pursuant to any other agreement or any

- 12 -

cross-collateral provision contained in the Purchased Contracts.

(s) <u>Taxes.</u> Seller has timely paid all taxes that are due and owing in respect of the Purchased Assets, and has filed all necessary tax returns with respect thereto.

(t) <u>Schedule 1</u>. All information set forth on <u>Schedule 1</u> is true and accurate and, without limiting the generality of the foregoing, the payments set forth on <u>Schedule 1</u> for each Initial Contract is a true and accurate description of the periodic payments due and owing under the applicable Initial Contract on and after the Initial Cut-Off Date, the due date shown on <u>Schedule 1</u> with respect to each periodic payment is the actual due date for such payment under the applicable Initial Contract, and the equipment listed on <u>Schedule 1</u> for each Initial Contract is a true and accurate description of the Equipment financed under such Initial Contract.

(u) <u>Location(s) of Records</u>. The offices where Seller keeps all its Records are located at the address(es) listed on <u>Exhibit F</u> or such other locations notified to TCFEF in accordance with <u>Section 5.2(a)</u> in jurisdictions where all action required by <u>Section 5.2(a)</u> has been taken and completed.

(v) Any representation or warranty set forth in this <u>Section 3.1</u> made by Seller as of any Addition Date shall, to the extent such representation or warranty is made with respect to the Purchased Contracts, be deemed to be made only with respect to the related Additional Contracts.

Section 3.2.     <u>Repurchase of Certain Contracts.</u>

(a) If (i) any representation or warranty set forth in <u>Section 3.1</u> was not true and correct as of the date on which such representation or warranty was made and such breach could reasonably be expected to have a material adverse effect on the interest of TCFEF in or the collectibility of a Purchased Contract, or (ii) Seller fails to perform its obligations under <u>Sections 2.7</u>, <u>2.9</u> or <u>2.11</u>, Seller shall, within twenty (20) Business Days following the date on which Seller discovers or receives notice of such breach or failure to perform, repurchase such Purchased Contract from TCFEF and pay to TCFEF in immediately available funds an amount equal to the Contract Balance of such Purchased Contract as of such repurchase date; <u>provided</u>, <u>however</u>, that no such payment shall be required if such breach is cured to the satisfaction of TCFEF within such twenty (20) Business Days.

(b) TCFEF shall sell to Seller without recourse, representation or warranty, and Seller shall repurchase from TCFEF, all right, title and interest of TCFEF in, to and under any Purchased Contract repurchased in accordance with this <u>Section 3.2</u> and all related Purchased Assets.  Following receipt of the Contract Balance for a repurchased Contract, TCFEF shall execute and deliver to Seller a reconveyance document substantially in the form of Exhibit G, shall return to Seller the security deposit relating to such repurchased contract (if any) Seller previously delivered to TCFEF, and shall take such other actions as may be reasonably requested by Seller to effect the sale of such Purchased Contract and such other Purchased Assets.

- 13 -

Section 3.3.    Representations and Warranties of TCFEF.  TCFEF hereby represents and warrants to Seller, as of the Closing Date and as of each Addition Date, that:

(a) Existence and Power.  TCFEF (i) is a national bank duly organized, validly existing and in good standing under the laws of the United States, (ii) has full power and all licenses necessary to own its properties and to carry on its business as now being conducted and (iii) has full power and authority to enter into this Agreement and to carry out the terms and conditions contained herein.

(b) Financial Capacity.  TCFEF is solvent and has, or will have at closing, unencumbered cash sufficient to fully satisfy its obligations to timely pay the Initial Purchase Amount and any Additional Purchase Amount to Seller and after payment of the Initial Purchase Amount and any Additional Purchase Amount, TCFEF will remain solvent.

(c) No Conflict.  The execution, purchase and acceptance by TCFEF of Purchased Contracts and Purchased Assets under this Agreement and each other Transaction Document (i) do not contravene or violate  its charter or by-laws, (ii) any law, rule or regulation applicable to it, (iii) any restrictions under any agreement, contract or instrument to which it is a party or by which it or any of its property is bound, or (iv) any order, writ, judgment, award, injunction or decree binding on or affecting it or its property.

(d) Governmental Authorization.  No authorization or approval or other action by, and no notice to or filing with, any governmental authority or regulatory body is required for the due execution, delivery and performance by TCFEF of this Agreement or any other Transaction Document.

(e) Binding Effect.  This Agreement and each other Transaction Document constitute the legal, valid and binding obligations of TCFEF enforceable against TCFEF in accordance with their respective terms.

(f) Actions; Suits.  There are no actions, suits, proceedings or investigations pending, or, to the best of TCFEF's knowledge after due inquiry, threatened, against or affecting TCFEF or any of its properties before any court, regulatory body, administrative agency, arbitrator or other tribunal or governmental authority that could reasonably be expected to negatively affect TCFEF or its financial condition so as to prevent or impede TCFEF from carrying out its obligations under this Agreement.


**ARTICLE IV**
CONDITIONS PRECEDENT

Section 4.1    Conditions Precedent to Initial Purchase.  On or before the Closing Date, Seller shall deliver to TCFEF the documents listed on Schedule 2.

- 14 -

Section 4.2    Conditions Precedent to Additional Purchase. Each sale of Additional Purchased Assets pursuant to a Supplemental Conveyance shall be subject to the further conditions precedent that Seller shall have delivered to TCFEF, on or before the related Addition Date, in form and substance satisfactory to TCFEF, all documents and agreements described in the applicable Supplemental Conveyance.

## ARTICLE V
## COVENANTS

Section 5.1    Affirmative Covenants of Seller. Until the date on which all amounts owed (whether due or to become due) to TCFEF under this Agreement or any other Transaction Document have been indefeasibly paid in full:

(a) Notices. During the 90-day period following the Closing Date and each Addition Date, Seller shall notify TCFEF in writing of any of the following within five (5) days after it has knowledge of the occurrence thereof, describing the same and, if applicable, the steps being taken with respect thereto: (i) Seller becomes subject to an Insolvency Proceeding; (ii) the entry against Seller of any judgment or decree for an amount in excess of $1,000,000.00 or the institution against Seller of any lawsuit or other proceeding which has, or could reasonably be expected to have, a Material Adverse Effect; or (iii) the occurrence of any other event or condition with respect to Seller which has, or could reasonably be expected to have, a Material Adverse Effect.

(b) Compliance with Laws. Seller shall comply in all respects with all applicable laws, rules, regulations, orders, writs, judgments, injunctions, decrees or awards to which it may be subject.

(c) Keeping and Marking of Books and Records. Seller shall maintain its historical Records reasonably relating to the Purchased Contracts, including all Records relating to Collections on the Purchased Contracts prior to the Initial Cut-Off Date or the Additional Cut-Off Date, as applicable, and Records relating to prior payment of taxes with respect to the Purchased Assets, shall mark such Records as belonging to TCFEF and shall deliver the originals or copies of any such Records to TCFEF as TCFEF may, from time to time, reasonably request, except to the extent that Seller has delivered such Records to TCFEF and did not retain copies thereof.

(d) Compliance with Purchased Contracts. Seller shall timely and fully perform and comply with all provisions and covenants required to be observed by it under the Purchased Contracts and under any agreements or contracts with any Broker or Vendor relating to the Purchased Contracts.

(e) Collection and Payment of Taxes. Seller shall be responsible for, bill for and collect all sales taxes, use taxes, stamp taxes, personal property taxes and other similar federal, state or local taxes or assessments to become due or are assessed prior to the Closing Date in the case of the Initial Purchased Assets or the Addition Date in the case of the Additional Purchased Assets with respect to the Purchased Assets,

- 15 -

including the Equipment and any Payments under the Purchased Contracts, in a timely manner and shall pay all such taxes or assessments to the applicable taxing authority when due. Seller shall pay all Taxes, interest, penalties, fees or other charges assessed as a result of its failure to comply with this section.

(f) <u>Vicarious Liability Claims</u>. Seller shall promptly upon receipt deliver to TCFEF all notices or other written communications relating to any claim, demand, suit, and action whatsoever arising out of or are attributable to the lease, ownership, use, possession or operation of the Equipment , including but not limited to claims and demands based on strict, absolute or vicarious liability (a "Claim"). Unless otherwise agreed to by Seller in writing, TCFEF shall at TCFEF's sole cost and expense enforce the Obligor's indemnification provision in the Contract with respect to a Claim and take such steps as are necessary or desirable in order to tender the defense of a Claim to the Obligor's liability insurance carrier. TCFEF shall cause TCFEF to be named on the Certificates of Title applicable to the Equipment that is the subject of a Claim.

Section 5.2    <u>Negative Covenants of Seller</u>. Until the date on which all amounts owed (whether due or to become due) to TCFEF under this Agreement or any other Transaction Document have been indefeasibly paid in full:

(a) <u>Change in Jurisdiction of Organization, Name, Principal Place of Business or Location of Records</u>. Seller shall not change its jurisdiction of organization, name, identity or organizational structure or relocate its principal place of business or chief executive office, and shall not change any office where Records are kept, unless, in each case, it shall have (i) given TCFEF at least thirty (30) days prior written notice thereof and (ii) delivered to TCFEF all financing statements, instruments and other documents reasonably requested by TCFEF in connection with such change or relocation.

(b) <u>Modifications to Purchased Contracts</u>. Seller shall not extend, amend, waive or otherwise modify the terms of any Purchased Contract without the prior written consent of TCFEF, which consent shall not be unreasonably withheld or delayed.

(c) <u>Sales; Adverse Claims.</u> Seller shall not sell, assign, transfer or convey (by operation of law or otherwise), or create or suffer to exist any Adverse Claim upon or with respect to (including, without limitation, through the filing of any financing statement), any Purchased Asset.

**ARTICLE VI**
ADMINISTRATION AND COLLECTION

Section 6.1    <u>Appointment of Servicer</u>

(a) The servicing, administration and collection of the Purchased Contracts shall be conducted by Seller or such other Person as may be designated by TCFEF in accordance with this <u>Section 6.1</u> (the "<u>Servicer</u>"). Seller hereby agrees to perform the duties and responsibilities of the Servicer pursuant to the terms of this Agreement. If

- 16 -

a Servicer Default has occurred and is continuing, TCFEF may terminate Seller as Servicer and designate itself or any other Person as successor Servicer in accordance with <u>Section 6.7</u>.

(b) Except for Seller's use of third party contractors to perform services related to inspection, repossession, repair or storage of collateral, or collection of amounts due under a Purchased Contract, Seller may not delegate any of its duties or responsibilities as Servicer to any Person without the prior written consent of TCFEF. If Seller shall delegate any of such duties or responsibilities in accordance with this <u>Section 6.1(b)</u>, (i) Seller shall be and remain primarily liable to TCFEF for the full and prompt performance of all duties and responsibilities of the Servicer hereunder, (ii) TCFEF shall be entitled to deal exclusively with Seller in matters relating to the discharge by the Servicer of its duties and responsibilities hereunder, and (iii) Servicer and/or Seller shall be responsible for all costs and expenses related to or incurred in connection with, the use of third party contractors, subject to Servicers right to receive reimbursement thereof with respect to a Defaulted Contract as described in Section 6.5. TCFEF need not give notice, demand or other communication to any Person other than Seller in order for communication to the Servicer or to any sub-servicer or other delegate of the Servicer to be accomplished. Seller, at all times that it is the Servicer, shall be responsible for providing any sub-servicer or other delegate of the Servicer with any notice given to the Servicer under this Agreement.

Section 6.2    <u>Duties of Servicer</u>

(a) The Servicer shall take or cause to be taken, all in accordance with applicable laws, rules and regulations, with reasonable care and diligence and in accordance with its usual and customary servicing policies and procedures, all such actions as may be necessary or advisable to collect each Purchased Contract, including, without limitation, the commencement of any legal action with respect to any Delinquent Contract or any Defaulted Contract and foreclosure upon or repossession of any related Equipment or other collateral, provided, however, that Servicer shall not retain outside legal counsel with respect to any Delinquent Contract or Defaulted Contract without the prior written consent of TCFEF.

(b) The Servicer shall send invoices to each Obligor under any Purchased Contract at least 20 days prior to the date on which such invoice is due; provided, however, so long as Servicer does not in the normal course of business send invoices to customers making payments by ACH, Servicer shall not be required to send invoices to an Obligor that makes payments by ACH. The Servicer shall instruct all Obligors under the Purchased Contracts to pay all Collections directly to Servicer. All such amounts constituting Collections received by Servicer shall be held in trust by Servicer for the benefit of TCFEF.

(c) On each Remittance Date, the Servicer shall make all Collections received during the prior calendar week available to TCFEF by wire transfer of such Collections to a bank account designated by TCFEF.

- 17 -

(d) The Servicer shall not extend the maturity of any amount due or to become due under a Purchased Contract without the prior written consent of TCFEF. If a Servicer Default has occurred and is continuing, the Servicer shall, at the direction of TCFEF, commence or settle any legal action with respect to any Delinquent Contract or Defaulted Contract and foreclose upon or repossess any related Equipment or other collateral.

(e) The Servicer shall hold in trust for TCFEF all Records that evidence or relate to the Purchased Assets or that are otherwise necessary or desirable to collect the Purchased Contracts and shall, if a Servicer Default has occurred and is continuing, deliver to TCFEF or to such other Person as may be designated by TCFEF all such Records, in each case at a location designated by TCFEF.

(f) Without limiting the generality of Section 6.2(a), the Servicer shall monitor each Obligor's compliance with insurance obligations under the applicable Purchased Contract and shall take reasonable steps to receive and maintain current insurance certificates with either Seller and its assigns or TCFEF properly listed as loss payee and additional insured with respect to the applicable Equipment. With respect to all Purchased Contracts pursuant to which Seller has obtained automatic insurance, the Servicer shall maintain such insurance in full force and effect, notify the provider of the automatic insurance that TCFEF shall be the loss payee and additional insured on all Purchase Contracts subject to the automatic insurance, and shall bill and collect from the Obligor and pay to the provider of the automatic insurance the amount necessary to cover all premiums on any such automatic insurance.

(g) Without limiting the generality of Section 6.2(a) and Section 6.2(b), the Servicer shall with respect to each Purchased Contract (i) bill for and collect all (A) sales and use taxes ("Sales and Use Taxes"), (D) personal property taxes and other similar taxes with respect to any Equipment ("Personal Property Taxes"), and (D) other sums payable under each Purchased Contract, and (ii) upon Servicer's receipt of Sales and Use Taxes and Personal Property Taxes (collectively the "Taxes"), prepare all required tax returns for, and remit to the appropriate agencies, all such Taxes required to be reported and paid by Seller under the applicable Purchased Contract.

Section 6.3     Responsibilities of Seller

The exercise by TCFEF of its rights hereunder shall not release Seller from any of its duties or responsibilities with respect to the Purchased Contracts. TCFEF shall have no obligation or liability with respect to the Purchased Contracts and shall not be obligated to perform the obligations of Seller with respect to the Purchased Contracts.

Section 6.4     Reports

On each Reporting Date, the Servicer shall prepare and deliver to TCFEF the reports described on Exhibit H. These reports shall include a calculation of the amount to be remitted to TCFEF

- 18 -

on the next Remittance Date including, without limitation, the amount of the Scheduled Payments, the amount to be paid in connection with any repurchase of Purchased Contracts with a reference to the provision under which the repurchase occurs, and the amount to be paid in connection with any prepayment. In addition to the reports delivered on the Reporting Date, on the 5th day of each month, the Servicer shall prepare and deliver to TCFEF, in an electronic form acceptable to TCFEF, a delinquency report for each Purchased Contract showing its delinquency status as of the month-end date of the immediately preceding month as more fully described on Exhibit H. Each report shall be delivered in either an electronic or disc format acceptable to TCFEF as more fully set forth on Exhibit H for the applicable report. Reports delivered in an electronic format shall refer to the relevant Purchased Contracts by contract number and shall not include the Obligor's name.

Section 6.5    Servicing Fee

The Servicer shall receive no compensation from TCFEF for its services hereunder and Servicer's costs and expenses of carrying out its duties hereunder are for its own account. If, at TCFEF's option following a Contract Default, Servicer continues to service the Defaulted Contract, Servicer shall obtain TCFEF's written approval prior to incurring any out-of-pocket expense with respect to such Defaulted Contract and TCFEF shall, within twenty Business Days following receipt of an itemized invoice, reimburse Servicer for all previously approved out-of-pocket expenses actually incurred by Servicer.

Section 6.6    Servicer Defaults

The occurrence of any one or more of the following events shall constitute a Servicer Default:

(a)    The Servicer shall fail to make any payment, transfer or deposit on or before the date occurring three Business Days after the date such payment, transfer or deposit is required to be made by the Servicer under this Agreement.

(b)    The Servicer shall fail duly to observe or perform any other covenant or agreement of the Servicer set forth in this Agreement or in any other Transaction Document and such failure shall continue unremedied for 30 days after the earlier of the date on which the Servicer receives notice of such failure and the date on which the Servicer becomes aware of such failure.

(c)    Any representation, warranty or certification made by the Servicer in this Agreement or in any other Transaction Document shall prove to have been incorrect in any material respect when made or deemed made and such representation, warranty or certification shall continue to be incorrect in any material respect for 30 days after the earlier of the date on which the Servicer receives notice of such incorrectness and the date on which the Servicer becomes aware of such incorrectness.

(d)    The Servicer shall become subject to an Insolvency Proceeding.

- 19 -

(e)    The Servicer shall become subject to a certified class action proceeding alleging that Servicer engaged in illegal conduct in connection with the origination or servicing of Contracts.

(f)    The average of the Delinquency Percentages for any three consecutive months shall exceed 5%.

Section 6.7    Remedies (Servicer Defaults)

If a Servicer Default has occurred and is continuing, TCFEF may take any one or more of the following actions: (i) replace the Person then acting as Servicer, or (ii) deliver the Notices of Assignment to the Obligors under the Purchased Contracts or otherwise notify such Obligors of TCFEF's interest in the Purchased Contracts and direct such Obligors to remit all Collections to an address and account designated by TCFEF. If a successor servicer shall be appointed with respect to the Purchased Contracts, the outgoing servicer shall remit to such successor servicer any related security deposits. To the extent permitted by applicable law, Seller hereby grants to TCFEF an irrevocable power of attorney to take all such actions in the name and on behalf of Seller as may be necessary or advisable, in the reasonable determination of TCFEF, to collect all Purchased Contracts, including, without limitation, endorsing Seller's name on checks and other instruments representing Collections. The aforementioned rights and remedies shall be in addition to all other rights and remedies of TCFEF available under this Agreement, by operation of law, at equity or otherwise, all of which are hereby expressly preserved, including, without limitation, all rights and remedies provided under the UCC, all of which rights shall be cumulative. If any authorized signatory of the Servicer or Seller whose signature appears on any Notice of Assignment shall cease to have such authority before the delivery of such notice, such notice shall nevertheless be valid as if such authority had remained in force.

Section 6.8    Contract Defaults

The occurrence of any one or more of the following events shall constitute a Contract Default with respect to a Purchased Contract:

(a)    The Obligor under such Purchased Contract shall fail to make one or more Scheduled Payments under such Purchased Contract for 90 or more days past the due date under such Contract (or such Purchased Contract shall otherwise become a Defaulted Contract).

(b)    The Obligor under such Purchased Contract shall become subject to an Insolvency Proceeding.

(c)    A material event of default other than as described in "a" or "b" above shall have occurred and be continuing under such Purchased Contract for a period of 30 days.

Section 6.9    Remedies (Contract Defaults)

If a Contract Default has occurred and is continuing with respect to a Purchased Contract, TCFEF may, in its absolute and sole discretion, notify Seller and the Servicer that it proposes to

- 20 -

terminate the Servicer as servicer with respect to such Purchased Contract as of a date specified in such notice (such date to be at least 10 days after the Servicer's receipt of such notice). On such termination date, TCFEF may terminate the Servicer as servicer with respect to such Purchased Contract and take such actions as it may deem appropriate to service such Purchased Contract including, without limitation, sending the Notice of Assignment to the related Obligor(s) or otherwise notifying such Obligor(s) of TCFEF's interest in the Purchased Contracts and directing such Obligor(s) to remit all Collections on such Purchased Contract to an address and account designated by TCFEF. The Servicer shall remit to TCFEF any related security deposits on such Purchased Contract. To the extent permitted by applicable law, Seller hereby grants to TCFEF an irrevocable power of attorney to take all such actions in the name and on behalf of Seller as may be necessary or advisable, in the reasonable determination of TCFEF, to collect such Purchased Contract, including, without limitation, endorsing Seller's name on checks and other instruments representing Collections with respect to such Purchased Contract; provided, however, that TCFEF shall not, without the prior written consent of Seller, communicate with the related Obligor or otherwise service such Purchased Contract in Seller's name. The aforementioned rights and remedies shall be in addition to all other rights and remedies of TCFEF available under this Agreement, by operation of law, at equity or otherwise, all of which are hereby expressly preserved, including, without limitation, all rights and remedies provided under the UCC, all of which rights shall be cumulative.

## ARTICLE VII
## ARTICLE IIINDEMNIFICATION AND MAKE-WHOLE

Section 7.1     Indemnities.

(a) Without limiting any other rights which TCFEF may have hereunder or under applicable law, Seller shall indemnify TCFEF and its officers, directors, agents and employees (each, an "Indemnified Party") from and against any and all damages, losses, claims, taxes, liabilities, costs, expenses and other amounts payable, including reasonable attorneys' fees and disbursements (all of the foregoing being collectively referred to as "Indemnified Amounts") awarded against or incurred by any Indemnified Party arising out of or as a result of (i) any breach by Seller of any representation or warranty made or deemed made by Seller (or any of its officers or employees) in this Agreement or any other Transaction Document, (ii) any breach by Seller of any covenant made or deemed made by Seller in this Agreement or any other Transaction Document, or (iii) any action, proceeding or claim (actual or threatened) related to this Agreement or any other Transaction Document or to any Purchased Asset arising from the negligence or willful misconduct of Seller, including, without limitation, any judgment, award, settlement, reasonable attorneys' fees and other costs or expenses incurred in connection with any such action, proceeding or claim. The foregoing notwithstanding, Seller shall have no indemnification obligation under this Section 7.1(a) for Indemnified Amounts to the extent that a final judgment of a court of competent jurisdiction holds that such Indemnified Amounts resulted from gross negligence or willful misconduct on the

- 21 -

part of the Indemnified Party seeking indemnification. Except with respect to any claim arising out of the willful misconduct or gross negligence of Seller (or any of its officers or employees), no claim may be made by any Indemnified Party against Seller or its officers, directors, agents or employees for any special, indirect, consequential or punitive damages in respect of any claim for breach of contract or any other theory of liability arising out of or related to the transactions contemplated by this Agreement.

(b) Without limiting any other rights which Seller may have hereunder or under applicable law, TCFEF shall indemnify Seller and its officers, directors, agents and employees (each, an "Indemnified Party") from and against any and all damages, losses, claims, taxes, liabilities, costs, expenses and other amounts payable, including reasonable attorneys' fees and disbursements (all of the foregoing being collectively referred to as "Indemnified Amounts") awarded against or incurred by any Indemnified Party arising out of or as a result of (i) any breach by TCFEF of any representation or warranty made by TCFEF (or any of its officers or employees) in this Agreement or any other Transaction Document, (ii) any breach by TCFEF of any covenant made by TCFEF in this Agreement or any other Transaction Document, or (iii) any action, proceeding or claim (actual or threatened) related to this Agreement or any other Transaction Document or to any Purchased Asset arising from the negligence or willful misconduct of TCFEF, including, without limitation, any judgment, award, settlement, reasonable attorneys' fees and other costs or expenses incurred in connection with any such action, proceeding or claim. The foregoing notwithstanding, TCFEF shall have no indemnification obligation under this Section 7.1(b) for Indemnified Amounts to the extent that a final judgment of a court of competent jurisdiction holds that such Indemnified Amounts resulted from gross negligence or willful misconduct on the part of the Indemnified Party seeking indemnification. Except with respect to any claim arising out of the willful misconduct of TCFEF (or any of its officers or employees), no claim may be made by any Indemnified Party against TCFEF or its officers, directors, agents or employees for any special, indirect, consequential or punitive damages in respect of any claim for breach of contract or any other theory of liability arising out of or related to the transactions contemplated by this Agreement.

Section 7.2   Intentionally Omitted.

Section 7.3   Make-Whole. In consideration of TCFEF agreeing to purchase the Purchased Contracts and paying the Initial Purchase Amount and the Additional Purchase Amount, as applicable, to Seller and in order to induce TCFEF to do so, Seller further agrees that, upon the occurrence of an event which results in a prepayment of a Purchased Contract, and provided that the amount the Obligor is required to pay pursuant to the terms of the Purchased Contract is less than the Contract Balance, Seller shall, after written demand therefor from TCFEF, pay to TCFEF an amount equal to the difference between the Contract Balance and the amount the Obligor is required to pay pursuant to the terms of the Purchase Contract.

**ARTICLE VIII**
MISCELLANEOUS

- 22 -

Section 8.1   Waivers and Amendments.  No failure or delay on the part of either party in exercising any power, right or remedy under this Agreement shall operate as a waiver thereof, nor shall any single or partial exercise of any such power, right or remedy preclude any other further exercise thereof or the exercise of any other power, right or remedy. The rights and remedies herein provided shall be cumulative and nonexclusive of any rights or remedies provided by law.  Any waiver of this Agreement shall be effective only in the specific instance and for the specific purpose for which given.  No provision of this Agreement may be amended, supplemented, modified or waived except in writing signed by Seller and TCFEF.

Section 8.2   Notices.  All communications and notices provided for hereunder shall be in writing (including bank wire, telecopy or electronic facsimile transmission or similar writing) and shall be given to the other parties hereto at their respective addresses or telecopy numbers set forth on the signature pages hereof or at such other address or telecopy number as such Person may hereafter specify in writing for the purpose of notice to each of the other parties hereto. Each such notice or other communication shall be effective and deemed received (i) if given by telecopy, upon the receipt thereof, (ii) if given by mail, three (3) Business Days after the time such communication is deposited in the mail with first class postage prepaid or (iii) if given by any other means, when received at the address specified in this Section 8.2.

Section 8.3   Protection of TCFEF's Interests.

(a)      Seller shall, from time to time at its expense, promptly take all necessary action to vest legal and equitable title to the Purchased Assets irrevocably in TCFEF, free and clear of any Adverse Claims, (including, without limitation, the filing of all financing statements or other similar instruments or documents necessary under the UCC (or any comparable law) to perfect TCFEF's interest in the Purchased Assets) and shall take such other action to perfect, protect or more fully evidence TCFEF's interest in the Purchased Assets or to enable TCFEF to exercise and enforce its rights and remedies under this Agreement and the other Transaction Documents as TCFEF may reasonably request.  Seller shall defend the interest of TCFEF in, to and under the Purchased Assets against all claims of third parties claiming through or under Seller or any of its Affiliates.  If Seller fails to perform any of its obligations hereunder, TCFEF may (but shall not be required to) perform, or cause the performance of, such obligation, and TCFEF's costs and expenses incurred in connection therewith shall be payable by Seller as provided in Section 7.1  Without limiting the foregoing, if Seller fails to perform any of its obligations hereunder with respect to the filing of financing statements, Seller irrevocably authorizes TCFEF, in the sole discretion of TCFEF, and appoints TCFEF as its attorney-in-fact, to act on its behalf (i) to file financing statements necessary in TCFEF's sole discretion to perfect and to maintain the perfection and priority of the interest of TCFEF in the Purchased Contracts and (ii) to file a carbon, photographic or other reproduction of this Agreement or any financing statement with respect to the Purchased Contracts as a financing statement in such offices as TCFEF in its sole discretion deems necessary to perfect and to maintain the perfection and priority of the interest of TCFEF in the Purchased Contracts.  This appointment is coupled with an interest and is irrevocable.

Section 8.4   Confidentiality.  Seller shall not disclose to any Person any confidential information with respect to TCFEF or the business of TCFEF or with respect to the Purchased

- 23 -

Assets, except that Seller may disclose such information (i) to its officers, directors, employees and agents, including accountants, legal counsel, financing sources and other advisors and employees of Seller (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such information and instructed to keep such information confidential) and (ii) as required by any law, rule or regulation or by any subpoena or similar legal process.

Section 8.5    Limitation of Liability.  Except with respect to any claim arising out of the willful misconduct or gross negligence of TCFEF, no claim may be made by Seller against TCFEF or its Affiliates, directors, officers, employees, attorneys or agents for any special, indirect, consequential or punitive damages in respect of any claim for breach of contract or any other theory of liability arising out of or related to the transactions contemplated by this Agreement.

Section 8.6    CHOICE OF LAW.  THIS AGREEMENT SHALL BE CONSTRUED IN ACCORDANCE WITH THE INTERNAL LAWS (AND NOT THE LAW OF CONFLICTS) OF THE STATE OF NEW YORK.

Section 8.7    CONSENT TO VENUE AND JURISDICTION.  EACH PARTY HERETO AGREES THAT ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY DOCUMENT EXECUTED BY ANY PARTY PURSUANT TO THIS AGREEMENT SHALL BE VENUED IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MINNESOTA OR MINNESOTA STATE COURTS SITTING IN HENNEPIN COUNTY, MINNESOTA.  EACH PARTY HERETO HEREBY IRREVOCABLY CONSENTS TO THE JURISDICTION OF THE COURTS SET FORTH IN THIS SECTION AND AGREES THAT ALL CLAIMS IN RESPECT OF SUCH ACTION OR PROCEEDING MAY BE HEARD AND DETERMINED IN SUCH COURTS AND IRREVOCABLY WAIVES ANY OBJECTION IT MAY NOW OR HEREAFTER HAVE AS TO THE VENUE OF ANY SUCH SUIT, ACTION OR PROCEEDING BROUGHT IN SUCH A COURT OR THAT SUCH COURT IS AN INCONVENIENT FORUM.

Section 8.8    WAIVER OF JURY TRIAL.  EACH PARTY HERETO HEREBY WAIVES TRIAL BY JURY IN ANY JUDICIAL PROCEEDING INVOLVING, DIRECTLY OR INDIRECTLY, ANY MATTER (WHETHER SOUNDING IN TORT, CONTRACT OR OTHERWISE) IN ANY WAY ARISING OUT OF, RELATED TO, OR CONNECTED WITH THIS AGREEMENT, ANY DOCUMENT EXECUTED BY SUCH PARTY PURSUANT TO THIS AGREEMENT OR THE RELATIONSHIP ESTABLISHED HEREUNDER OR THEREUNDER.

Section 8.9    Survival of Terms.  All representations and warranties made by Seller in this Agreement or any other Transaction Document shall survive the execution and delivery of this Agreement or such other Transaction Document regardless of any investigation made by TCFEF or such other party and notwithstanding that TCFEF or such other party may have had notice or knowledge that any such representation or warranty was incorrect.  All rights and obligations of the parties under this Agreement with respect to any Purchased Assets, including

- 24 -

without limitations the provisions of Article VIII, shall survive any termination of this Agreement.

Section 8.10    Counterparts; Severability; Section References.  This Agreement may be executed in any number of counterparts and by different parties hereto on separate counterparts, each of which when so executed shall be deemed to be an original and all of which when taken together shall constitute one and the same agreement.  Any provision of this Agreement which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.  Unless otherwise specified, references herein to "Article," "Section," "Exhibit," "Schedule," and "Annex" shall mean a reference to articles and sections of, and exhibits, schedules and annexes to, this Agreement.

Section 8.11    Assignment.  Except as specifically provided herein, neither party shall assign its rights or delegate its duties under this Agreement without the prior written consent of the other party; provided, however, that TCFEF may without the prior written consent of Seller, assign its rights or delegate its duties under this Agreement or assign its interest in Purchase Contracts to an affiliate or to an entity that purchases all or substantially all of TCFEF's assets.

Section 8.12    Repurchase of Valley Packaging Corp.  With respect to the Purchased Contract between Valley Packaging Corp. and Seller (the "Valley Packaging Contract"), at the expiration of the initial term of the Valley Packaging Contract, Seller agrees to purchase from TCFEF and TCFEF agrees to sell to Seller, the Valley Packaging Contract for a purchase price of $26,929.80.

[Signatures appear on the following page.]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed and delivered by their respective duly authorized officers as of the date hereof.

SELLER:  AXIS CAPITAL, INC.

By: _____

| | |
|---|---|
| Name: | Shauna Heckathorn |
| Title: | CFO |
| | |
| Address: | 308 North Locust Street |
| | Grand Island, NE  68801 |
| Attention: | Legal Department |
| Telephone: | (308) 398-4140 |
| Facsimile: | (308) 398-4141 |

PURCHASER:  TCF EQUIPMENT FINANCE, A DIVISION OF TCF NATIONAL BANK

By: _____

| | |
|---|---|
| Name: | Gary Peterson |
| Title: | President - Equipment Finance Division |
| | |
| Address: | 11100 Wayzata Blvd., Suite 801 |
| | Minnetonka, MN 55305 |
| Attention: | Executive Vice President & |
| | Chief Legal Officer |
| Telephone: | (952) 656-7574 |
| Facsimile: | (952) 229-6358 |

- 26 -

Contract Schedule (Include description of Equipment Schedule, Additional Collateral and Supporting Documents (if any), description of any amendments or modifications to standard approved lease forms, Equipment and periodicity, amount, number and due dates of payments, amount of any security deposits or advance payments)

{Attach}

- 27 -

# Schedule 1

| Lease # | Equipment | Term Orig | Rem Inv'd | Next Due | Day | Current | 1-30 | 31-60 | 61-90 | 91-120 | Over 120 | Total | Lessee Name |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 930025 | 2016 FREIGHTL | 58 | 50 | 4/15/2016 | 15 | 233,829.90 | | | | | | 233,829.90 | NORTHEAST CONCRETE PUMPING CORPORATION |
| 930458 | (1) LARGE FOR | 60 | 54 | 4/15/2016 | 15 | 33,530.75 | | | | | | 33,530.75 | GENISIS INVESTMENTS, INCORPORATED d/b/a |
| 930858 | ALIGNMENT RAC | 48 | 42 | 4/1/2016 | 1 | 28,930.40 | | | | | | 28,930.40 | HUMBLE HOLDINGS, INC. d/b/a |
| 930896 | 2015 UNICARRI | 48 | 43 | 4/1/2016 | 1 | 132,000.00 | | | | | | 132,000.00 | VALLEY PACKAGING CORP. |
| 930942 | 2008 KENWORTH | 42 | 36 | 4/15/2015 | 15 | 109,189.96 | | | | | | 109,189.96 | ANDREWS SITE PREP INCORPORATED |
| 930962 | (1) SANKOSHA | 60 | 55 | 4/1/2016 | 1 | 82,727.68 | | | | | | 82,727.68 | TOMMY WAYNE WILSON d/b/a |
| 931012 | ELEVATOR MODE | 36 | 30 | 4/1/2016 | 1 | 61,118.98 | | | | | | 61,118.98 | LINCOLN SANDS HOTEL PARTNERS LLC d/b/a |
| 931051 | (11) KING HEA | 36 | 30 | 4/1/2016 | 1 | 232,472.41 | | | | | | 232,472.41 | TRINETRA HOTELS, LLC d/b/a |
| 931065 | USED CONTINUO | 48 | 42 | 4/1/2016 | 1 | 60,565.07 | | | | | | 60,565.07 | VIVA HOLDINGS, LLC |
| 931094 | SCISSORS LIFT | 63 | 58 | 4/15/2016 | 15 | 31,034.00 | | | | | | 31,034.00 | COMMONWEALTH DODGE, LLC |
| 931143 | SKID STEER | 60 | 54 | 4/15/2016 | 15 | 43,382.35 | | | | | | 43,382.35 | CAREY'S LAWNSCAPE, INC. |
| 931155 | PROPANE TANKS | 48 | 42 | 4/15/2016 | 15 | 78,889.95 | | | | | | 78,889.95 | DON ROSE OIL CO., INC. |
| 931160 | CONCENTRATORS | 24 | 18 | 4/15/2016 | 15 | 64,021.83 | | | | | | 64,021.83 | SOUTHEASTERN MEDICAL EQUIPMENT COMPANY |
| 931164 | STERLING COIL | 60 | 55 | 4/15/2016 | 15 | 16,581.60 | | | | | | 16,581.60 | A-QUICK BINDERY, LLC |
| 931199 | SOLVENT PURGE | 60 | 55 | 4/1/2016 | 1 | 89,144.16 | | | | | | 89,144.16 | A AFFORDABLE STRIPING & SEALING, LLC |
| 931204 | FLORA UV FLAT | 60 | 54 | 4/15/2016 | 15 | 118,664.70 | | | | | | 118,664.70 | CLEAR SIGN & DESIGN INC. |
| 931283 | HORIZON HT30 | 35 | 31 | 4/1/2016 | 1 | 30,080.00 | | | | | | 30,080.00 | COPY PLUS, LLC |
| 931299 | 2010 TAKEUCHI | 42 | 38 | 4/1/2016 | 1 | 18,790.59 | | | | | | 18,790.59 | CARMINE N PATRIZIO d/b/a |
| 931352 | HUNTER FRT-00 | 60 | 55 | 4/1/2016 | 1 | 17,357.76 | | | | | | 17,357.76 | CAL ENTERPRISES, INC. d/b/a |
| 931365 | 2007 DOON TRL | 48 | 43 | 4/15/2016 | 15 | 27,016.00 | | | | | | 27,016.00 | BRIAN MUNDAY TRUCKING, LLC |
| 931366 | 2007 DOONAN T | 48 | 43 | 4/15/2016 | 15 | 22,509.96 | | | | | | 22,509.96 | BRIAN MUNDAY TRUCKING, LLC |
| 931375 | 2016 HEIL | 37 | 33 | 4/15/2016 | 15 | 86,999.20 | | | | | | 86,999.20 | AMBER CHEMICAL, INC |
| 931419 | 2015 NH SKID | 48 | 44 | 4/15/2016 | 15 | 47,673.45 | | | | | | 47,673.45 | CODAY ENTERPRISES, INC. d/b/a |
| 931610 | 2016 FORD 113 | 57 | 9 | 11/10/2036 | 10 | 29,488.77 | | | | | | 29,488.77 | THURSTON COUNTY SHERIFFS DEPARTMENT |
| 931619 | 2016 FORD 145 | 57 | 10 | 5/10/2036 | 10 | 36,173.20 | | | | | | 36,173.20 | THURSTON COUNTY SHERIFFS DEPARTMENT |
| 931676 | TEST EQUIPMEN | 60 | 56 | 4/15/2016 | 15 | 62,985.00 | | | | | | 62,985.00 | CLARIPHY COMMUNICATIONS, INC. |
| 931677 | TEST EQUIPMEN | 60 | 56 | 4/15/2016 | 15 | 63,259.17 | | | | | | 63,259.17 | CLARIPHY COMMUNICATIONS, INC. |
| 929773-5 | (100) ZF R500 | 60 | 54 | 4/15/2016 | 15 | 44,041.25 | | | | | | 44,041.25 | SYNERGY SOFTWARE & CONSULTING, L.L.C. d/b/a |
| 930352-1 | (1) WALK-IN F | 49 | 44 | 4/15/2016 | 15 | 43,372.80 | | | | | | 43,372.80 | STERLING FOOD MART, INC. |

| Bill-To Name | Orig Term-Vendor | Residual | Start Date | FICO | Equip Cost | State | Equip Code | Equip Code Descr | NBV |
|---|---|---|---|---|---|---|---|---|---|
| NORTHEAST CONCRETE PUMPING CORPORATION | 58 ALLIANCE CONCRETE PUMPS | - | 7/21/15 | 739 | 223,995.75 | ME | 161 | TITLED - CABOVER TRUCKS W/O SLEEPER | 203,808.32 |
| GENESIS INVESTMENTS, INCORPORATED d/b/a | 50 ADVANCED GREIG LAMINATORS, INC | 7,135.00 | 9/11/15 | 806 | 35,675.00 | OR | 117 | INDUSTRIAL EQUIPMENT | 34,667.04 |
| HUMBLE HOLDINGS, INC. d/b/a | 48 ARMSTRONG SERVICES | | 11/25/15 | 715 | 26,824.54 | TX | 52 | SERVICE | 24,886.33 |
| VALLEY PACKAGING CORP. | 48 KMH SYSTEMS, INC. | 26,929.80 | 10/30/15 | Corp | 134,649.00 | TN | 112 | FORKLIFTS | 129,885.63 |
| ANDREWS SITE PREP INCORPORATED | 42 MNL TRUCK SALES, INC | | 11/12/15 | 689 | 98,399.10 | FL | 85 | TITLED - DUMP TRUCKS | 94,329.06 |
| TOMMY WAYNE WILSON d/b/a | 60 CONSOLIDATED LAUNDRY EQUIPMENT | - | 11/12/15 | 703 | 71,887.00 | NC | 117 | INDUSTRIAL EQUIPMENT | 70,681.17 |
| LINCOLN SANDS HOTEL PARTNERS LLC d/b/a | 36 OTIS ELEVATOR COMPANY | 1.00 | 11/17/15 | 777 | 59,048.00 | OR | 45 | HOTEL/MOTEL EQUIPMENT | 55,341.34 |
| TRINETRA HOTELS, LLC d/b/a | 36 ALLEGRETTO FUNDING GROUP, INC. | 1.00 | 11/23/15 | 734 | 227,947.89 | IN | 45 | HOTEL/MOTEL EQUIPMENT | 213,798.75 |
| VIVIA HOLDINGS, LLC | 48 CENTISILE PRINTING MACHINERY, | - | 11/25/15 | 791 | 56,598.75 | CA | 117 | INDUSTRIAL EQUIPMENT | 52,701.34 |
| COMMONWEALTH DODGE, LLC | 63 RONNIE'S EQUIPMENT AND SERVICE | 1.00 | 12/4/15 | Corp | 24,500.00 | KY | 112 | FORKLIFTS | 25,078.49 |
| CAREY'S LAWNSCAPE, INC. | 60 TITAN MACHINERY INC | 101.00 | 12/3/15 | 782 | 37,000.00 | NE | 111 | CONSTRUCTION HEAVY EQUIPMENT | 35,603.64 |
| DON ROSE OIL CO., INC. | 48 QUALITY STEEL CORPORATION | 1.00 | 12/8/15 | 780 | 65,144.85 | CA | 117 | INDUSTRIAL EQUIPMENT | 65,476.40 |
| SOUTHEASTERN MEDICAL EQUIPMENT COMPANY | 24 PINNACLE MEDSOURCE, INC. | | 12/14/15 | 751 | 70,339.32 | GA | 90 | MEDICAL EQUIPMENT | 59,411.98 |
| A-QUICK BINDERY, LLC | 60 SPIEL ASSOCIATES, INC. | | 12/9/15 | 808 | 14,450.00 | NY | 117 | INDUSTRIAL EQUIPMENT | 13,845.10 |
| A AFFORDABLE STRIPING & SEALING, LLC | 60 STATEWIDE TRAFFIC SAFETY & SIG | | 12/16/15 | 776 | 73,971.66 | NV | 117 | INDUSTRIAL EQUIPMENT | 77,424.05 |
| CLEAR SIGN & DESIGN INC. | 60 GRAPHIXDIRECT.COM, INC. | 1.00 | 12/14/15 | 802 | 114,333.60 | CA | 117 | INDUSTRIAL EQUIPMENT | 107,614.70 |
| COPY PLUS, LLC | 35 STANDARD GRAPHICS MID-ATLANTIC | | 12/18/15 | 655 | 35,000.00 | TX | 124 | INDUST MANUFACTURING EQUIPMENT | 27,661.53 |
| CARMINE N PATREZIO d/b/a | 42 KENNEDY AUCTIONS | | 12/18/15 | 769 | 16,685.00 | CT | 111 | CONSTRUCTION HEAVY EQUIPMENT | 16,751.03 |
| CAL ENTERPRISES, INC. d/b/a | 60 LAPPEN AUTO SUPPLY CO., INC. d | | 12/28/15 | 768 | 15,285.76 | MA | 53 | SERVICE | 14,629.21 |
| BRIAN MUNDAY TRUCKING, LLC | 48 LARSON TRUCK SALES, INC. | | 12/31/15 | 777 | 23,500.00 | WA | 150 | TITLED - DROP TRAILERS | 22,703.48 |
| BRIAN MUNDAY TRUCKING, LLC | 48 RAVENEL TRUCK SALES, LLC | | 12/31/15 | 777 | 19,600.00 | WA | 150 | TITLED - DROP TRAILERS | 19,052.37 |
| AMBER CHEMICAL, INC | 37 EZ TANK TRAILER SALES & LEASIN | | 12/31/15 | Corp | 83,322.48 | CA | 156 | TITLED - TANK TRAILERS | 79,510.23 |
| CODAY ENTERPRISES, INC. d/b/a | 48 TULSA NEW HOLLAND, INC. | | 12/30/15 | 754 | 40,856.65 | OK | 115 | DOZERS | 44,257.12 |
| THURSTON COUNTY SHERIFF'S DEPARTMENT | 57 ANDERSON FORD | | 1/29/16 | Corp | 27,699.00 | NE | 11 | TITLED - VEHICLES | 24,952.69 |
| THURSTON COUNTY SHERIFF'S DEPARTMENT | 57 ANDERSON FORD | | 1/29/16 | Corp | 30,580.00 | NE | 11 | TITLED - VEHICLES | 31,203.85 |
| CLARIPHY COMMUNICATIONS, INC. | 60 MIRCOLEASE | | 2/9/16 | Corp | 52,281.25 | CA | 22 | HARDWARE | 54,407.35 |
| CLARIPHY COMMUNICATIONS, INC. | 60 MIRCOLEASE | | 2/9/16 | Corp | 52,508.67 | CA | 22 | HARDWARE | 54,470.46 |
| SYNERGY SOFTWARE & CONSULTING, L.L.C. d/b/a | 60 SCANSOURCE | 101.00 | 12/11/15 | 778 | 38,534.40 | MI | 22 | HARDWARE | 38,308.29 |
| STERLING FOOD MART, INC. | 49 CASH-WA DISTRIBUTING CO. OF KE | 101.00 | 12/2/15 | 759 | 38,095.42 | KS | 182 | FOOD SERVICE - FREEZERS | 37,618.06 |

| Yield | Monthly Pmt | Rem Term | SIC Code | SIC Descr | Orig GLR | Pmt Freq | Orig Equip - Purchased | Purchase Option | Credit Rating | Loss Rating | DQ Total | DuePrior | Apr-16 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | 1,762,776.11 | | | | 233,829.90 | | |
| 6.50 | 4,584.90 | 51 | 1771 | CONCRETE WORK | 283,080.60 | R | 217,327.32 | NOTOWNED | A | 1 | 233,829.90 | - | 4,584.90 |
| 5.97 | 609.65 | 55 | 7334 | PHOTOCOPYING & PRINTING | 36,579.00 | R | 35,675.00 | FMVT | A | 4 | 40,665.75 | - | 609.65 |
| 8.44 | 672.80 | 43 | 7500 | AUTO REPAIR, SERVICES, PARKING | 32,279.22 | R | 26,824.54 | EFA | B | 5 | 28,950.40 | - | 672.80 |
| 9.52 | 3,000.00 | 44 | 2653 | CORRUGATED & SOLID FIBER BOXES | 144,000.00 | R | 134,649.00 | FMVT | B | 4 | 158,929.80 | - | 3,000.00 |
| 9.45 | 2,951.08 | 37 | 1629 | HEAVY CONSTRUCTION | 123,882.14 | R | 93,180.00 | EFA | B | 4 | 109,189.96 | - | 2,951.08 |
| 6.81 | 1,477.28 | 56 | 7216 | DRYCLEANING PLANTS EXCEPT RUG | 88,636.80 | R | 71,887.00 | EFA | B | 5 | 82,727.68 | - | 1,477.28 |
| 7.55 | 1,971.58 | 31 | 7011 | HOTELS AND MOTELS | 70,976.88 | R | 59,048.00 | PPO | B | 5 | 61,119.98 | - | 1,971.58 |
| 6.34 | 7,499.11 | 31 | 7011 | HOTELS AND MOTELS | 269,967.96 | R | 210,496.89 | PPO | B | 5 | 232,473.41 | - | 7,499.11 |
| 7.77 | 1,408.49 | 43 | 8742 | MANAGEMENT CONSULTING SVCS | 67,607.52 | R | 56,598.75 | EFA | B | 4 | 60,565.07 | - | 1,408.49 |
| 8.86 | 526.00 | 59 | 5511 | NEW & USED CAR DEALERS | 31,857.00 | R | 24,500.00 | PPO | A | 4 | 31,035.00 | - | 526.00 |
| 8.86 | 788.77 | 55 | 782 | LAWN & GARDEN SERVICES | 47,326.20 | R | 37,000.00 | PPO | A | 4 | 43,483.35 | - | 788.77 |
| 10.48 | 1,834.65 | 43 | 5172 | PETROLEUM PRODUCTS, N.E.C. | 88,063.20 | R | 60,180.00 | EFA | A | 4 | 78,890.95 | - | 1,834.65 |
| 9.05 | 3,369.57 | 19 | 7352 | MEDICAL EQUIPMENT RENTAL & LEASING | 80,869.68 | R | 70,339.32 | EFA | A | 6 | 64,021.83 | - | 3,369.57 |
| 7.85 | 296.10 | 56 | 2752 | COMMERCIAL PRINTING, LITHOGRAP | 17,766.00 | R | 14,450.00 | EFA | A | 5 | 16,581.60 | - | 296.10 |
| 6.07 | 1,591.86 | 56 | 1611 | HIGHWAY & STREET CONSTRUCTION | 95,511.60 | R | 73,971.66 | EFA | B | 5 | 89,144.16 | - | 1,591.86 |
| 4.26 | 2,157.54 | 55 | 2700 | PRINTING & PUBLISHING | 129,452.40 | R | 102,750.00 | PPO | A | 4 | 118,666.70 | - | 2,157.54 |
| 6.18 | 940.00 | 32 | 7334 | PHOTOCOPYING & PRINTING | 38,840.00 | R | 35,000.00 | EFA | B | 5 | 30,080.00 | - | 940.00 |
| 7.02 | 481.81 | 39 | 5431 | FRUIT & VEGETABLE MARKETS | 20,236.02 | R | 16,635.00 | EFA | A | 4 | 18,790.59 | - | 481.81 |
| 7.43 | 309.96 | 56 | 7539 | AUTOMOTIVE REPAIR SHOPS | 18,596.10 | R | 15,285.76 | EFA | A | 4 | 17,357.76 | - | 309.96 |
| 9.57 | 614.00 | 44 | 4213 | TRUCKING | 29,472.00 | R | 23,500.00 | EFA | A | 4 | 27,016.00 | - | 614.00 |
| 9.16 | 511.59 | 44 | 4213 | TRUCKING | 24,556.32 | R | 19,600.00 | EFA | A | 4 | 22,509.96 | - | 511.59 |
| 6.25 | 2,558.80 | 34 | 2819 | INDUSTRIAL INORGANIC CHEMICALS NEC | 100,449.05 | R | 83,322.48 | EFA | A | 4 | 85,999.20 | - | 2,558.80 |
| 7.73 | 1,059.41 | 45 | 1611 | HIGHWAY & STREET CONSTRUCTION | 50,851.68 | R | 40,856.65 | EFA | A | 4 | 47,673.45 | - | 1,059.41 |
| 6.41 | 3,276.53 | 9 | 9111 | ADMINISTRATION OFFICES | 32,765.30 | R | 27,699.00 | EFA | A | 4 | 29,488.77 | - | - |
| 6.30 | 3,617.32 | 10 | 9111 | ADMINISTRATION OFFICES | 36,173.20 | R | 30,580.00 | EFA | A | 4 | 36,173.20 | - | - |
| 6.22 | 1,105.00 | 57 | 3600 | ELECTRONIC AND OTHER ELECTRICAL EQ. | 66,300.00 | R | 52,281.25 | EFA | B | 4 | 62,985.00 | - | 1,105.00 |
| 6.36 | 1,109.81 | 57 | 3600 | ELECTRONIC AND OTHER ELECTRICAL EQ. | 66,588.60 | R | 52,508.67 | EFA | B | 4 | 63,259.17 | - | 1,109.81 |
| 5.20 | 800.75 | 55 | 4813 | TELEPHONE COMMUNICATIONS EX RA | 48,045.00 | R | 38,534.40 | PPO | A | 6 | 44,142.25 | - | 800.75 |
| 7.72 | 963.84 | 45 | 5411 | GROCERY STORES | 46,363.32 | R | 38,095.42 | PPO | A | 2 | 43,473.80 | - | 963.84 |

| 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| May-16 | Jun-16 | Jul-16 | Aug-16 | Sep-16 | Oct-16 | Nov-16 | Dec-16 | Jan-17 | Feb-17 | Mar-17 | Apr-17 | May-17 | Jun-17 | Jul-17 | Aug-17 | Sep-17 | Oct-17 |
| 48,811.67 | 45,194.35 | 45,194.35 | 45,194.35 | 45,194.35 | 45,194.35 | 52,088.20 | 45,194.35 | 45,194.35 | 45,194.35 | 45,194.35 | 45,194.35 | 52,088.20 | 45,194.35 | 45,194.35 | 45,194.35 | 45,194.35 | 45,194.35 |
| 4,584.90 | 4,584.90 | 4,584.90 | 4,584.90 | 4,584.90 | 4,584.90 | 4,584.90 | 4,584.90 | 4,584.90 | 4,584.90 | 4,584.90 | 4,584.90 | 4,584.90 | 4,584.90 | 4,584.90 | 4,584.90 | 4,584.90 | 4,584.90 |
| 609.65 | 609.65 | 609.65 | 609.65 | 609.65 | 609.65 | 609.65 | 609.65 | 609.65 | 609.65 | 609.65 | 609.65 | 609.65 | 609.65 | 609.65 | 609.65 | 609.65 | 609.65 |
| 672.80 | 672.80 | 672.80 | 672.80 | 672.80 | 672.80 | 672.80 | 672.80 | 672.80 | 672.80 | 672.80 | 672.80 | 672.80 | 672.80 | 672.80 | 672.80 | 672.80 | 672.80 |
| 3,000.00 | 3,000.00 | 3,000.00 | 3,000.00 | 3,000.00 | 3,000.00 | 3,000.00 | 3,000.00 | 3,000.00 | 3,000.00 | 3,000.00 | 3,000.00 | 3,000.00 | 3,000.00 | 3,000.00 | 3,000.00 | 3,000.00 | 3,000.00 |
| 2,951.08 | 2,951.08 | 2,951.08 | 2,951.08 | 2,951.08 | 2,951.08 | 2,951.08 | 2,951.08 | 2,951.08 | 2,951.08 | 2,951.08 | 2,951.08 | 2,951.08 | 2,951.08 | 2,951.08 | 2,951.08 | 2,951.08 | 2,951.08 |
| 1,477.28 | 1,477.28 | 1,477.28 | 1,477.28 | 1,477.28 | 1,477.28 | 1,477.28 | 1,477.28 | 1,477.28 | 1,477.28 | 1,477.28 | 1,477.28 | 1,477.28 | 1,477.28 | 1,477.28 | 1,477.28 | 1,477.28 | 1,477.28 |
| 1,971.58 | 1,971.58 | 1,971.58 | 1,971.58 | 1,971.58 | 1,971.58 | 1,971.58 | 1,971.58 | 1,971.58 | 1,971.58 | 1,971.58 | 1,971.58 | 1,971.58 | 1,971.58 | 1,971.58 | 1,971.58 | 1,971.58 | 1,971.58 |
| 7,499.11 | 7,499.11 | 7,499.11 | 7,499.11 | 7,499.11 | 7,499.11 | 7,499.11 | 7,499.11 | 7,499.11 | 7,499.11 | 7,499.11 | 7,499.11 | 7,499.11 | 7,499.11 | 7,499.11 | 7,499.11 | 7,499.11 | 7,499.11 |
| 1,408.49 | 1,408.49 | 1,408.49 | 1,408.49 | 1,408.49 | 1,408.49 | 1,408.49 | 1,408.49 | 1,408.49 | 1,408.49 | 1,408.49 | 1,408.49 | 1,408.49 | 1,408.49 | 1,408.49 | 1,408.49 | 1,408.49 | 1,408.49 |
| 526.00 | 526.00 | 526.00 | 526.00 | 526.00 | 526.00 | 526.00 | 526.00 | 526.00 | 526.00 | 526.00 | 526.00 | 526.00 | 526.00 | 526.00 | 526.00 | 526.00 | 526.00 |
| 788.77 | 788.77 | 788.77 | 788.77 | 788.77 | 788.77 | 788.77 | 788.77 | 788.77 | 788.77 | 788.77 | 788.77 | 788.77 | 788.77 | 788.77 | 788.77 | 788.77 | 788.77 |
| 1,834.65 | 1,834.65 | 1,834.65 | 1,834.65 | 1,834.65 | 1,834.65 | 1,834.65 | 1,834.65 | 1,834.65 | 1,834.65 | 1,834.65 | 1,834.65 | 1,834.65 | 1,834.65 | 1,834.65 | 1,834.65 | 1,834.65 | 1,834.65 |
| 3,369.57 | 3,369.57 | 3,369.57 | 3,369.57 | 3,369.57 | 3,369.57 | 3,369.57 | 3,369.57 | 3,369.57 | 3,369.57 | 3,369.57 | 3,369.57 | 3,369.57 | 3,369.57 | 3,369.57 | 3,369.57 | 3,369.57 | 3,369.57 |
| 296.10 | 296.10 | 296.10 | 296.10 | 296.10 | 296.10 | 296.10 | 296.10 | 296.10 | 296.10 | 296.10 | 296.10 | 296.10 | 296.10 | 296.10 | 296.10 | 296.10 | 296.10 |
| 1,591.86 | 1,591.86 | 1,591.86 | 1,591.86 | 1,591.86 | 1,591.86 | 1,591.86 | 1,591.86 | 1,591.86 | 1,591.86 | 1,591.86 | 1,591.86 | 1,591.86 | 1,591.86 | 1,591.86 | 1,591.86 | 1,591.86 | 1,591.86 |
| 2,157.54 | 2,157.54 | 2,157.54 | 2,157.54 | 2,157.54 | 2,157.54 | 2,157.54 | 2,157.54 | 2,157.54 | 2,157.54 | 2,157.54 | 2,157.54 | 2,157.54 | 2,157.54 | 2,157.54 | 2,157.54 | 2,157.54 | 2,157.54 |
| 940.00 | 940.00 | 940.00 | 940.00 | 940.00 | 940.00 | 940.00 | 940.00 | 940.00 | 940.00 | 940.00 | 940.00 | 940.00 | 940.00 | 940.00 | 940.00 | 940.00 | 940.00 |
| 481.81 | 481.81 | 481.81 | 481.81 | 481.81 | 481.81 | 481.81 | 481.81 | 481.81 | 481.81 | 481.81 | 481.81 | 481.81 | 481.81 | 481.81 | 481.81 | 481.81 | 481.81 |
| 309.96 | 309.96 | 309.96 | 309.96 | 309.96 | 309.96 | 309.96 | 309.96 | 309.96 | 309.96 | 309.96 | 309.96 | 309.96 | 309.96 | 309.96 | 309.96 | 309.96 | 309.96 |
| 614.00 | 614.00 | 614.00 | 614.00 | 614.00 | 614.00 | 614.00 | 614.00 | 614.00 | 614.00 | 614.00 | 614.00 | 614.00 | 614.00 | 614.00 | 614.00 | 614.00 | 614.00 |
| 511.59 | 511.59 | 511.59 | 511.59 | 511.59 | 511.59 | 511.59 | 511.59 | 511.59 | 511.59 | 511.59 | 511.59 | 511.59 | 511.59 | 511.59 | 511.59 | 511.59 | 511.59 |
| 2,558.80 | 2,558.80 | 2,558.80 | 2,558.80 | 2,558.80 | 2,558.80 | 2,558.80 | 2,558.80 | 2,558.80 | 2,558.80 | 2,558.80 | 2,558.80 | 2,558.80 | 2,558.80 | 2,558.80 | 2,558.80 | 2,558.80 | 2,558.80 |
| 1,059.41 | 1,059.41 | 1,059.41 | 1,059.41 | 1,059.41 | 1,059.41 | 1,059.41 | 1,059.41 | 1,059.41 | 1,059.41 | 1,059.41 | 1,059.41 | 1,059.41 | 1,059.41 | 1,059.41 | 1,059.41 | 1,059.41 | 1,059.41 |
| 3,617.32 | | | | | | 3,276.53 | | | | | | 3,276.53 | | | | | |
| 3,276.53 | | | | | | 3,617.32 | | | | | | 3,617.32 | | | | | |
| 1,105.00 | 1,105.00 | 1,105.00 | 1,105.00 | 1,105.00 | 1,105.00 | 1,105.00 | 1,105.00 | 1,105.00 | 1,105.00 | 1,105.00 | 1,105.00 | 1,105.00 | 1,105.00 | 1,105.00 | 1,105.00 | 1,105.00 | 1,105.00 |
| 1,109.81 | 1,109.81 | 1,109.81 | 1,109.81 | 1,109.81 | 1,109.81 | 1,109.81 | 1,109.81 | 1,109.81 | 1,109.81 | 1,109.81 | 1,109.81 | 1,109.81 | 1,109.81 | 1,109.81 | 1,109.81 | 1,109.81 | 1,109.81 |
| 800.75 | 800.75 | 800.75 | 800.75 | 800.75 | 800.75 | 800.75 | 800.75 | 800.75 | 800.75 | 800.75 | 800.75 | 800.75 | 800.75 | 800.75 | 800.75 | 800.75 | 800.75 |
| 963.84 | 963.84 | 963.84 | 963.84 | 963.84 | 963.84 | 963.84 | 963.84 | 963.84 | 963.84 | 963.84 | 963.84 | 963.84 | 963.84 | 963.84 | 963.84 | 963.84 | 963.84 |

| | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 | 31 | 32 | 33 | 34 | 35 | 36 | 37 | 38 | 39 | 40 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Nov-17 | Dec-17 | Jan-18 | Feb-18 | Mar-18 | Apr-18 | May-18 | Jun-18 | Jul-18 | Aug-18 | Sep-18 | Oct-18 | Nov-18 | Dec-18 | Jan-19 | Feb-19 | Mar-19 | Apr-19 |
| | 48,718.63 | 41,824.78 | 41,824.78 | 41,824.78 | 41,824.78 | 41,824.78 | 48,718.63 | 41,824.78 | 41,824.78 | 41,824.78 | 41,824.78 | 41,824.78 | 39,249.94 | 31,414.09 | 31,414.09 | 28,855.29 | 28,855.29 | 28,855.29 |
| | 4,584.90 | 4,584.90 | 4,584.90 | 4,584.90 | 4,584.90 | 4,584.90 | 4,584.90 | 4,584.90 | 4,584.90 | 4,584.90 | 4,584.90 | 4,584.90 | 4,584.90 | 4,584.90 | 4,584.90 | 4,584.90 | 4,584.90 | 4,584.90 |
| | 609.65 | 609.65 | 609.65 | 609.65 | 609.65 | 609.65 | 609.65 | 609.65 | 609.65 | 609.65 | 609.65 | 609.65 | 609.65 | 609.65 | 609.65 | 609.65 | 609.65 | 609.65 |
| | 672.80 | 672.80 | 672.80 | 672.80 | 672.80 | 672.80 | 672.80 | 672.80 | 672.80 | 672.80 | 672.80 | 672.80 | 672.80 | 672.80 | 672.80 | 672.80 | 672.80 | 672.80 |
| | 3,000.00 | 3,000.00 | 3,000.00 | 3,000.00 | 3,000.00 | 3,000.00 | 3,000.00 | 3,000.00 | 3,000.00 | 3,000.00 | 3,000.00 | 3,000.00 | 3,000.00 | 3,000.00 | 3,000.00 | 3,000.00 | 3,000.00 | 3,000.00 |
| | 2,951.08 | 2,951.08 | 2,951.08 | 2,951.08 | 2,951.08 | 2,951.08 | 2,951.08 | 2,951.08 | 2,951.08 | 2,951.08 | 2,951.08 | 2,951.08 | 2,951.08 | 2,951.08 | 2,951.08 | 2,951.08 | 2,951.08 | 2,951.08 |
| | 1,477.28 | 1,477.28 | 1,477.28 | 1,477.28 | 1,477.28 | 1,477.28 | 1,477.28 | 1,477.28 | 1,477.28 | 1,477.28 | 1,477.28 | 1,477.28 | 1,477.28 | 1,477.28 | 1,477.28 | 1,477.28 | 1,477.28 | 1,477.28 |
| | 1,971.58 | 1,971.58 | 1,971.58 | 1,971.58 | 1,971.58 | 1,971.58 | 1,971.58 | 1,971.58 | 1,971.58 | 1,971.58 | 1,971.58 | 1,971.58 | 1.00 | - | - | - | - | - |
| | - | 7,499.11 | 7,499.11 | 7,499.11 | 7,499.11 | 7,499.11 | - | 7,499.11 | 7,499.11 | 7,499.11 | 7,499.11 | 7,499.11 | - | - | - | - | - | - |
| | 1,408.49 | 1,408.49 | 1,408.49 | 1,408.49 | 1,408.49 | 1,408.49 | 1,408.49 | 1,408.49 | 1,408.49 | 1,408.49 | 1,408.49 | 1,408.49 | 1,408.49 | 1,408.49 | 1,408.49 | 1,408.49 | 1,408.49 | 1,408.49 |
| | 1,408.49 | - | - | - | - | - | 1,408.49 | - | - | - | - | - | 1,408.49 | - | - | - | - | - |
| | 526.00 | 526.00 | 526.00 | 526.00 | 526.00 | 526.00 | 526.00 | 526.00 | 526.00 | 526.00 | 526.00 | 526.00 | 526.00 | 526.00 | 526.00 | 526.00 | 526.00 | 526.00 |
| | 788.77 | 788.77 | 788.77 | 788.77 | 788.77 | 788.77 | 788.77 | 788.77 | 788.77 | 788.77 | 788.77 | 788.77 | 788.77 | 788.77 | 788.77 | 788.77 | 788.77 | 788.77 |
| | 1,834.65 | 1,834.65 | 1,834.65 | 1,834.65 | 1,834.65 | 1,834.65 | 1,834.65 | 1,834.65 | 1,834.65 | 1,834.65 | 1,834.65 | 1,834.65 | 1,834.65 | 1,834.65 | 1,834.65 | 1,834.65 | 1,834.65 | 1,834.65 |
| | 296.10 | 296.10 | 296.10 | 296.10 | 296.10 | 296.10 | 296.10 | 296.10 | 296.10 | 296.10 | 296.10 | 296.10 | 296.10 | 296.10 | 296.10 | 296.10 | 296.10 | 296.10 |
| | 1,591.86 | 1,591.86 | 1,591.86 | 1,591.86 | 1,591.86 | 1,591.86 | 1,591.86 | 1,591.86 | 1,591.86 | 1,591.86 | 1,591.86 | 1,591.86 | 1,591.86 | 1,591.86 | 1,591.86 | 1,591.86 | 1,591.86 | 1,591.86 |
| | 2,157.54 | 2,157.54 | 2,157.54 | 2,157.54 | 2,157.54 | 2,157.54 | 2,157.54 | 2,157.54 | 2,157.54 | 2,157.54 | 2,157.54 | 2,157.54 | 2,157.54 | 2,157.54 | 2,157.54 | 2,157.54 | 2,157.54 | 2,157.54 |
| | 940.00 | 940.00 | 940.00 | 940.00 | 940.00 | 940.00 | 940.00 | 940.00 | 940.00 | 940.00 | 940.00 | 940.00 | 940.00 | - | - | - | - | - |
| | 481.81 | 481.81 | 481.81 | 481.81 | 481.81 | 481.81 | 481.81 | 481.81 | 481.81 | 481.81 | 481.81 | 481.81 | 481.81 | 481.81 | 481.81 | 481.81 | 481.81 | 481.81 |
| | 309.96 | 309.96 | 309.96 | 309.96 | 309.96 | 309.96 | 309.96 | 309.96 | 309.96 | 309.96 | 309.96 | 309.96 | 309.96 | 309.96 | 309.96 | 309.96 | 309.96 | 309.96 |
| | 614.00 | 614.00 | 614.00 | 614.00 | 614.00 | 614.00 | 614.00 | 614.00 | 614.00 | 614.00 | 614.00 | 614.00 | 614.00 | 614.00 | 614.00 | 614.00 | 614.00 | 614.00 |
| | 511.59 | 511.59 | 511.59 | 511.59 | 511.59 | 511.59 | 511.59 | 511.59 | 511.59 | 511.59 | 511.59 | 511.59 | 511.59 | 511.59 | 511.59 | 511.59 | 511.59 | 511.59 |
| | 2,558.80 | 2,558.80 | 2,558.80 | 2,558.80 | 2,558.80 | 2,558.80 | 2,558.80 | 2,558.80 | 2,558.80 | 2,558.80 | 2,558.80 | 2,558.80 | 2,558.80 | 2,558.80 | 2,558.80 | - | - | - |
| | 1,059.41 | 1,059.41 | 1,059.41 | 1,059.41 | 1,059.41 | 1,059.41 | 1,059.41 | 1,059.41 | 1,059.41 | 1,059.41 | 1,059.41 | 1,059.41 | 1,059.41 | 1,059.41 | 1,059.41 | 1,059.41 | 1,059.41 | 1,059.41 |
| | 3,276.53 | - | - | - | - | - | 3,276.53 | - | - | - | - | - | 3,276.53 | - | - | - | - | - |
| | 3,617.32 | - | - | - | - | - | 3,617.32 | - | - | - | - | - | 3,617.32 | - | - | - | - | - |
| | 1,105.00 | 1,105.00 | 1,105.00 | 1,105.00 | 1,105.00 | 1,105.00 | 1,105.00 | 1,105.00 | 1,105.00 | 1,105.00 | 1,105.00 | 1,105.00 | 1,105.00 | 1,105.00 | 1,105.00 | 1,105.00 | 1,105.00 | 1,105.00 |
| | 1,109.81 | 1,109.81 | 1,109.81 | 1,109.81 | 1,109.81 | 1,109.81 | 1,109.81 | 1,109.81 | 1,109.81 | 1,109.81 | 1,109.81 | 1,109.81 | 1,109.81 | 1,109.81 | 1,109.81 | 1,109.81 | 1,109.81 | 1,109.81 |
| | 800.75 | 800.75 | 800.75 | 800.75 | 800.75 | 800.75 | 800.75 | 800.75 | 800.75 | 800.75 | 800.75 | 800.75 | 800.75 | 800.75 | 800.75 | 800.75 | 800.75 | 800.75 |
| | 963.84 | 963.84 | 963.84 | 963.84 | 963.84 | 963.84 | 963.84 | 963.84 | 963.84 | 963.84 | 963.84 | 963.84 | 963.84 | 963.84 | 963.84 | 963.84 | 963.84 | 963.84 |

| | 41 May-19 | 42 Jun-19 | 43 Jul-19 | 44 Aug-19 | 45 Sep-19 | 46 Oct-19 | 47 Nov-19 | 48 Dec-19 | 49 Jan-20 | 50 Feb-20 | 51 Mar-20 | 52 Apr-20 | 53 May-20 | 54 Jun-20 | 55 Jul-20 | 56 Aug-20 | 57 Sep-20 | 58 Oct-20 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 32,798.06 | 25,904.21 | 25,422.40 | 25,422.40 | 25,422.40 | 25,422.40 | 28,401.31 | 44,310.67 | 15,458.62 | 15,357.62 | 15,357.62 | 15,357.62 | 22,251.47 | 15,357.62 | 10,772.72 | 10,772.72 | 10,772.72 | 10,772.72 |
| | 4,584.90 | 4,584.90 | 4,584.90 | 4,584.90 | 4,584.90 | 4,584.90 | 4,584.90 | 4,584.90 | 4,584.90 | 4,584.90 | 4,584.90 | 4,584.90 | 4,584.90 | 4,584.90 | - | - | - | - |
| | 609.65 | 609.65 | 609.65 | 609.65 | 609.65 | 609.65 | 609.65 | 609.55 | 609.65 | 609.65 | 609.65 | 609.65 | 609.65 | 609.65 | 609.65 | 609.65 | 609.65 | 609.65 |
| | 672.80 | 672.80 | 672.80 | 672.80 | 672.80 | 672.80 | - | - | - | - | - | - | - | - | - | - | - | - |
| | 3,000.00 | 3,000.00 | 3,000.00 | 3,000.00 | 3,000.00 | 3,000.00 | 3,000.00 | 26,929.80 | - | - | - | - | - | - | - | - | - | - |
| | 1,477.28 | 1,477.28 | 1,477.28 | 1,477.28 | 1,477.28 | 1,477.28 | 1,477.28 | 1,477.28 | 1,477.28 | 1,477.28 | 1,477.28 | 1,477.28 | 1,477.28 | 1,477.28 | 1,477.28 | 1,477.28 | 1,477.28 | 1,477.28 |
| | 1,408.49 | 1,408.49 | 1,408.49 | 1,408.49 | 1,408.49 | 1,408.49 | - | - | - | - | - | - | - | - | - | - | - | - |
| | 526.00 | 526.00 | 526.00 | 526.00 | 526.00 | 526.00 | 526.00 | 526.00 | 526.00 | 526.00 | 526.00 | 526.00 | 526.00 | 526.00 | 526.00 | 526.00 | 526.00 | 526.00 |
| | 788.77 | 788.77 | 788.77 | 788.77 | 788.77 | 788.77 | 788.77 | 788.77 | 788.77 | 788.77 | 788.77 | 788.77 | 788.77 | 788.77 | 788.77 | 788.77 | 788.77 | 788.77 |
| | 1,834.65 | 1,834.65 | 1,834.65 | 1,834.65 | 1,834.65 | 1,834.65 | 1.00 | - | - | - | - | - | - | - | - | - | - | - |
| | 296.10 | 296.10 | 296.10 | 296.10 | 296.10 | 296.10 | 296.10 | 296.10 | 296.10 | 296.10 | 296.10 | 296.10 | 296.10 | 296.10 | 296.10 | 296.10 | 296.10 | 296.10 |
| | 1,591.86 | 1,591.86 | 1,591.86 | 1,591.86 | 1,591.85 | 1,591.86 | 1,591.86 | 1,591.86 | 1,591.86 | 1,591.86 | 1,591.86 | 1,591.86 | 1,591.86 | 1,591.86 | 1,591.86 | 1,591.86 | 1,591.86 | 1,591.86 |
| | 2,157.54 | 2,157.54 | 2,157.54 | 2,157.54 | 2,157.54 | 2,157.54 | 2,157.54 | 2,157.54 | 2,157.54 | 2,157.54 | 2,157.54 | 2,157.54 | 2,157.54 | 2,157.54 | 2,157.54 | 2,157.54 | 2,157.54 | 2,157.54 |
| | 481.81 | 481.81 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| | 309.96 | 309.96 | 309.96 | 309.96 | 309.96 | 309.96 | 309.96 | 309.96 | 309.96 | 309.96 | 309.96 | 309.96 | 309.96 | 309.96 | 309.96 | 309.96 | 309.96 | 309.96 |
| | 614.00 | 614.00 | 614.00 | 614.00 | 614.00 | 614.00 | 614.00 | - | - | - | - | - | - | - | - | - | - | - |
| | 511.59 | 511.59 | 511.59 | 511.59 | 511.59 | 511.59 | 511.59 | - | - | - | - | - | - | - | - | - | - | - |
| | 1,059.41 | 1,059.41 | 1,059.41 | 1,059.41 | 1,059.41 | 1,059.41 | 1,059.41 | 1,059.41 | - | - | - | - | - | - | - | - | - | - |
| | 3,276.53 | - | - | - | - | - | 3,276.53 | - | - | - | - | - | 3,276.53 | - | - | - | - | - |
| | 3,617.32 | - | - | - | - | - | 3,617.32 | - | - | - | - | - | 3,617.32 | - | - | - | - | - |
| | 1,105.00 | 1,105.00 | 1,105.00 | 1,105.00 | 1,105.00 | 1,105.00 | 1,105.00 | 1,105.00 | 1,105.00 | 1,105.00 | 1,105.00 | 1,105.00 | 1,105.00 | 1,105.00 | 1,105.00 | 1,105.00 | 1,105.00 | 1,105.00 |
| | 1,109.81 | 1,109.81 | 1,109.81 | 1,109.81 | 1,109.81 | 1,109.81 | 1,109.81 | 1,109.81 | 1,109.81 | 1,109.81 | 1,109.81 | 1,109.81 | 1,109.81 | 1,109.81 | 1,109.81 | 1,109.81 | 1,109.81 | 1,109.81 |
| | 800.75 | 800.75 | 800.75 | 800.75 | 800.75 | 800.75 | 800.75 | 800.75 | 800.75 | 800.75 | 800.75 | 800.75 | 800.75 | 800.75 | 800.75 | 800.75 | 800.75 | 800.75 |
| | 963.84 | 963.84 | 963.84 | 963.84 | 963.84 | 963.84 | 963.84 | 963.84 | 101.00 | - | - | - | - | - | - | - | - | - |

| | 59 | 60 | 61 | 62 | 63 | | | Purchase Price |
| | 20,647.86 | 2,740.81 | 526.00 | 526.00 | 1.00 | 1,980,203.69 | 1,980,203.69 | 1,844,234.18 |
| | Nov-20 | Dec-20 | Jan-21 | Feb-21 | Mar-21 | CF Total | DQ Total | Tvalue 1st pymt |
|---|---|---|---|---|---|---|---|---|
| | 7,135.00 | - | - | - | - | 233,829.90 | 233,829.90 | 216,001.41 |
| | - | - | - | - | - | 40,665.75 | 40,665.75 | 36,782.50 |
| | - | - | - | - | - | 28,930.40 | 28,930.40 | 27,090.84 |
| | - | - | - | - | - | 158,929.80 | 158,929.80 | 146,871.93 |
| | - | - | - | - | - | 109,189.96 | 109,189.96 | 103,040.43 |
| | 1,477.28 | - | - | - | - | 82,727.68 | 82,727.68 | 75,951.72 |
| | - | - | - | - | - | 61,119.98 | 61,119.98 | 58,293.21 |
| | - | - | - | - | - | 232,473.41 | 232,473.41 | 221,724.32 |
| | 526.00 | 526.00 | 526.00 | 526.00 | 1.00 | 60,555.07 | 60,555.07 | 56,713.99 |
| | 101.00 | - | - | - | - | 31,035.00 | 31,035.00 | 28,322.33 |
| | - | - | - | - | - | 43,483.35 | 43,483.35 | 39,832.19 |
| | - | - | - | - | - | 78,890.95 | 78,890.95 | 73,767.66 |
| | - | - | - | - | - | 64,021.83 | 64,021.83 | 62,111.35 |
| | 296.10 | - | - | - | - | 16,581.60 | 16,581.60 | 15,201.61 |
| | 1,591.86 | - | - | - | - | 89,144.16 | 89,144.16 | 81,842.64 |
| | 1.00 | - | - | - | - | 118,665.70 | 118,665.70 | 108,953.87 |
| | - | - | - | - | - | 30,080.00 | 30,080.00 | 28,645.30 |
| | - | - | - | - | - | 18,790.59 | 18,790.59 | 17,703.57 |
| | 309.96 | - | - | - | - | 17,357.76 | 17,357.76 | 15,936.04 |
| | - | - | - | - | - | 27,016.00 | 27,016.00 | 25,223.37 |
| | - | - | - | - | - | 22,509.96 | 22,509.96 | 21,016.33 |
| | - | - | - | - | - | 86,999.20 | 86,999.20 | 82,477.46 |
| | - | - | - | - | - | 47,673.45 | 47,673.45 | 44,442.33 |
| | 3,276.53 | - | - | - | - | 29,488.77 | 29,488.77 | 26,738.20 |
| | 3,617.32 | - | - | - | - | 36,173.20 | 36,173.20 | 33,116.78 |
| | 1,105.00 | 1,105.00 | - | - | - | 62,985.00 | 62,985.00 | 57,655.75 |
| | 1,109.81 | 1,109.81 | - | - | - | 63,259.17 | 63,259.17 | 57,906.72 |
| | 101.00 | - | - | - | - | 44,142.25 | 44,142.25 | 40,437.17 |
| | - | - | - | - | - | 43,473.80 | 43,473.80 | 40,433.16 |

Documents to be Delivered to TCFEF On or Prior to the Closing Date

A. Operative Agreements

    1. Purchase and Sale Agreement between Seller and TCFEF

    2. Bill of Sale and Assignment of Equipment Schedules

    3. A Copy of a Certificate of Title for each item of Equipment or Additional Collateral which is subject to requirements of applicable laws requiring the recordation or other indication of ownership or security interests therein

B. Corporate Documents

    1. Officer's Certificate of Seller (reps and warranties)

    2. Secretary's Certificate of Seller (including Resolutions, bylaws, incumbency)

C. Miscellaneous

UCC-1 financing statement containing a collateral description approved by Seller, naming Axis Capital, Inc. as Seller and TCF Equipment Finance, a division of TCF National Bank as Buyer with respect to the Purchased Assets, to be filed with the Secretary of State of the State of Nebraska.

D. Purchased Contract Documents

Purchased Contract Documents are those documents set forth in Schedule 1, to be delivered to TCF Equipment Finance in hard copy (including original Equipment Schedules and certified copies of applicable Master Lease Agreements as per Section 2.7 of the Purchase Agreement).

- 28 -

Wire Transfer Instructions

Seller's wire transfer instructions:

Bank:  Wells Fargo Bank, N.A.
ABA:  121000248
Account:  3189952660
Name:  Axis Capital, Inc.
Reference:  TCF Portfolio Sale #01

Contract Forms

The Contract Forms are attached hereto.  There are a total of 6 forms attached to this Exhibit, having the following names:

1. Master Lease Agreement and Schedules
2. Equipment Finance Agreement - two editions
3. Lease Agreement ($1.00, $101, or 10% PUT)
4. Lease with Option to Purchase (FMV)
5. KMH Systems, Inc. Rental Agreement
6. Alliance Funding Group Equipment Lease

- 30 -

# MASTER LEASE AGREEMENT

DATE OF MASTER LEASE AGREEMENT:_____     MASTER LEASE AGREEMENT # _____

**LESSOR:**

| |
|---|
| AXIS CAPITAL INC |
| ADDRESS |
| 308 NORTH LOCUST STREET |
| CITY / STATE / ZIP |
| GRAND ISLAND NE 68801 |
| PHONE NUMBER |
| 308-398-4140 |

**LESSEE:**

| |
|---|
| |
| ADDRESS |
| |
| CITY / STATE / ZIP |
| |
| PHONE NUMBER |
| |

**LESSEE INFORMATION:**

| FORM OF ORGANIZATION: | |
|---|---|
| STATE OF ORGANIZATION: | |

| FEDERAL TAX ID NO.: | |
|---|---|
| STATE ORGANIZATION ID #: | |

For and in consideration of the mutual promises set forth below, **AXIS CAPITAL, Inc.** ("Lessor") and the lessee named above ("Lessee") agree as follows:

1. **MASTER LEASE.** This Master Lease Agreement ("Master Lease") provides terms and conditions the parties hereto intend to be applicable to various lease transactions. Each lease contract shall be evidenced by a Lease Schedule, in the form attached hereto as Exhibit A, executed by Lessor and Lessee that explicitly incorporates the provisions of this Master Lease and sets forth specific terms of that particular lease contract (each such Lease Schedule, as it incorporates this Master Lease, shall be called "the Lease Schedule"). Where the provisions of a Lease Schedule conflict with the terms of this Master Lease, the provisions of the Lease Schedule shall prevail. Each Lease Schedule shall constitute a complete and separate lease agreement, independent of all other Lease Schedules and without any requirement of being accompanied by an originally executed counterpart of this Master Lease. One originally executed counterpart of the Lease Schedule shall be stamped "Original" and retained by the Lessor. If more than one counterpart of the Lease Schedule is executed by Lessor and Lessee, all other counterparts shall be stamped "Duplicate Original." Only transfer of possession or control by the Lessor of the originally executed counterpart stamped "Original" shall be effective for purposes of perfecting an interest in the Lease Schedule by possession.

2. **DISCLAIMER OF WARRANTIES.** LESSOR IS NOT A SELLER, SUPPLIER OR MANUFACTURER (AS SUCH TERMS ARE DEFINED OR USED, AS THE CASE MAY BE, IN THE UNIFORM COMMERCIAL CODE "UCC")), OR DEALER, NOR A SELLER'S OR A DEALER'S AGENT. THE EQUIPMENT IS LEASED HEREUNDER "AS IS", AND LESSOR HAS NOT MADE, AND HEREBY DISCLAIMS LIABILITY FOR, AND LESSEE HEREBY WAIVES ALL RIGHTS AGAINST LESSOR RELATING TO, ANY AND ALL WARRANTIES, REPRESENTATIONS OR OBLIGATIONS OF ANY KIND WITH RESPECT TO THE EQUIPMENT, EITHER EXPRESS OR IMPLIED, ARISING BY APPLICABLE LAW OR OTHERWISE, INCLUDING ANY OF THE SAME RELATING TO OR ARISING IN OR UNDER (a) *MERCHANTABILITY OR FITNESS FOR PARTICULAR USE OR PURPOSE*, (b) COURSE OF PERFORMANCE, COURSE OF DEALING OR USAGE OR TRADE OR (c) TORT (WHETHER OR NOT ARISING FROM THE ACTUAL, IMPLIED OR IMPUTED NEGLIGENCE OF LESSOR OR STRICT LIABILITY) OR THE UCC (INCLUDING ARTICLE 2A, AS HEREINAFTER DEFINED; AND, WITHOUT LIMITING THE FOREGOING, INCLUDING, (i) ANY WARRANTIES CONTAINED IN §§ 2A-210, 211, 212 AND 213, (ii) ANY RIGHT TO DEEM LESSOR IN DEFAULT PURSUANT THERETO AND (iii) ALL OF LESSEE'S RIGHTS AND REMEDIES UNDER §§ 2A-508 THROUGH 521) OR OTHER APPLICABLE LAW WITH RESPECT TO THE EQUIPMENT, INCLUDING ITS TITLE OR FREEDOM FROM LIENS, FREEDOM FROM TRADEMARK, PATENT OR COPYRIGHT INFRINGEMENT, FREEDOM FROM LATENT DEFECTS (WHETHER OR NOT DISCOVERABLE), CONDITION, MANUFACTURE, DESIGN, SERVICING OR COMPLIANCE WITH APPLICABLE LAW; it being agreed that all such risks, as between Lessor and Lessee, are to be borne by Lessee; and Lessor's agreement to enter into this Lease and any Lease Schedule is in reliance upon the freedom from and complete negation of liability or responsibility for the matters waived and disclaimed herein. Without limiting the generality of any other provision hereof, Lessee acknowledges that Lessor is not responsible for any direct, indirect, incidental or consequential damage to or losses attributable to the Equipment or any products manufactured thereby. All assignable warranties made by the Supplier to Lessor are hereby assigned to Lessee for and during the term of the Lease Schedule relating thereto and Lessee agrees to resolve all such claims directly with the Supplier. Provided that no default or Default has occurred and is then continuing, Lessor fully shall cooperate with Lessee with respect to the resolution of such claims, in good faith and by appropriate proceedings at Lessee's expense. Any such claim shall not affect in any manner the unconditional obligation of Lessee to make rent payments hereunder.

3. **UCC ARTICLE 2 LEASE.** Lessee and Lessor agree and acknowledge that it is the intent of both parties that in the event Article 2A of the Uniform Commercial Code ("UCC") is deemed to be applicable to this Lease, this Lease shall qualify as a statutory finance lease under the UCC Article 2 (A). Lessee acknowledges and agrees that Lessee has selected both: (1) the Equipment; and (2) the supplier from whom Lessor is to purchase the Equipment. Lessee acknowledges that Lessor has not participated in any way in Lessee's selection of the Equipment or of the supplier, and Lessor has not selected, manufactured or supplied the Equipment. LESSEE IS ADVISED THAT IT MAY HAVE RIGHTS UNDER THE CONTRACT EVIDENCING THE LESSOR'S PURCHASE OF THE EQUIPMENT FROM THE SUPPLIER CHOSEN BY LESSEE AND THAT LESSEE SHOULD CONTACT THE SUPPLIER OF THE EQUIPMENT FOR A DESCRIPTION OF ANY SUCH RIGHTS. Lessor agrees to order the Equipment from Seller but shall not be liable for specific performance or damages if, for any reason, Seller delays or fails to

LESSEE INITIALS _____

fill such order Lessor has no obligation to install the Equipment. Lessee acknowledges that Lessor, or its assigns is not the manufacturer, the supplier or the dealer of the Equipment and that Lessor, or its assigns has not recommended Seller to Lessee. Lessee hereby waives any claim against Lessor or its assigns with respect to negligence or strict liability in the design, construction or manufacture of the Equipment.

4.  **NET AND NONCANCELLABLE LEASE.** This is a net Lease and Lessee's obligation to pay the rent and other amounts due hereunder is unconditional and not subject to abatement, reduction or setoff, defense, counterclaim or interruption of any kind. The Master Lease is a non-cancelable lease and will not terminate in the event of any damage to or destruction of the Equipment. The Master Lease may be terminated only as expressly provided herein. To the extent permitted by law, Lessee waives the right to (i) cancel the Master Lease; (ii) repudiate the Master Lease; (iii) reject the Equipment; (iv) revoke acceptance of the Equipment; (v) recover damages from Lessor for any breaches of warranty or for any other reason; (vi) grant a security interest in the Equipment to a third party (vii) deduct from rents all or any part of claimed damages resulting from Lessor's default, if any.

5.  **TERM.** The initial term of the Master Lease (the "Initial Term") respecting the Equipment shall commence on the 1st day of the month following acceptance of the equipment by Lessee and end upon the full performance and observance by Lessee of each and every term, condition and covenant set forth in the Master Lease. Except as otherwise provided in the Lease Schedule or any amendment thereto, the Lease Schedule will continue through the Base Term and thereafter until terminated by either party upon at least 90 days prior written notice to the other party, which notice may not be withdrawn without the consent of the other party.

6.  **SECURITY DEPOSIT AND ADVANCE RENTALS.** The Security Deposit or Advance Rentals specified on each Lease Schedule shall be paid by Lessee to Lessor upon the signing of the Lease Schedule and may be deposited in Lessor's general operating account. Following completion of the term of the Master Lease for that Equipment, and provided there has been no breach of the Master Lease, Lessor shall refund to Lessee without interest the Security Deposit that relates to Equipment whose lease term has expired as long as no event of default has occurred on this schedule or any other schedule under this Master Lease. No security deposit shall be applied by the Lessee to the last rent payment. Any Advance Rentals paid by Lessee shall be applied to the last rent payments due during the Initial Term of the Master Lease, except as otherwise agreed by Lessor.

7.  **COMMENCEMENT & RENTAL PAYMENTS.** The Master Lease shall commence upon the written acceptance hereof by Lessor, hereafter referred to as the "Commencement Date" and shall end upon full performance in observance by Lessee of each and every term, condition, and covenant set forth in the Master Lease and any extensions thereof. The monthly rental payments shall be in advance and shall be in the amount and frequency as provided in the Lease Schedule. The first such rental payment shall commence and be made on the 1st day of the calendar month following the earliest date on which the equipment is accepted by the Lessee or an Interim Funding Agreement is executed by the Lessee. In addition to regular rentals, Lessee shall pay to Lessor interim rent, which shall be a pro rata portion of the monthly rental charges based on a daily rental charge of one-thirtieth (1/30th) of the monthly rental calculated from the earliest date of which the equipment is accepted by Lessee, or a prefunding addendum is executed by the Lessee, to the end of the month. Interim rent shall be due and payable upon Lessee's receipt of invoice from Lessor. Lessee agrees to pay Lessor the following, or if less, the maximum allowed by law: (a) late charges equal to ten percent (10%) of the amount due for all scheduled payments not made when due or $25.00 whichever is greater, and (b) $25.00 for each check returned or ACH debit not honored for any reason and (c) if the Lessor has had to perform collection activities in connection with such late late payment, the Lessor's specified collections charges then in effect for such activities. The foregoing will not be construed as interest but as reimbursement to Lessor to cover administrative and overhead expenses related to the processing and collection of the late amount on Lessee's account. In addition, Lessee agrees to pay to Lessor fees in connection with the documentation of this Lease, any site inspections for Equipment or any additional collateral, and/or lien search Lessor deems necessary. Lessee agrees that all such fees may not only cover Lessor's cost but they may also include a profit.

8.  **TITLE.** The parties intend and agree that the Equipment shall remain personal property, and that Lessor's title thereto not be impaired, notwithstanding the manner in which it may be affixed to any real property. Lessee shall obtain and deliver to Lessor (to be recorded at Lessee's expense), from any person having an interest in the property where the Equipment is to be located, waivers of any lien, encumbrance or interest which such person might have or hereafter obtain or claim with respect to the Equipment. It is the express intention of the parties hereto that (1) each Lease Schedule, incorporating by reference the terms of this Master Lease, constitutes a true "lease" and a "finance lease" as such terms are defined in the UCC Article 2A - Leases ("Article 2A") (whether or not Article 2A is then in effect in the State) and not a sale or retention of security interest; and (2) title to the Equipment shall at all times remain in Lessor, and Lessee shall acquire no ownership, property, rights, equity, or interest other than a leasehold interest, solely as a lessee subject to the terms and conditions hereof. Title to the Equipment shall at all times remain in Lessor and Lessee shall protect and defend the title of Lessor and keep it free of all claims and liens other than those of Lessee hereunder or created by Lessor. If the Master Lease shall be construed by a court to be a lease "intended as security" and not a "true" lease, then Lessee, to secure all of Lessee's payment and performance obligations under the Master Lease, hereby grants to Lessor a first priority security interest in the Equipment and all proceeds thereof, as security for all of the Lessee's indebtedness and obligations owing under the Master Lease, and the irrevocable right to make such filings under the Uniform Commercial Code or other law naming Lessee as debtor, as Lessor may deem necessary to establish or perfect Lessor's security interest. If the Master Lease is deemed to be a lease intended as security and not a true lease, then as additional collateral Lessee and each guarantor hereby grants to Lessor a first priority security interest in all receivables, general intangibles, life insurance policies, chattel paper, instruments, goods, equipment, machinery, fixtures, furnishings, and all other personal and real property together with all other accessories, accessions, attachments thereto, whether now owned or hereafter acquired, and all other substitutions, renewals, replacements and improvements and all proceeds of the foregoing, including proceeds in the form of rights and supporting obligations (collectively together with the Equipment, the "Collateral"). If the Master Lease is intended as security, the parties agree that each rental payment included compensation that constitutes interest.

9. **SOFTWARE.** All references to "Equipment" shall include software and/or software licenses. Notwithstanding any contrary language in the Master Lease, Lessee understands that the Vendor shall continue to retain title to the equipment described as computer software or software license. The Lessee hereby grants to Lessor a security interest in all of its right, title and interest in and to the Equipment, including the software, as some may be modified, corrected, supplemented or enhanced from time to time. Lessor shall have all the rights of a secured creditor under the Uniform Commercial Code (the "UCC") with respect to the Equipment. Lessee shall not be permitted to assign its interest hereunder or sublease said License or use of the Equipment to any other person or entity without both Lessor's and Vendor's prior written consent, which may be declined for any reason. Lessee shall have no right, title or interest in the Equipment or License except as expressly provided herein and in any license agreement with the Vendor. Lessee hereby acknowledges receiving a copy of said license agreement, the terms of which are incorporated by reference herein. Lessee agrees to be bound by the terms and conditions of said License and agrees to indemnify and hold Lessor harmless from and against all claims, losses, liabilities, damages, judgment, suits and all legal proceedings and expenses in connection therewith, arising out of the possession, use and operation of the Equipment or arising out of Lessee's breach of the terms of the license agreement. This indemnity shall be in addition to that provided in the Master Lease.

10. **LAWS AND TAXES.** LESSEE SHALL COMPLY WITH ALL LAWS AND REGULATIONS RELATING TO THE EQUIPMENT AND ITS USE AND SHALL PROMPTLY PAY WHEN DUE ALL SALES, USE, PROPERTY, EXCISE AND OTHER TAXES AND ALL LICENSE AND REGISTRATION FEES NOW OR HEREAFTER IMPOSED BY ANY GOVERNMENTAL BODY OR AGENCY UPON THE EQUIPMENT OR ITS USE OR THE RENTALS HEREUNDER. Lessee shall prepare and file all tax returns relating to taxes for which Lessee is responsible hereunder which Lessee is permitted to file under the laws of the applicable taxing jurisdiction. Lessee agrees to indemnify and hold Lessor and any Assignee (as defined below) harmless from, against and in respect of any and all such taxes. If the Lessor is required to file personal property tax returns and/or pay property taxes, then Lessee shall pay directly to Lessor, the amount of such taxes paid together with reasonable administrative fee to compensate the Lessor for administrative overhead expenses shall be payable to Lessor as additional payments, and failure to repay the same shall constitute a default hereunder. Lessor shall not be obligated to contest any valuation of or tax imposed on the Equipment subject of this Lease, or otherwise file for any exemptions relating to such taxes, as any and all of such actions shall be the responsibility of the Lessee.

11. **TAX BENEFIT INDEMNITY.** If (a) Lessor incurs a disallowance, elimination, recapture, reduction or disqualification, in whole or in part, or any deduction, credit or other tax benefit claimed by Lessor for federal, state, or local income tax purposes in any tax law change), (b) Lessor shall lose the right to claim any Tax Benefit for any reason (including any tax law change), (c) any tax law change should adversely affect Lessor's anticipated net after tax rate of return over the term of this Lease (any one or more of the occurrences in (a), (b) or (c) above being hereafter called a "Tax Loss"), then, upon demand by Lessor, the Lessee shall immediately pay to Lessor as additional rent the amount which will (after deduction thereof of all taxes, interest, additions to tax or penalties that have been or will be required to be paid by Lessor at the highest marginal corporate tax rate under all applicable federal, state, and local laws), in Lessor's reasonable opinion, compensate Lessor for the Tax Loss.

12. **INSPECTION.** Lessor shall have the right during normal business hours to enter into and upon the premises where the Equipment is located for the purpose of inspecting the same or observing its use.

13. **ALTERATIONS.** Without the prior written consent of Lessor, Lessee shall not make any alterations, additions or improvements to the Equipment. Any alteration, addition or improvement shall become the property of Lessor and part of the Equipment for all purposes hereunder.

14. **REPAIRS.** Lessee, at its own cost and expense, shall keep the Equipment in good repair, condition and working order and shall furnish or purchase any and all parts, mechanisms, devices and labor required to keep the Equipment in good mechanical and working order. If indicated on the applicable Lease Schedule, Lessee shall at its own expense cause the Equipment to be covered by a maintenance contract, with a service organization acceptable to Lessor, at all times during the Master Lease term and until the Equipment has been returned to Lessor.

15. **LOSS OR DAMAGE.** From the date the supplier ships the Equipment to Lessee or the date Lessor confirms Lessee's purchase order or contract to Supplier, Lessee hereby assumes and shall bear the entire risk of loss for theft, damage, destruction or other injury to the Equipment from any and every cause whatsoever. NO SUCH LOSS OR DAMAGE SHALL IMPAIR ANY OBLIGATION OF LESSEE UNDER THE MASTER LEASE WHICH SHALL CONTINUE IN FULL FORCE AND EFFECT. In the event any item of Equipment shall become lost, stolen, destroyed, damaged beyond repair or rendered permanently unfit for any reason, or in the event of condemnation or seizure of the Equipment (or any part thereof) and irrespective of payment from any insurance coverage maintained by Lessee, but applying full credit there for, Lessee shall at the option of Lessor, (a) place the Equipment in good repair, condition and working order acceptable to Lessor; or (b) replace the Equipment (or any part thereof) with like equipment having a fair market value equal to that of the replaced equipment prior to it being so affected and in good repair, condition and working order and transfer clear title to such replacement equipment to Lessor whereupon such replacement equipment shall be deemed the Equipment for all purposes; or (c) pay to Lessor the following amounts: (i) if the Master Lease provides for a Casualty Loss Value of the Equipment, the total rent due and owing at the time of such payment plus an amount calculated by Lessor which is equal to the Casualty Loss Value as defined in and attached to each Lease Schedule; (ii) if the Master Lease does not provide for a Casualty Loss Value of the Equipment, not as a penalty, but herein liquidated for all purposes, an amount equal to the sum of (A) any accrued and unpaid rent as of the date of the loss, theft, damage or destruction occurred ("Date of Loss") (B) the then present value (determined at a discount rate of three percent (3%) per annum) of all future rentals reserved in the Master Lease and contracted to be paid over the unexpired term of the Master Lease and (C) the agreed upon or estimated residual value of the equipment as of the expiration of this Lease or any renewal thereof, as of the date such amount is received by Lessor; and (D) any other amount otherwise then due and owing under the Master Lease or which otherwise will become due and owing irrespective of the fact that the Equipment has been damaged, destroyed, lost or stolen including any additional taxes or other charges that may otherwise arise by reason of the damage, destruction, loss or theft of the Equipment. Upon Lessor's receipt of such payment, Lessee shall be

LESSEE INITIALS _____  _____

entitled to the proceeds of any recovery in respect of any such item of Equipment from insurance or otherwise to the extent that said proceeds do not exceed the Casualty Loss Value of such item of Equipment, and any excess shall be retained by Lessor.

16. **DELIVERY AND ACCEPTANCE.** Unless otherwise provided in a Lease Schedule, Lessee shall pay the cost of transportation of the Equipment to Lessee. Lessee shall bear the risk of loss during such transportation. Upon delivery Lessee shall sign and deliver to Lessor an acceptance certificate satisfactory to Lessor.

17. **LOCATION OF USE.** Lessee hereby agrees that the Equipment will be used solely for business or commercial purposes. Unless otherwise stated on a Lease Schedule, the Lessee will cause the Equipment subject to that Lease Schedule to be located (after initial delivery to Lessee) at Lessee's address stated at the heading of this Agreement until such time as the Equipment is returned to Lessor or returned in accordance with Lessor's instructions.

18. **RETURN OF EQUIPMENT.** Upon the expiration of or earlier termination of this Lease with respect to an item of Equipment, Lessee shall return the same directly to Lessor at its offices in Grand Island, Nebraska, or such other location as Lessor designates, in good repair, condition and working order (ordinary wear and tear resulting from proper use thereof alone excepted), completed and ready for further use. Lessee shall pay all transportation and other expenses relating to such return. Lessee authorizes Lessor to sell the Equipment while located upon Lessee's premises. In the event Lessee breaches this section, Lessor may, in lieu of its other remedies, require Lessee to purchase the items of Equipment as to which the breach occurred on the same terms as if Lessee were exercising an option to purchase such Equipment under this Master Lease and Schedule specific to said equipment (whether or not such an option was granted to Lessee). Individual schedule(s) under said Master Lease may have different options at the expiration of the set term or any renewal term; in the event no option is marked the Schedule will default to Section 18 of the Master Lease as stated above.

19. **INSURANCE.** Lessee at its expense shall provide insurance coverage in amounts and with insurance carriers acceptable to Lessor for all risks of: (a) loss, theft, damage or destruction to the Equipment, with coverage not less than the original cost of the Equipment (excluding depreciation); and (b) public liability and property damage covering personal injuries, death or property damage resulting from the ownership, maintenance, use, operation or transportation of the Equipment, with coverage of not less than $1,000,000 per occurrence. Each of the insurance policies providing said coverage shall name Lessor and any Assignee as loss payee and additional insured, provide that the policy may not be canceled or materially altered without thirty (30) days prior written notice to Lessor, and be primary without right of contribution from any insurance carried by Lessor. Lessee shall, if requested by Lessor, provide Lessor with a certificate(s) evidencing said coverage prior to taking possession of the Equipment. Lessee hereby irrevocably appoints Lessor as Lessee's attorney-in-fact to make claim for, receive payment of, and execute and endorse all documents, checks or drafts for loss or damage or returned premium under any insurance policy of Lessee's. If Lessee fails to obtain and maintain in effect the requisite insurance policies, Lessor, with no prejudice or waiver of any other right hereunder or provided by law, may at its option obtain insurance to be issued covering Lessor's interest in the Equipment for the term of this agreement, including all extensions and/or renewals. Lessor may add the costs of acquiring and maintaining such insurance and related fees for Lessor's services in placing and maintaining such insurance (collectively, "Insurance Charge") on which Lessor may earn a profit, to the other amounts due Lessor by Lessee under the terms hereof. Such insurance coverage may duplicate the coverage under Lessee's existing policies. The Insurance Charge shall be paid in equal installments added to remaining Rental Payments. Nothing in this agreement will create an insurance relationship between Lessor and any other person Lessee acknowledges that Lessor is not required to secure or maintain any insurance, and Lessor will not be liability to Lessee if Lessee terminates any insurance coverage that Lessor arranges. The proceeds of such insurance payable as a result of loss or damage to the Equipment shall be applied as set out in Paragraph 15.

20. **INDEMNITY.** Lessee shall and does hereby agree to indemnify, defend and hold harmless Lessor and any Assignee, and each of their directors, officers, employees, agents or affiliates from any and all claims, demands, actions, suits, proceedings, costs, expenses, damages, and liabilities (including attorneys' fees) arising out of, connected with or resulting from the delivery, possession, use, operation, maintenance, repair or return of Equipment by Lessee or its employees, agents, customers or invitees or vendors. Lessee's obligations under the preceding sentence shall survive expiration of any rental term or the termination of the Master Lease.

21. **REPRESENTATIONS AND WARRANTIES BY LESSEE.** Lessee represents and warrants to Lessor that: (a) the Master Lease constitutes Lessee's legal, valid and binding obligation and is enforceable against Lessee in accordance with its terms; (b) Lessee's entry into and performance under the Master Lease will not result in any breach, default or violation under Lessee's charter documents (articles of incorporation and bylaws in the case of a corporation or partnership agreement in the case of a partnership or articles of organization and operating agreement in the case of a limited liability company) or any other agreement to which Lessee is a party or to which it or its property is subject; (c) there are no suits or proceedings pending or threatened before any court, government agency or arbitrator which, if determined adversely to Lessee, would have a material adverse effect on its financial condition or ability to perform its obligations under the Master Lease; (d) that any financial statements or other information which Lessee has furnished Lessor concerning the business or condition of Lessee are true, correct and complete at the time furnished or as of the date of such financial statements; (e) the Equipment shall remain personal property; with respect to any Equipment that is the subject of any sale and leaseback transaction pursuant hereto, Lessee has good title to, rights in, and/or power to transfer all of the same. The Equipment is removable from and is not essential to the premises upon which it is located regardless of its attachment to realty, and Lessee agrees to take such action at its expense as may be necessary to prevent any third party from acquiring any interest in the Equipment as a result of its attachment to realty with respect to all of the Equipment leased hereto.

22. **FINANCIAL STATEMENTS.** Upon request by Lessor, Lessee will within thirty days of completion provide statements for its most recently completed fiscal year end or quarter and any other financial information reasonably requested.

LESSEE INITIALS _____

23. **ASSIGNMENT BY LESSOR.** Lessor may from time to time without notice to Lessee sell, assign, pledge, transfer or convey to a third party (each an "Assignee") all or part of Lessor's right, title and interest in the Lease Schedule, the Equipment, or any sums payable therefor. Lessor may grant a security interest in the same to such Assignee as collateral security for any loans or advances made or to be made to Lessor by such Assignee. Lessee, upon receipt of notice of any such transfer, assignment or security interest and instructions from Lessor shall pay its obligations under the Master Lease to Assignee (or to any other party designated by Assignee). Upon any such transfer, assignment or granting of a security interest by Lessor, Lessee's obligations hereunder with respect to Assignee, including, without limit, its obligation to pay the Assignee rents and other sums due and to become due under the Master Lease, shall be absolute and unconditional, and shall not be subject to any abatement, reduction, recoupment, defense, offset or counterclaim for any reason, including but not limited to any defect in the Equipment, the condition, design, operation or fitness for use or any loss or destruction of the Equipment or any part thereof, the prohibition or other restriction against Lessee's use of the Equipment, the interference with such use by any person or entity, any failure by Lessor to perform any of its obligations herein contained, or any other cause, whether similar or dissimilar to the foregoing. Upon notice of any intended transfer, assignment, or granting of a security interest: (a) Lessee shall promptly submit to Lessor such documents as may be reasonably required by the intended Assignee, in form and substance satisfactory to the intended Assignee, including without limitation: (1) a certificate that the Equipment was delivered and accepted; (2) if Lessee is a corporation, a certified copy of resolutions adopted by Lessee's Board of Directors authorizing execution of the Master Lease; (3) an acknowledgment to Lessor's transfer, assignment or granting of a security interest; (4) a UCC Financing Statement; (b) in the event of any such assignment, transfer, or granting of a security interest: (1) Lessee shall send copies of any notices which are required hereunder to be sent to Lessor to the Assignee as well as to Lessor; (2) Lessee shall not permit the Master Lease to be amended or any provisions thereof to be waived without the prior written consent of the Assignee; (3) Lessee agrees not to look to the Assignee to perform any of Lessor's obligations hereunder; (4) Lessee agrees that Assignee shall be exclusively entitled to all of the rights and remedies provided to Lessor under the Master Lease; (c) no such transfer, assignment or granting of a security agreement by Lessor shall relieve Lessor of any of its obligations under the Master Lease or shall limit Lessee's rights to look to Lessor for the performance of such obligations.

24. **ASSIGNMENT BY LESSEE.** LESSEE SHALL NOT ASSIGN, TRANSFER, PLEDGE, OR HYPOTHECATE THE MASTER LEASE, THE EQUIPMENT OR ANY PART THEREOF, OR ANY INTEREST THEREIN. LESSEE SHALL NOT SUBLET OR LEND THE EQUIPMENT, OR ANY PART THEREOF, OR PERMIT THE EQUIPMENT OR ANY PART THEREOF TO BE USED BY ANYONE OTHER THAN LESSEE WITHOUT THE PRIOR WRITTEN CONSENT OF LESSOR (OR FOLLOWING AN ASSIGNMENT, ANY ASSIGNEE OF WHICH THE LESSEE HAS KNOWLEDGE OF) WHICH CONSENT WILL NOT BE UNREASONABLY WITHHELD. If Lessee is a corporation or a partnership, the change in ownership of 50% or more of the ownership interest in Lessee during the term of the Master Lease without the written consent of Lessor constitutes a prohibited assignment hereunder. Subject always to the foregoing, the Master Lease inures to the benefit of, and is binding upon the heirs, legatees, personal representatives, successors, and assigns of the parties hereto. No sale, assignment or sublease, whether authorized by Lessor or in violation of the terms hereof, shall relieve Lessee of its obligations and Lessee shall remain primarily liable hereunder and under each Lease Schedule. Assigns shall become bound as a "new debtor" to the Master Lease as set forth under UCC § 9-203(e).

25. **DEFAULT.** Any one of the following events shall constitute an "Event of Default" hereunder: (a) Lessee shall fail to pay when due any installment of rent or other amount due hereunder; (b) Lessee shall fail to observe or perform any other agreement to be observed or performed by Lessee hereunder; (c) Lessee, any guarantor of the Master Lease, or any partner of Lessee if Lessee is a partnership shall cease doing business as a going concern or make an assignment for the benefit of creditors; (d) Lessee, any guarantor of the Master Lease, or any partner of Lessee if Lessee is a partnership shall voluntarily file, take any action to authorize the filing, or have filed against it involuntarily, a petition for liquidation, reorganization, adjustment of debt or similar relief under the federal or state bankruptcy or insolvency law; (e) a trustee, receiver, or liquidator be appointed for Lessee, any guarantor of the Master Lease, or for all or a substantial part of the assets of Lessee or any guarantor; (f) any individual Lessee or individual guarantor of the Master Lease, or partner of Lessee if Lessee is a partnership, shall die; (g) an event of default shall occur under any other obligation Lessee or any guarantor of the Master Lease owes to Lessor; (h) an event of default by Lessee shall occur under any agreement involving Lessee's or a guarantor's indebtedness to a lender for borrowed money; or (i) Lessee shall have terminated its corporate existence, consolidated with, merged into, or conveyed or leased substantially all of its assets as an entity to any person unless:(i) such person executes and delivers to Lessor an agreement satisfactory in form and substance to Lessor, in its sole discretion, containing such person's effective assumption and its agreement to pay, perform, comply with and otherwise be liable for all of Lessee's obligations having previously arisen, or then or thereafter arising, under the Master Lease together with any documents, agreements, certificates, opinions and filings by Lessor; and (ii) Lessor (and any Assignee) is satisfied as to the creditworthiness of such person.

26. **REMEDIES.** Upon the occurrence of an Event of Default and at any time thereafter, Lessor or Assignee may exercise from time to time any one or more of the following remedies: (a) terminate this Master Lease as to any portion or all of the Equipment; (b) take immediate possession of any or all of the Equipment; wherever situated, and for such purpose enter upon any premises without liability for so doing or requirement to post bond in any legal proceeding; (c) hold, use, lease, sell or otherwise dispose of any or all of the Equipment in such manner as Lessor in its sole discretion may decide. With respect to any exercise of its rights to recover and/or dispose of any Equipment, Lessee acknowledges and agrees that Lessor shall have no obligation, subject to the requirements of commercial reasonableness, to clean up or otherwise prepare the Equipment for disposition; (d) accelerate the due date of all remaining rent payments due hereunder for the entire remaining Initial Term of this Master Lease or any amendment thereto, including any renewal term then in effect, whereupon said amounts shall be immediately due and payable; (e) recover the sum of: (i) any accrued and unpaid rent, plus (ii) the then present value (determined at a discount rate of three percent (3%) per annum) as calculated by Lessor of all future rentals reserved in this Master Lease and contracted to be paid over the unexpired Initial Term of this Master Lease (or any renewal period then in effect), and (iii) the anticipated residual value of the Equipment as of the expiration of this Master Lease or any renewal thereof, as of the date such amount is received by Lessor; (iv) any indemnity payment, if then determinable;

LESSEE INITIALS _____

(v) all reasonable costs and expenses incurred by Lessor in any repossession, recovery, storage, repair, sale, re-lease or other disposition of the Equipment, including but not limited to costs of transportation, possession, storage, refurbishing, advertising and broker's fees together with all attorney's fees and cost incurred in connection therewith or otherwise resulting from Lessee's default (including any incurred at trial, on appeal or any other proceeding); and (vi) the value of all Tax Benefits lost to Lessor as a result of Lessee's default or the enforcement by Lessor of any remedy (f) expend such monies as Lessor deems appropriate to cure or mitigate the effect of the Event of Default, or to protect Lessor's interest in the Equipment and this Master Lease, with all such sums to be immediately reimbursed to Lessor by Lessee; (g) setoff Lessee's Security Deposit or any other property of Lessee held by Lessor against any amount owed by Lessee to Lessor; and (h) exercise any other remedy permitted by law, equity or any other agreements with Lessee or any guarantor of this Master Lease. No remedy given in this paragraph is intended to be exclusive and each shall be cumulative. No express or implied waiver by Lessor of any Event of Default shall constitute a waiver of any subsequent Event of Default. Default interest will be charged on the amount calculated in clause (e) above in this Section at 18% per annum or the highest amount allowed by law from the due date thereof until received by Lessor.

27. **NOTICES.** Any written notices hereunder shall be deemed to have been given when delivered personally or deposited in the United States mails, postage prepaid, certified mail, return receipt requested, and if to Lessee, mailed to its address set forth at the heading of this Agreement or to such other address as may be last known to Lessor, and if to Lessor, addressed to AXIS Capital, Inc., 308 North Locust Street, Grand Island NE 68801, or such other address as Lessor may hereafter specify in a written notice to Lessee. Lessee hereby agrees that by providing Lessor with an email address or a telephone number for a wireless device, Lessee express consents to receiving communications including voice and text messages from Lessor or our affiliates or assigns at the number or email address, and this express consent applies to each such email address or telephone number that Lessee provides to Lessor now or in the future and permits such calls and emails regardless of their purpose and understand these calls and messages may incur additional fees from Lessee's internet or wireless provider.

28. **LABELING.** Lessee shall keep all Equipment free from any marking or labeling which might be interpreted as a claim or ownership thereof by Lessee or any party other than Lessor or anyone so claiming through Lessor. If Lessor requests Lessee shall cause the Equipment to be plainly marked or tagged to indicate Lessor's interest in the Equipment.

29. **FURTHER ASSURANCES.** Lessee agrees to execute or otherwise authenticate and deliver such other documents, records, financing statements or instruments necessary to effect the transactions contemplated by this Master Lease or requested by Lessor to document or protect Lessor's ownership interest in the Equipment. You hereby grant to us a security interest under the "UCC" in the equipment referenced on Schedule "A" and other property and all accessories and additions thereto and replacements and all proceeds of the foregoing (the "equipment") that Lessor deems necessary to perfect its interest in the Master Lease and Equipment. Such security interest is granted to secure payment and performance of your obligations hereunder. All amounts received under this Master Lease shall be applied towards your obligations as we determine. As additional collateral you and each guarantor hereby grant us a first priority security interest in all receivables, general intangibles, life insurance policies, chattel paper, instruments, goods, equipment, machinery, fixtures, furnishings, and all other personal and real property together with all other accessories, accessions, attachments thereto, whether now owned or hereafter acquired, and all other substitutions, renewals, replacements and improvements and all proceeds of the foregoing, including proceeds in the form of goods, accounts, chattel paper, documents, instruments, general intangibles, investment property, deposit accounts, letter of credit rights and supporting obligations (collectively together with the Equipment, the "Collateral") or any other agreement should we so choose. Lessee shall provide written notice to Lessor not less than thirty (30) days prior to any contemplated change in the name, jurisdiction of organization or address of the chief executive officer of Lessee, or any change in its state organizational identification number (if applicable).

30. **USA PATRIOT ACT; ANTI-MONEY LAUNDERING.** Lessor hereby notifies the Lessee that pursuant to the requirements of the USA PATRIOT Act (Title III of Pub. L. 107-56 (signed into law October 26, 2011)) (the "Act"), it is required to obtain, verify and record information that identifies each lessee and guarantor, which information includes the name and address of each lessee and guarantor and other information that will allow Lessor to identify each lessee and guarantor in accordance with the Act. The Lessee and the guarantors of any Lease agree to, promptly following a request by the Lessor, provide all such other documentation and information that the Lessor requests in order to comply with its ongoing obligations under applicable "know your customer" and anti-money laundering rules and regulations, including the Act. Lessee hereby represents that Lessee is and will remain in full compliance with all applicable laws including, without limitation, (a) ensuring that no person who owns a controlling interest in or otherwise controls Lessee or any guarantor is or shall be listed on the Specially Designated Nationals and Blocked Person List maintained by the Office of Foreign Assets Control ("OFAC"), Department of the Treasury, and/or any other similar lists maintained by OFAC pursuant to any authorizing statute, Executive Order or regulation, and (b) compliance with all applicable Bank Secrecy Act ("BSA") laws, regulations, and government guidance on BSA compliance and on the prevention and detection of money laundering violations.

31. **ENTIRE AGREEMENT.** The Master Lease shall not be amended, altered, or changed, or any obligation hereunder waived, except by written agreement signed by the parties hereto. No agent or employee of Lessor shall have the power to waive any of the terms or provisions hereof, or to incur additional obligations on behalf of Lessor, unless such waiver or additional obligations are evidenced by an agreement in writing signed by a duly authorized officer of Lessor and by the Lessee. No agent or employee of Lessor shall have the authority to receive any payment of rentals or other sums accruing hereunder except remittances made payable to the order of Lessor for purposes of forwarding same to Lessor, and no agent or employee shall have any power to endorse for collection or otherwise any of those remittances. This Master Lease will be binding upon and insure to the benefit of the heirs, executors, administrators, successors, and permitted assigns of the parties hereto. This Lease sets forth the entire understanding of the parties with respect to its subject matter and may only be amended by written instrument executed by both parties and any other purported amendment shall be void. Lessee does authorize AXIS Capital, Inc to either insert or correct the lease number, Lease name, address, equipment location and signature date, This Master Lease may be executed in separate counterparts, which together shall constitute one and

the same instrument. If Lessee constitutes more than one person, Lessee agrees that the liability of each such person hereunder shall be joint and          several. Once Lessee signs this Master Lease and AXIS Capital accepts it by counter signature, this Master Lease becomes non-cancelable for          the full term.

32. **SEVERABILITY.** If any provision of the Master Lease is held invalid, that invalidity shall not affect the other provisions that can be given without the invalid provisions, and to this end the provisions of the Master Lease are declared to be severable.

33. **GOVERNING LAW; FORUM; WAIVER OF JURY TRIAL.** Lessee consents this Lease shall be governed by construed and interpreted under the laws of the State of Nebraska without reference to its principles of conflicts of laws. Lessee hereby agrees that all actions or proceedings arising directly or indirectly from or in connection with this Lease shall be litigated only in the state and county if Lessor's principal place of business or such form as Lessor shall elect. Lessee consents to the jurisdiction and venue of the foregoing courts and consents that any process or notice of motion or other application to either of such courts or a judge therof may be served inside or outside the state of Lessor's principal place of business by registered or certified mail, return receipt requested, directed to Lessee at its address set forth in this Master Lease (and service so made shall be deemed complete five (5) days after the same has been posted as aforesaid) or by personal service, or in such a manner as may be permissible under the rules of such courts. YOU CONSENT TO THE NON-EXCLUSIVE JURISDICTION OF THE FEDERAL AND STATE COURTS LOCATED IN THE STAT OF NEBRASKA IN ANY ACTION OR PROCEEDING RELATING TO THIS LEASE AND YOU AGREE THAT NEITER YOU NOR US WILL BE LIABLE FOR SPECIAL, INCIDENTAL, PUNITIVE OR CONSEQUENTIAL DAMAGES IN ANY SUCH ACTION OR PROCEEDING. YOU WAIVE ANY OBJECTION BASED ON IMPROPER VENUE AND/OR FORUM NON CONVENIENS WITH RESPECT TO ANY SUCH ACTION OR PROCEEDING AND THE PARTIES WAIVE ANY RIGHTS EITHER MAY HAVE TO A TRAIL BY JURY IN ANY SUCH ACTION OR PROCEEDING.

34. **POWER OF ATTORNEY.** Lessee irrevocably authorizes and appoints Lessor as its attorney in fact to complete, amend and execute on Lessee's behalf financing statements in connection with the Master Lease and to conform the description of the property (including serial numbers) and any such financing statements or other documentation. Lessee will also promptly execute and deliver to Lessor such documents and take further action as Lessor may request to more effectively carry out the intent and purpose of the Master Lease.

**IN WITNESS WHEREOF,** the parties hereunto set their hands as of the date first written above.

**LESSOR: AXIS CAPITAL, INC.**          **LESSEE:**

By: _____          By: _____

Title: _____          Title: _____

# GUARANTY

To induce AXIS CAPITAL, INC. ("AXIS") from time to time to either lease equipment _____(the "Lessee"), sell equipment to Lessee or to make a loan to Lessee pursuant to leases, installment sale contracts, or promissory notes, as the case may be (all such leases, installment sale contracts, and promissory notes, whether now existing or hereafter arising, being referred to herein as "Contract(s)," the undersigned hereby agrees as follows:

1.  The undersigned hereby absolutely and unconditionally guarantees to AXIS the full and prompt payment and performance when due of each and every obligation of the Lessee under the Contracts.

2.  The undersigned hereby waives (i) notice of the acceptance hereof by AXIS and of the creation and existence of the Contracts and (ii) any and all defenses otherwise available to a guarantor or accommodation party.

3.  This Guaranty is complete, absolute, unconditional, and continuing, and the liability of the undersigned hereunder shall not be affected or impaired in any way by any of the following, each of which AXIS may agree to without the consent of the undersigned: (a) any extension or renewal of any Contract whether or not for longer than the original period; (b) any change in the terms of payment or other terms of any Contract or any collateral therefore, or any exchange, release of, or failure to obtain any collateral therefore, (c) any waiver or forbearance granted to Lessee or any other person liable with respect to any Contract or any release of, compromise with, or failure to assert rights against Lessee or any such other person; and (d) the application or failure to apply in any particular manner any payments or credits on any Contract or any other obligation Lessee may owe to AXIS.

4.  AXIS shall not be required first to resort for payment of any Contract to Lessee or to any other person or to any collateral before exercising and enforcing its rights under this Guaranty. The undersigned agrees not to obtain reimbursement or payment from Lessee or any other person obligated with respect to any Contract or from any collateral for any Contract until the obligations under such Contract have been fully satisfied. The undersigned shall not without prior written consent from AXIS, assign any interest hereunder or related hereto including, without limitation, any claim arising by subrogation.

5.  The undersigned shall be and remain liable for any deficiency following foreclosure of any leasehold, mortgage or security interest securing any Contract whether or not the liability of Lessee under such Contract is discharged by such foreclosure.

6.  The undersigned agrees to pay all costs, expenses and reasonable attorney's fees paid or incurred by AXIS in endeavoring to enforce any Contract and this Guaranty.

7.  AXIS may at any time sell, assign or otherwise transfer all or any part of its interest in this Guaranty.

8.  As additional collateral a blanket lien will be placed on the assets of the business and each individual guarantor.

9.  This agreement shall be governed by the laws of the State of Nebraska and shall be interpreted, construed and enforced in accordance with the laws of the State of Nebraska. In the event of legal proceedings, the undersigned consents to personal jurisdiction and venue in any State or Federal Court located within the State of Nebraska. THE PARTIES WAIVE ANY RIGHTS THEY MAY HAVE TO A JURY TRIAL.

10.  This Guaranty constitutes the entire agreement between the parties and no provision shall be deemed waived, amended or modified by either party unless such waiver, amendment or modification is in writing and signed by both parties.

11.  This Guaranty shall be binding upon the estate, heirs, successors and assigns of the undersigned, and shall inure to the benefit of the successors and assigns of AXIS.

Dated: _____

| | |
|---|---|
| _____ | _____ |
| (Individual) | (Corporation or Partnership) |
| By: _____ | By: _____ |
| _____ | _____ |
| Home Address | Title |
| _____ | |
| Home Telephone Number | |
| -- | |
| _____ | |
| Social Security Number | |

# ACCEPTANCE CERTIFICATE

TO:   AXIS CAPITAL, INC. ("LESSOR")
    308 NORTH LOCUST STREET
    GRAND ISLAND, NE 68801

FROM: ("LESSEE")

RE:   Lease Schedule No. _____

The undersigned ("Lessee") hereby certifies that Lessee has satisfactorily received, inspected and installed all of the items of equipment (collectively, the "Equipment") described in Lease Schedule No. _____ (the "Lease") to the Master Lease Agreement dated _____, between Lessee and Lessor.

The Equipment is unconditionally accepted by Lessee as the Equipment leased under the terms and conditions of the Lease. Lessee specifically authorizes and requests the Lessor to pay the supplier for the Equipment. Lessee understands that this Acceptance Certificate may not be canceled or revoked. Lessee is entitled to the promises and warranties of the supplier and manufacturer provided to the Lessor and Lessee should contact the supplier for a statement of warranties including any disclaimers and limitations of them or remedies. LESSOR MAKES NO EXPRESS OR IMPLIED WARRANTY WITH RESPECT TO THE EQUIPMENT AND SPECIFICALLY DISCLAIMS ANY WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE AND ANY LIABILITY FOR CONSEQUENTIAL DAMAGES ARISING OUT OF THE USE OR INABILITY TO USE THE EQUIPMENT.

Lessee grants Lessor the right to insert the respective commencement and rental payment dates upon the face of the above-described Lease Schedule.

Acceptance Date: _____  Lessee: _____

              By: _____

              Title: _____

# LEASE SCHEDULE
## (With Purchase Agreement)

**Master Lease Agreement Dated:** _____     **Lease Schedule No.:** _____

**Lessor:**    AXIS CAPITAL INC        **Lessee:** _____
308 NORTH LOCUST STREET
GRAND ISLAND NE 68801

**Supplier(s):**    SEE SCHEDULE A

**Description of Equipment:** SEE SCHEDULE A

| Quantity | Description | Serial Number |
|---|---|---|
|  |  |  |

**Equipment Location (if different from Lessee's address):**

**Equipment Acceptance Date:** _____

**Lease Schedule Commencement Date:** _____

**Schedule of Payments:**

| LEASE TERM (MONTHS) | AMOUNT OF MONTHLY LEASE PAYMENT (APPLICABLE TAXES TO BE BILLED) | ADVANCED PAYMENT (FIRST 1 AND LAST 1) | + | DOCUMENTATION FEE | = | INITIAL AMOUNT DUE |
|---|---|---|---|---|---|---|
|  |  |  |  | $ |  |  |

**Billing:**   __x__ Monthly    _____ Semi-Annually    _____ Other—See additional provisions
     _____ Quarterly    _____ Annually

## ADDITIONAL PROVISIONS:

1. INCORPORATION OF THE STANDARD TERMS AND CONDITIONS. This Lease Schedule incorporates the terms and conditions of the Master Lease Agreement dated _____, between Lessor and Lessee. Capitalized terms used in this Lease Schedule and not otherwise defined shall have the meanings ascribed thereto in the Master Lease Agreement.

2. SCHEDULE OF PAYMENTS. If the actual cost of the Equipment varies from the amount initially quoted to us by you or by the Supplier of Equipment, you hereby authorize us to adjust the rent payments accordingly. Prior to the commencement hereof, Rent may be increased up to 15%, or decreased without limit. Lessor is also authorized to either insert or correct the Lessee name, Lessee address, Equipment Location, Equipment Acceptance Date, or Commencement Date.

3. PURCHASE AGREEMENT: Notwithstanding any provision contained in the Master Lease Agreement or the Lease Schedule to the contrary, upon expiration of the lease term set forth in the Lease Schedule (the "Initial Lease Term") and upon payment by Lessee of all rentals and other amounts due, Lessee agrees to purchase all of Lessor's right, title and interest in and to all, but not less than all of the equipment described and covered by the Lease Schedule (the "Equipment") for the purchase price of $1.00. Any purchase of the Equipment shall be "AS IS" and "WHERE IS" with all faults and without any warranty whatsoever. Lessor may require payment of the purchase price at any time, but not more than thirty (30) days prior to expiration of the Lease.

4. ENTIRE AGREEMENT. This Lease Schedule, together with the incorporated terms and conditions contained in the Master Lease Agreement, constitutes the entire agreement between Lessee and Lessor and supersedes all prior and contemporaneous writings, understandings, and agreements. No waiver, consent, modification or change of terms of this Lease shall bind either party unless in writing signed by both parties, and then such waiver, consent, modification, or change shall be effective only in the specific instance and for the specific purpose given. Any terms and conditions of any purchase order or other documents submitted by Lessee in connection with this Lease which are in addition to or inconsistent with the terms and conditions of this Lease will not be binding on Lessor and will not apply to this Lease. Lessee by the signature below of its authorized representative acknowledges that it has read this Lease Agreement, understands it, and agrees to be bound by its terms and conditions.

**DATED:** _____

**LESSOR:**    AXIS CAPITAL INC        **LESSEE:** _____

**BY:** _____        **BY:** _____

**TITLE:** _____        **TITLE:** _____

# LEASE SCHEDULE
## (With Purchase Agreement)

**Master Lease Agreement Dated:** _____     **Lease Schedule No.:** _____

**Lessor:**   AXIS CAPITAL INC           **Lessee:** _____
              308 NORTH LOCUST STREET
              GRAND ISLAND NE 68801

**Supplier(s):**   SEE SCHEDULE A

**Description of Equipment: SEE SCHEDULE A**

| Quantity | Description | Serial Number |
|----------|-------------|---------------|
|          |             |               |

**Equipment Location (if different from Lessee's address):**

**Equipment Acceptance Date:** _____

**Lease Schedule Commencement Date:** _____

**Schedule of Payments:**

| LEASE TERM (MONTHS) | AMOUNT OF MONTHLY LEASE PAYMENT (APPLICABLE TAXES TO BE BILLED) | | ADVANCED PAYMENT (FIRST 1 AND LAST 1) | + | DOCUMENTATION FEE | = | INITIAL AMOUNT DUE |
|---|---|---|---|---|---|---|---|
| | $ | | | | $ | | |

**Billing:**   x   Monthly     _____ Semi-Annually     Other—See additional provisions
              _____ Quarterly   _____ Annually        _____

## ADDITIONAL PROVISIONS:

1. INCORPORATION OF THE STANDARD TERMS AND CONDITIONS. This Lease Schedule incorporates the terms and conditions of the Master Lease Agreement dated _____, between Lessor and Lessee. Capitalized terms used in this Lease Schedule and not otherwise defined shall have the meanings ascribed thereto in the Master Lease Agreement.

2. SCHEDULE OF PAYMENTS. If the actual cost of the Equipment varies from the amount initially quoted to us by you or by the Supplier of Equipment, you hereby authorize us to adjust the rent payments accordingly. Prior to the commencement hereof, Rent may be increased up to 15%, or decreased without limit. Lessor is also authorized to either insert or correct the Lessee name, Lessee address, Equipment Location, Equipment Acceptance Date, or Commencement Date.

3. PURCHASE AGREEMENT: Notwithstanding any provision contained in the Master Lease Agreement or the Lease Schedule to the contrary, upon expiration of the lease term set forth in the Lease Schedule (the "Initial Lease Term") and upon payment by Lessee of all rentals and other amounts due, Lessee agrees to purchase all of Lessor's right, title and interest in and to all, but not less than all of the equipment described and covered by the Lease Schedule (the "Equipment") for the purchase price of 10% of the original purchase amount. Said purchase amount shall be paid immediately after you make the final rent payment. Any purchase of the Equipment shall be "AS IS" and "WHERE IS" with all faults and without any warranty whatsoever. Lessor may require payment of the purchase price at any time, but not more than thirty (30) days prior to expiration of the Lease.

4. ENTIRE AGREEMENT. This Lease Schedule, together with the incorporated terms and conditions contained in the Master Lease Agreement, constitutes the entire agreement between Lessee and Lessor and supersedes all prior and contemporaneous writings, understandings, and agreements. No waiver, consent, modification or change of terms of this Lease shall bind either party unless in writing signed by both parties, and then such waiver, consent, modification, or change shall be effective only in the specific instance and for the specific purpose given. Any terms and conditions of any purchase order or other documents submitted by Lessee in connection with this Lease which are in addition to or inconsistent with the terms and conditions of this Lease will not be binding on Lessor and will not apply to this Lease. Lessee by the signature below of its authorized representative acknowledges that it has read this Lease Agreement, understands it, and agrees to be bound by its terms and conditions.

**DATED:** _____

**LESSOR:**   AXIS CAPITAL INC          **LESSEE:** _____

**BY:** _____          **BY:** _____

**TITLE:** _____        **TITLE:** _____

# LEASE SCHEDULE
## (With Option to Purchase)

**Master Lease Agreement Dated:** _____    **Lease Schedule No.:** _____

**Lessor:** AXIS CAPITAL INC    **Lessee:**
308 NORTH LOCUST STREET
GRAND ISLAND NE 68801

**Supplier(s):** SEE SCHEDULE A

**Description of Equipment: SEE SCHEDULE A**

| Quantity | Description | Serial Number |
|----------|-------------|---------------|
|          |             |               |

**Equipment Location (if different from Lessee's address):**
**Lease Commencement Date:** _____

**Schedule of Payments:**

| LEASE TERM (MONTHS) | AMOUNT OF MONTHLY LEASE PAYMENT (APPLICABLE TAXES TO BE BILLED) | ADVANCED PAYMENT (FIRST 1 AND LAST 1) | + | DOCUMENTATION FEE | = | INITIAL AMOUNT DUE |
|---|---|---|---|---|---|---|
|  | $ |  |  | $ |  |  |

**Billing:** __x__ Monthly    _____ Semi-Annually    _____ Other—See additional provisions
_____ Quarterly    _____ Annually

## ADDITIONAL PROVISIONS:

1. INCORPORATION OF THE STANDARD TERMS AND CONDITIONS. This Lease Schedule incorporates the terms and conditions of the Master Lease Agreement dated _____, between Lessor and Lessee. Capitalized terms used in this Lease Schedule and not otherwise defined shall have the meanings ascribed thereto in the Master Lease Agreement.

2. SCHEDULE OF PAYMENTS. If the actual cost of the Equipment varies from the amount initially quoted to us by you or by the Supplier of Equipment, you hereby authorize us to adjust the rent payments accordingly. Prior to the commencement hereof, Rent may be increased up to 15%, or decreased without limit. Lessor is also authorized to either insert or correct the Lessee name, Lessee address, Equipment Location, Equipment Acceptance Date, or Commencement Date.

3. PURCHASE OPTION: Provided no Event of Default has occurred or remains uncured, Lessee shall have the option to purchase, at the expiration of the Initial Term of this Lease Schedule, all but not less than all of the Equipment for Fair Market Value upon giving ninety (90) days prior written notice which notice shall be irrevocable. For purposes of this Lease Schedule, Fair Market Value of the Equipment shall be determined (i) by written agreement of Lessor and Lessee, (ii) or failing to reach mutual agreement, at Lessee's expense by a professional appraiser acceptable to Lessor, or (iii) if Fair Market Value cannot be determined by either of the proceeding methods, as determined by Lessor in a commercially reasonable manner. Any purchase of the Equipment pursuant to this Section shall be "AS IS" and "WHERE IS" with all faults and without any warranty whatsoever. Lessor may require payment of the purchase price at any time, but not more than thirty (30) days prior to expiration of the Lease.

4. ENTIRE AGREEMENT. This Lease Schedule, together with the incorporated terms and conditions contained in the Master Lease Agreement, constitutes the entire agreement between Lessee and Lessor and supersedes all prior and contemporaneous writings, understandings, and agreements. No waiver, consent, modification or change of terms of this Lease shall bind either party unless in writing signed by both parties, and then such waiver, consent, modification, or change shall be effective only in the specific instance and for the specific purpose given. Any terms and conditions of any purchase order or other documents submitted by Lessee in connection with this Lease which are in addition to or inconsistent with the terms and conditions of this Lease will not be binding on Lessor and will not apply to this Lease. Lessee by the signature below of its authorized representative acknowledges that it has read this Lease Agreement, understands it, and agrees to be bound by its terms and conditions.
**DATED:**_____

**LESSOR:** AXIS CAPITAL INC    **LESSEE:** _____

**BY:** _____    **BY:** _____

**TITLE:** _____    **TITLE:** _____

**AXIS CAPITAL, INC.**
308 North Locust Street
Grand Island, NE 68801

## INCUMBENCY CERTIFICATE

The undersigned certifies that he/she,_____
is Member of _____ a limited liability company organized under the laws of the State of
_____ and that, as such, he/she is authorized to execute this Certificate on behalf of said corporation, and further certifies that
each of the persons specified below is a duly elected, qualified and acting officer of the corporation, in the capacities so specified,
and that the signature appearing opposite his/ her name is his/her true signature:

| Name | Title | Signature |
|------|-------|-----------|
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |

*NOTE: PLEASE ATTACH A COPY OF THE DRIVER'S LICENSE FOR
EACH OF THE AUTHORIZED SIGNERS LISTED ABOVE*

A photocopy or facsimile of this Incumbency Certificate will be legally admissible under the "best evidence rule." A signed copy of
this Incumbency Certificate sent by facsimile shall be treated as an original document and shall be admissible as evidence
thereof, and all signatures thereon shall be binding as if manual signatures were personally delivered.

The undersigned further certifies that the foregoing is duly authorized on behalf of the corporation to execute and deliver any
Equipment Lease Agreement or Agreements or Guaranties and other related documents to AXIS Capital, Inc., and to bind the
corporation thereby.

WITNESS the seal of the corporation and the signature of the undersigned this_____ day of _____,
20_____.

_____
Member

**Important:**
**If the Authorized Officer and Member are the same**
**individual, signatures must be witnessed:**

_____

_____
Print Name

# REQUEST FOR ELECTRONIC LEASE PAYMENTS

_____ ("Lessee") hereby requests and authorizes AXIS Capital, Inc. or its Assigns ("Lessor"), to initiate debit and/or credit entries on the due date per Lease Schedule #_____ to the Master Lease Agreement dated _____, or from time to time as amounts are due in connection with Lease Schedule #_____ to the Depository Account designated below and authorizes the bank designated below (the "Bank") to debit and/or credit same to such account.  This agreement shall continue until Bank has received written termination thereof from both Lessee and Lessor.

Bank/Depository Name: _____

Bank Address: _____

City: _____ State:_____ Zip:_____

Bank Account #:_____

ABA #:_____

Customer Account #:_____
             (internal use only)

**LESSEE:** _____

_____         _____
     Signature                              Date

**Please attach voided check below:**


**axis**
**Capital, Inc.**
Relationship Driven to Succeed

308 N LOCUST ST
GRAND ISLAND, NE 68801
308-398-4140
308-398-4141 FAX

| DEBTOR ("you" or "your"): | STREET ADDRESS | CITY | STATE | ZIP | SUPPLIER:<br>See Schedule A |
|---|---|---|---|---|---|
| COLLATERAL LOCATION (if different from above) | BUSINESS PHONE | EMAIL ADDRESS | | | COLLATERAL ("Collateral"):<br>See Schedule A |

| TERM (in months) | PAYMENT AMOUNT $ |
|---|---|

**1. Agreement.** AXIS Capital, Inc. ("Secured Party", "we", "us" or "our") agrees to lend to Debtor and you agree to borrow from us an amount for the financing of the Collateral. Amounts received by us under this Equipment Finance Agreement ("EFA") shall be applied as we determine. This EFA has an interim term ("Interim Term") and an initial term ("Initial Term"). The foregoing collectively the "Term". The Interim Term starts on the date we fund the purchase price of the Collateral following your acceptance of it. The Initial Term starts on the billing date specified by us ("Commencement Date"). You agree to pay us: (a) payments (each a "Payment") shown above during each month of the Initial Term; the first Payment is due on the Commencement Date, and (b) all other amounts that become due under this EFA, including 1/30th of a Payment for each day of the Interim Term. You authorize us to adjust the Payment if the final cost of the Collateral or tax is different from that on which such Payment is based by up to 15% or to decrease without limit to reflect the changes in the final amount paid to the supplier. Any amount not paid within 10 days of when due is subject to a late charge of the lower of (i) the greater of 10% or $25.00, or (ii) the highest amount allowed by law.

**2. Grant of Security Interest.** You hereby grant to us a security interest in the Collateral and all proceeds to secure all of your obligations under this EFA. **Disclaimer of Warranties and Claims. We make no representation or warranty as to any matter whatsoever including the merchantability or fitness for a particular purpose of the Collateral. This EFA is irrevocable. Your obligation to pay all amounts payable hereunder is absolute and unconditional and will not be subject to any reduction, setoff, defense, counterclaim, deferment or recoupment for any reason.** You acknowledge you selected the Collateral and the Supplier and the Supplier is not our agent nor are we its agent. You agree the Collateral will only be used for commercial or business purposes only and in compliance with law.

**3. Collateral.** You will not modify or change location of the Collateral without our prior consent and allow us to inspect it upon our request. At your expense you will maintain the Collateral in good operating condition and repair. You will keep the Collateral free and clear from all liens and encumbrances. Titled Collateral will be titled and/or registered as we direct. You are responsible for any damage or destruction of the Collateral. You will at our election repair the Collateral at your expense or pay to us all amounts then due and owing plus the total of all unpaid Payments for the Term discounted to their then present value (determined at a discount rate of 3% per annum) as of the date such amount is received by us. You will indemnify and hold us, our members, managers, employees or assigns harmless from and against any claims, costs, expenses, damages and liabilities, in any way relating to the Collateral.

**4. Fees and Taxes.** You agree to pay when due and to hold us harmless from all taxes, interest and penalties relating to this EFA and the Collateral ("Taxes") and reimburse us for those Taxes we pay on your behalf. We will pay any personal property, excise, and/or sales taxes relating to the Collateral and you will reimburse us plus fees for administration costs. You agree to pay us documentation fees and all other fees we deem necessary.

**5. Insurance.** During the Term you will maintain insurance we specify on the Collateral. If you do not provide us satisfactory proof of insurance we may, but are not required to, buy such insurance for our benefit and add charges which may result in a higher premium you would pay if you obtained insurance, plus an interest charge.

**6. Default and Remedies.** If any one of the following occurs, you will be in default: (i) you fail to pay any amount under this Agreement or any other Agreement entered into by you and held or serviced by us when due, (ii) you cease doing business, admit your inability to pay your debts, or you file or have filed against you a petition under the Bankruptcy Code, (iii) you breach any other obligation of yours contained in this Agreement, or (iv) any of the above events of default occur with respect to any guarantor. Upon your default, we may do any or all of the following: (a) terminate this EFA, (b) take possession of the Collateral; you irrevocably waive any security required of us in the event we take possession of the Collateral and require you to deliver it to us at your expense to a location designated by us, (c) declare all sums due and to become due hereunder immediately due and payable, all future payments discounted to their then present value (determined at a discount rate of 3% per annum); (d) sell, dispose of, hold, or lease the Collateral, (e) exercise any other right or remedy which may be available to us under applicable law. You shall reimburse us for all costs we incur when enforcing our rights including our attorneys' fees and costs of repossession, repair, storage, and remarketing of the Collateral. A waiver of default will not be a waiver of any other or subsequent default. Default interest will be charged on the amount calculated in clause (c) above in this Section at the lower of the 18% per annum or the highest amount allowed by law.

**7. General.** This EFA shall be governed and construed under the laws of the State of Nebraska without reference to its principles of conflicts of laws. **You consent to the non-exclusive jurisdiction of courts located in Nebraska in any action relating to this EFA. You waive any objection based on improper venue and/or forum non conveniens and waive any right to a jury trial.** You irrevocably grant us the right to make such filings under the Uniform Commercial Code as we deem necessary. You will not assign your rights under this EFA, or permit the Collateral to be used by anyone other than you. We may assign this EFA, in whole or in part, without notice to you or your consent. You agree that our assignee will have the same rights and benefits that we have now, but will not be subject to any claims, defenses or set offs that you may have against us. This EFA sets forth the entire understanding of the parties with respect to its subject matter and may only be amended in writing signed by both parties. You represent and warrant to us that all information conveyed to us in connection with this EFA and all related documents whether by you, a guarantor, the supplier or any other person, is true, accurate, complete and not misleading. This EFA may be executed in separate counterparts which together shall be the same instrument. All fees may not only cover our costs but may include a profit. If Lessee constitutes more than one person, the liability of each shall be joint and several. Debtor authorizes Secured Party or their assigns to obtain a personal credit report on all principals and guarantors for credit purposes. Debtor also agrees to release any credit information requested by Secured Party, which may include business or personal banking, mortgage, tax returns, landlord, trade or finance information. A facsimile of this EFA agreement may be the equivalent of an original. Debtor authorizes AXIS Capital, Inc. to insert or correct the Debtor name, address, equipment location, or signature date. THIS EFA WILL BE NON-CANCELABLE FOR THE FULL TERM. Any notice given hereunder shall be in writing and deemed given two business days after being deposited with the US Postal Service, first class postage prepaid, and addressed to the recipient at its address set forth above or such other address given to the sender by written notice.

By execution of this Equipment Finance Agreement, the undersigned Debtor hereby certifies he/she is elected and authorized to negotiate, procure, and execute an Equipment Finance Agreement on behalf of the Debtor and any documentation covering such agreement. *By signing below Debtor irrevocably accepts delivery of the Collateral under the Equipment Finance Agreement and irrevocably authorizes Secured Party to pay the Supplier on behalf of the Debtor.*

| Debtor Name: | | ACCEPTED BY SECURED PARTY: | AXIS CAPITAL, INC.   Date: |
|---|---|---|---|
| Signature: | | BY: | |
| Printed Name and Title: | | Printed Name and Title: | |

**GUARANTY:** You (jointly and severally if more than one) unconditionally guarantee to us and our assigns the payment and performance when due of all of the obligations of the Debtor under this EFA and all related documents executed by the Debtor ("Agreements"). We may proceed against you before proceeding against the Debtor, the Collateral or enforce any other remedy. Notwithstanding any changes made to the Agreements in our dealings with Debtor, this Guaranty will remain in effect as changed even if you are not notified of the changes and will remain in effect even if the Agreements are no longer enforceable against the Debtor. You waive all notices to which you may have a right. You agree to pay us all our expenses in enforcing this Guaranty. You may not assign this Guaranty without our written consent. The governing law and venue provisions of the EFA shall apply to any action to enforce this Guaranty. You consent to our conducting a credit evaluation of you from all sources, periodically updating it and sharing the results with others.

| Guarantor Signature: | | Guarantor Signature: | |
|---|---|---|---|
| Printed Name: (no titles) | | Printed Name: (no titles) | |

**AUTHORIZATION FOR ACH PAYMENTS:** Debtor authorizes you, your successors and assigns to automatically initiate and make debit entry charges to Lessee's bank account indicated below for the payment of all amounts owed by you from time to time under the EFA. This Authorization is to remain in effect during the Term of the EFA. Any incorrect charge will be corrected upon notification to us, by either a credit or debit to Debtor's account.

| Bank Name: | | Acct Holder Name: | |
|---|---|---|---|
| Account No: | | Routing No: | |
| Authorized Signature: | | Printed Name and Title: | |

# EQUIPMENT FINANCE AGREEMENT

Agreement No. _____

Customer No. _____


axis
Capital, Inc.
*Financial Gateway of Assets*

308 N LOCUST ST
GRAND ISLAND, NE 68801
308-398-4140
309-398-4141 FAX
www.axiscapitalinc.com

| DEBTOR: | DOC REVIEW PROCESS, INC. d/b/a JENNYS ROCKSTAR TRAINING CAMP | SUPPLIER and COLLATERAL: | See Schedule A |
|---|---|---|---|

| Collateral Location: 123 TRAINING RD GRAND ISLAND NE 68801 |
|---|

| Term  (In Months) | Total Number of Payments | Amount of Each Periodic Payment $ | Security Deposit $0.00 |
|---|---|---|---|

DISCLAIMER OF WARRANTIES AND CLAIMS; LIMITATION OF REMEDIES: THERE ARE NO WARRANTIES BY OR ON BEHALF OF SECURED PARTY; AND NEITHER THE SUPPLIER, NOR ANY OTHER PARTY IS SECURED PARTY'S AGENT. DEBTOR ACKNOWLEDGES AND AGREES BY SIGNATURE BELOW: (A) SECURED PARTY MAKES NO WARRANTIES EITHER EXPRESS OR IMPLIED AS TO THE CONDITION OF THE COLLATERAL, ITS MERCHANTABILITY, ITS FITNESS OR SUITABILITY FOR ANY PARTICULAR PURPOSE; (B) DEBTOR ACCEPTS THE COLLATERAL "AS IS" AND WITH ALL FAULTS; (C) DEBTOR AGREES THAT THE COLLATERAL WILL BE USED SOLELY FOR COMMERCIAL OR BUSINESS PURPOSES; (D) IF THE COLLATERAL IS UNSATISFACTORY FOR ANY REASON DEBTOR'S ONLY REMEDY, IF ANY, SHALL BE AGAINST THE SUPPLIER OR MANFACTURER OF THE COLLATERAL AND NOT AGAINST SECURED PARTY; (E) DEBTOR SHALL HAVE NO REMEDY FOR CONSEQUENTIAL, INCIDENTAL, SPECIAL, PUNITIVE OR EXEMPLARY DAMAGES AGAINST SECURED PARTY, ALL OF THE SAME BEING DISCLAIMED AND WAIVED; AND (F) NO DEFECT, DAMAGE OR UNFITNESS OF THE COLLATERAL SHALL RELIEVE DEBTOR OF THE OBLIGATION TO MAKE PAYMENTS OR RELIEVE DEBTOR OF ANY OTHER OBLIGATION UNDER THIS AGREEMENT.

Amendments; Notices: No term or provision of this Equipment Finance Agreement ("Agreement") may be amended, altered, waived or discharged except by a written instrument signed by all parties to this Agreement any formal notice given pursuant to this Agreement shall be deemed given 2 business days after being placed with a reputable package delivery service for overnight delivery, postage prepaid, and addressed to the recipient at its address set forth above or such other address as a party may designate by written notice to the other.

THIS AGREEMENT, THE TERMS OF WHICH HAVE BEEN FREELY NEGOTIATED BY EACH PARTY, IS ALSO SUBJECT TO THE TERMS AND CONDITIONS B E L O W  A N D  O N  T H E FOLLOWING PAGE WHICH ARE MADE PART HEREOF AND WHICH DEBTOR AND SECURED PARTY ACKNOWLEDGE THEY HAVE READ AND ACCEPTED. BY EXECUTION OF THIS AGREEMENT, THE UNDERSIGNED CERTIFIES THAT HE/SHE IS ELECTED AND AUTHORIZED TO NEGOTIATE, PROCURE, AND EXECUTE AN EQUIPMENT FINANCE AGREEMENT AND ANY DOCUMENTATION COVERING SUCH EQUIPMENT FINANCE AGREEMENT. BY SIGNING BELOW DEBTOR HEREBY IRREVOCABLY ACCEPTS DELIVERY OF THE EQUIPMENT UNDER THIS EQUIPMENT FINANCE AGREEMENT AND IRREVOCABLY AUTHORIZES SECURED PARTY TO PAY THE SUPPLIER OR BEHALF OF THE DEBTOR. THIS IS A NON-CANCELABLE AGREEMENT.

| DEBTOR: | ACCEPTED BY SECURED PARTY:     AXIS CAPITAL, INC. |
|---|---|
| Signature: | By: |
| Printed Name: | Printed Name: |
| Title: | Title:                                          Date: |

CONTINUING GUARANTY: The undersigned ("you","your",) jointly and severally (more than one) unconditionally guarantees to AXIS Capital, INC. or its assigns, the prompt payment and performance when due of all of the obligations of the Debtor under the Agreement referenced above and all related documents executed by the Debtor in connection with it (collectively with the Agreement, the "Agreements"). AXIS Capital, Inc. shall not be obligated to proceed against the Debtor, the property being financed under the Agreement(s) or enforce any other remedy before proceeding against you to enforce this Continuing Guaranty ("Guaranty"). Notwithstanding any changes made to the Agreement(s) in the course of AXIS Capital, Inc.'s dealings with the Debtor, this Guaranty will remain in effect with respect to the Agreement(s) as so changed even if you are not notified of the changes and will remain in effect even if the Agreement(s) or any of them are no longer enforceable against the Debtor. You waive all presentments, demand for performance, notices of protest, notices of dishonor, and notices of acceptance of this Guaranty and all other notices to which you may have any right. You agree to pay AXIS Capital, Inc. for all expenses incurred by AXIS Capital, Inc. on enforcing this Guaranty. You may not assign this Guaranty. This Guaranty shall be governed by, construed, interpreted and enforced in accordance with the laws of the state of Nebraska without reference to its principles of conflicts of laws. You consent to the non-exclusive jurisdiction of the federal and state courts located in the state of Nebraska in any action to enforce this Guaranty and you waive any right to assert this is an inconvenient forum. You consent to AXIS Capital, Inc. conducting a credit evaluation of you from all sources periodically to update your file and authorize the sharing of the results with others. From time to time we may request financial information from you. This Guaranty may be executed in separate counterparts, which together shall constitute one and the same instrument.

| Guarantor Signature: | Cell Phone No: | Home Phone No.: |
|---|---|---|
| Printed Name: | | |
| Guarantor Signature: | Cell Phone No: | Home Phone No.: |
| Printed Name: | | |

AUTHORIZATION FOR PRE-AUTHORIZED PAYMENTS: Debtor hereby authorizes AXIS Capital, Inc. or its assigns to automatically initiate and make debit entries (charges) to Debtor's bank account (and for Debtor's bank to accept and post such debit entries) indicated below for the payment of all amounts owed by Debtor to AXIS Capital, Inc. from time to time under or in connection with the above-referenced Agreement. Debtor understands and agrees that AXIS Capital, Inc. may impose a fee in the event Debtor's bank does not pay a debit entry. This authority granted under this Authorization for Pre-authorized Payments is to remain in effect during the term of the Agreement, including all renewals and extensions, and Debtor acknowledges that if Debtor revokes such authority during the term of the Agreement Debtor shall be in default under the Agreement without the requirement of any prior notice from AXIS Capital, Inc. as a precondition for such default. Any erroneous or incorrect charge will be corrected upon notification to AXIS Capital, Inc. If corrections in the debit account are necessary, it may involve a credit or debit to Debtor's account. Debtor agrees that a facsimile or other copy of this Authorization, as executed, may be deemed the equivalent of the originally executed copy for all purposes.

| Bank Name: | Acct Holder Name: | |
|---|---|---|
| Account No: | Routing No: | |
| Authorized Signature: | Print Name & Title: | |

## TERMS AND CONDITIONS

1. **Definitions:** The words "you" and "your" refer to the DEBTOR, its successors and assigns, as shown above or on the preceding page, as applicable (the "first page"). The words "we", "us" and "our" refer to the SECURED PARTY, its successors and assigns, as shown on the first page. You authorize us or our designees to obtain credit reports regarding you and each guarantor.

2. **Acceptance:** We agree to lend to you, and you agree to borrow from us, an amount for the financing of the Collateral as defined above or on Schedule "A", for the term shown the first page ("Term"), which shall commence on the funding of the collateral evidenced by this Agreement (the "Commencement Date") We shall have no obligations under this Agreement whatsoever until we accept and sign this Agreement at our office and the satisfaction in our sole discretion of all conditions we may specify; including our receipt of all documents we specify and evidence satisfactory to us in the form of a telephone audit, physical inspection or otherwise that all of the Collateral has been received, is in satisfactory condition and you have accepted the Collateral for all purposes under this Agreement.

Case 1:18-cv-00070   Document 1-6   Filed 09/13/18   Page 55 of 89 PageID #: 209

**3. Security Interest:** You hereby grant to us a security interest under the Uniform Commercial Code ("UCC") in the equipment and other property described or referenced herein on the first page or Schedule "A" and all accessories and additions thereto and replacements thereof and all proceeds and products of the foregoing (collectively the "Equipment"). Such security interest is granted to secure payment and performance by you of your obligations hereunder. All amounts received from you under this Agreement shall be applied towards your obligations to us hereunder as we determine. As additional collateral, you and each guarantor hereby grant us a first priority security interest in all receivables, general intangibles, life insurance policies, chattel paper, instruments, goods, equipment, machinery, fixtures, furnishings, and all other personal and real property together with all other accessories, accessions, attachments thereto, whether now owned or hereafter acquired, and all other substitutions, renewals, replacements and improvements and all proceeds of the foregoing, including proceeds in the form of goods, accounts, chattel paper, documents, instruments, general intangibles, investment property, deposit accounts, letter of credit rights and supporting obligations (collectively together with the Equipment, the "Collateral") or any other agreement should we so choose.

**4. Security Deposit:** If you are in default for any reason under this Agreement, we have the right to apply the Security Deposit to any amounts due and owed to us. You agree that upon our demand you will replenish any amounts deducted from the Security Deposit and you agree that we may co-mingle any Security Deposit with our other assets. If you did not default under this agreement, the Security Deposit will be returned to you, without interest, after the final payment has been paid and performance of all of your obligations under this Agreement have been satisfied.

**5. Payments:** You promise to pay us the number of payments shown on the first page, in advance, in the amount shown on the first page, commencing at the start of our billing cycle as specified by us at our sole discretion following the Commencement Date, and continuing on the same day of each month thereafter during the Term (each "Payment", and each day a Payment is due hereunder a "Payment Date"),without need of an invoice, together with all other amounts due from time to time by you hereunder. The total initial payment shall be  paid upon your execution of this Agreement. If the contemplated transaction is not consummated, the total initial payment may be retained by us as partial compensation for costs and expenses incurred by us in preparation for the transaction. The amount of each Payment is based upon the total estimated cost of the Collateral, or the portion thereof being purchased with the proceeds of the agreement evidenced hereby, you have provided to us and which is set forth on the first page  If the final cost of the Collateral (or the portion being purchased) we pay the supplier is higher or lower than that estimate, you authorize us to adjust the amount of each Payment proportionately up to 15% higher or lower without limit than the Payment amount specified on the first page. You also agree to pay, if invoked, an amount  equal to 1/30th of the Payment amount for each day from and including the Commencement Date, to but excluding the first Payment Date. YOUR OBLIGATION TO MAKE PAYMENTS AND PAY OTHER AMOUNTS HEREUNDER IS ABSOLUTE AND UNCONDITIONAL AND NOT SUBJECT TO ABATEMENT, REDUCTION OR SET-OFF FOR ANY REASON WHATSOEVER. Following the first Payment Date, the Term shall continue without interruption for the number of months indicated on the first page.

**6. Location; Maintenance; Installation; Insurance:** You agree to  maintain records showing the location of each item of Collateral. You shall report each location to us upon our request and shall not change the location of the Collateral without our advance written consent. You are responsible for installing and keeping the Collateral in good working order. You shall not make any alterations, additions or improvements to the Collateral which detracts from its economic value or functional utility. If the Collateral is damaged or lost, you agree to continue making scheduled Payments unless we have received the Casualty Value pursuant to Section 11. You agree to keep the Collateral insured against loss during the Term and to have us named as Loss Payee and to obtain a general Public Liability Insurance policy, in both cases in such coverage amounts as we may specify from time to time, from anyone who is acceptable to us. All such policies shall specify that they may not be terminated without 30 days prior written notice to the Secured Party. You agree to provide us with a certificate of insurance acceptable to us, before the Term begins, and upon our request during the Term. If at any time you fail to deliver to us a valid certificate of insurance reflecting such insurance as being in effect, then we will have the right, but not the obligation, to have such insurance placed on the equipment protecting us for the Term at your expense; and if so placed, we will add this expense to the Payments and you will pay us our costs of obtaining such insurance and any customary charges or fees.

**7. Taxes and Fees; Indemnification:** You agree to pay when due and to indemnify and hold us harmless from all taxes, fees, fines, interest and penalties, including, without limitation, personal property, excise, sales or documentary stamp taxes, ("Taxes") relating to the use or ownership of the Collateral or this Agreement now or hereafter imposed, levied or assessed by any taxing authority. We may at our sole discretion, elect to pay any such Taxes directly to a taxing  authority and if so you agree to  reimburse us for any such Taxes paid on your behalf together with any filing or processing fees charged by us. If any taxing authority requires any Taxes to be paid in advance, and we pay such Taxes, however we may increase the cost of the Collateral we are financing by such amount as described in Section 5 above thereby increasing the amount of each Payment to reflect the payment of such Taxes. You also agree to pay us and reimburse us for all costs and expenses for documenting this Agreement. You agree to indemnify and hold us harmless from any suits, claims, losses or damages we suffer in any way relating to the use or ownership of the Collateral. Your obligations under this Section shall survive the expiration or earlier termination of this Agreement.  You agree to pay us fees in connection with the documentation of the Agreement and any site inspection, or lien search we deem necessary  You agree that all such fees and any insurance we obtain pursuant to the last sentence of Section 6 may not only cover our costs they may also include a profit.

**8. Personal Property:** The Collateral will be and shall remain personal property and, if requested by us, you will obtain real property waivers satisfactory to us. You shall keep the Collateral free from any and all liens and encumbrances other than those in our favor and you shall give us immediate notice of any attachment or other judicial process, liens or encumbrances affecting the collateral. You hereby irrevocably authorize us and appoint us as your attorney-in-fact with the power to execute and to file this Agreement and/or security agreement(s) with respect to the Collateral. If your signature on any financing statement or similar document is required by law, you shall execute such supplemental instruments and financing statements we deem to be necessary and advisable and shall otherwise cooperate to defend and perfect our interest in the Collateral  by filing or otherwise. You also agree to pay us on demand a filing and registration fee prescribed by the UCC. Any Collateral that is subject to title or registration laws shall be titled and registered as directed by us. You agree the use of this equipment will be only for commercial or business purposes and in compliance with law.

**9. Default; Remedies; Late Charges:** If any one of the following events occur with respect to you or any Guarantor, you will be in default and we can exercise any of the remedies described below: (i) you fail to pay any Payment or other amount due under this Agreement or any other Agreement entered into by you and held or serviced by us when due, (ii) you breach or fail to perform any of your other covenants and promises under this Agreement, (iii) you become insolvent, any action under the United States Bankruptcy Code is filed by or against you, make an assignment for the benefit of creditors, admit your inability to pay your debts as they become due, you terminate your entity's existence or take any actions regarding the cessation or  winding up of your business affairs or Debtor's or its guarantor's death has occurred.  If you are in default, at our election, we can accelerate and require that you pay, as reasonable liquidated damages for loss of bargain, the "Accelerated Balance". The Accelerated Balance will be equal to the total of: (i) accrued and unpaid amounts then due under this Agreement, (ii) all remaining future Payments discounted to their then present value (determined at a discount rate of 3% per annum).  Default interest will be charged on the Accelerated Balance at the lower of (i) 18% per annum or (ii) the highest amount allowed by law from the due date thereof until reached by us in cash. We can  also pursue any remedies available to  us under the UCC or any other law. In the event we seek to take possession of any part of the Collateral, you irrevocably waive to the fullest extent permitted by law any bonds, surety or security required by statute,  court rule or otherwise as an incident of such possession. You agree to pay our attorneys' fees and actual costs incurred by us in enforcing our rights hereunder including repossession, storage, refurbishment and sale of the Collateral as well as collection costs, and all non-sufficient funds fees and similar charges. If any amount not paid within 10 days of when due is subject to a late charge; you agree to pay the late charge of the lower of (i) the greater of 10% of the payment or $25.00 or (ii) the highest amount allowed by law. You also agree to pay a charge of $25.00 for each check returned for non-sufficient funds or any other reason or if any ACH debit charge is not honored. Such charges will not be construed as interest but as reimbursement to us to cover administrative and overhead expenses related to the processing and collection of the late payment.

**10. Assignment; Inspection:** YOU HAVE NO RIGHT TO SELL, TRANSFER, ASSIGN, LEASE, OR ENCUMBER THE COLLATERAL OR THIS AGREEMENT. We may sell, transfer, assign or encumber this Agreement, in whole or in part, without notice to you or your consent. You agree that if we sell, transfer, assign or encumber this Agreement, the assignee will have the rights and benefits that we assign to the assignee and will not have to perform any of our obligations. You agree that the rights of the assignee will not be subject to any claims, defenses or set-offs that you may have against us.  We and our agents and representatives shall have the right at any time during regular business hours to inspect the Collateral and for the purpose to have access to the location of the Collateral.

**11. Risk of Loss:** You assume and shall bear the entire risk of loss, theft, damage and destruction of the Collateral from any cause whatsoever, and no loss, theft, damage or destruction of the Collateral shall relieve you of the obligation to make Payments or fulfill any other obligation under this Agreement. You shall promptly notify us in writing of such loss, theft, damage or destruction If damage of any kind occurs to any item of Collateral. You shall, at our option but at your expense, (a) place the Collateral in good repair, condition or working order, or (b) if the Collateral cannot be repaired or is lost, stolen or suffers a constructive loss under an insurance policy covering the Collateral, pay to us the "Casualty Value". The Casualty Value will be equal to the total of  (i) accrued and unpaid amounts then due and owing and (ii) all remaining future Payments discounted to their present value (determined at a discount rate of 3% per annum) in both cases as of the date the Casualty Value is received by us.

**12. Choice of Law; Waiver of Jury Trial:** Subject to the following sentence, this Agreement shall be governed by, construed, interpreted and enforced in accordance with the laws of the state of  Nebraska. If any amount contracted for, charged or received in connection with this Agreement constitutes interest or regulated time-price differential governed by, not exempt from, and in excess of amounts lawfully permitted, under Nebraska law (the "Subject Amount"), then (i) if the law of state in which Debtor resides (as indicated in Debtor's address above; the "Debtor's State") would permit the lawful contracting for, charging or receipt of any part of the Subject Amount, then the parties agree that the  law of Debtor's State shall govern as to  the contracting for, charging and receipt of such interest or regulated time-price differential and (ii) if clause (i) preceding is not applicable, Secured Party shall make any necessary adjustments so as to eliminate such excess Debtor agrees to provide Secured Party advance written notice and an opportunity to cure pursuant to the preceding sentence any contract, charge or receipt claimed by Debtor to be unlawful, and Secured Party may calculate maximum lawful amounts by amortizing, prorating, allocating, reallocating, discounting, treating months as equal intervals, and spreading in each case to the fullest extent permitted by applicable law. You consent to the non- exclusive jurisdiction of the federal and state courts located in the state of Nebraska in any action or proceeding relating to this Agreement, YOU WAIVE ANY RIGHT TO A TRIAL BY JURY IN ANY SUCH ACTION OR PROCEEDING, AND YOU WAIVE ANY RIGHT TO ASSERT THIS IS AN INCONVENIENT FORUM.

**13. Miscellaneous:** During the Term, you agree to provide us if we request, all financial statements, copies of tax returns, landlord, trade, or personal banking information. If we supply you with labels, you shall label any and all Collateral and shall keep the same affixed in a prominent place. If any provision hereof or any remedy herein provided is found to be invalid under any applicable law, the remaining provisions hereof, shall be given effect in accordance with the manifest intent hereof.  The parties agree that each Payment may include a profit. You agree that a waiver of breach will not be a waiver of any other subsequent breach, and that any delay or  failure to  enforce our rights under this  Agreement does not prevent us from enforcing any rights at a later time.  YOU AGREE THAT WE WILL NOT BE LIABLE FOR ANY CONSEQUENTIAL OR INCIDENTAL DAMAGES FOR ANY DEFAULT BY US UNDER THIS AGREEMENT.  Section headings are for convenience and are not a part of this Agreement. You agree that by providing us with an email address or telephone number for a cellular or other wireless device, you expressly consent to receiving communications including email, voice and text messages from us or our affiliates or assigns at that email address or telephone number, and this express  consent applies to each  such email address or telephone number that you provide to us now, or in the future and permits such communications regardless of their purpose  These calls and messages may incur access fees from your internet or wireless provider. You agree that the original of this Agreement may be electronically duplicated and a copy hereof may be introduced in lieu of the original thereof and without further foundation. The parties hereto expressly waive the secondary evidence rule. You agree that this Agreement will be binding upon your successors, permitted assigns, heirs and legal representatives. Debtor authorizes Secured Party of their assigns to obtain a personal credit report on all principals and guarantors for credit purposes. Debtor also agrees to release any credit information requested by Secured Party, which may include business or personal banking, mortgage, tax returns, landlord, trade or finance information. You authorize us to complete any blank in this instrument or in any document executed or delivered in connection herewith that contemplates a date by inserting a date deemed appropriate by us  If Debtor constitutes more than one person, you agree that the liability of each such person hereunder is joint and several  Any restrictive endorsement on any check you give us in payment of any amount due hereunder shall be void  A facsimile or other copy of this Agreement, as executed, may be deemed the equivalent of the originally executed copy. This Agreement may be executed in separate counterparts which together shall constitute one and the same instrument

# LEASE AGREEMENT

Agreement No. _____

Customer No. _____



axis
Capital, Inc.

308 N. LOCUST ST
GRAND ISLAND, NE 68801
308-398-4440
308-398-4440 Fax
www.axiscapitalinc.com

| LESSEE ("you" or "your"): | STREET ADDRESS | CITY | STATE | ZIP | SUPPLIER: See Schedule A |
|---|---|---|---|---|---|

| EQUIPMENT LOCATION | BUSINESS PHONE | EMAIL ADDRESS | EQUIPMENT ("Equipment"): See Schedule |
|---|---|---|---|

| LEASE TERM (in months) | LEASE PAYMENT AMOUNT (plus applicable tax) | PURCHASE AMOUNT |
|---|---|---|
| | $ | $1.00, $101.00 ,10% PUT |

**1. Agreement.** AXIS Capital, INC ("Lessor", "we", "us" or "our") agrees to lease to Lessee and you agree to lease from us the Equipment. Amounts received by us under this Lease shall be applied as we determine. This Lease has an interim term ("Interim Term") and an Initial term ("Initial Term"). The foregoing collectively the "Term". The Interim Term starts on the date we fund the purchase price of the Equipment following your acceptance of it. The Initial Term starts on the billing date specified by us ("Commencement Date"). You agree to pay us: (a) payments (each a "Payment") shown above during each month of the Initial Term; the first Payment is due on the Commencement Date, and (b) all other amounts that become due under this Lease, including 1/30th of a Payment for each day of the Interim Term. You are contractually obligated to pay us the Purchase Amount set forth above as a final payment at the expiration of the Term. Any amount not paid within 10 days of when due is subject to a late charge of either (i) the greater of 10% or $25.00, or (ii) the highest amount allowed by law.

**2. Net Lease.** We assign to you during the Term any warranties we have in the Equipment and you should contact the Supplier for a description of those warranties. **We make no representation or warranty as to any matter whatsoever including the merchantability or fitness for a particular purpose of the Equipment. This Lease is irrevocable. Your obligation to pay all amounts payable hereunder is absolute and unconditional and will not be subject to any reduction, setoff, defense, counterclaim, deferment or recoupment for any reason.** You acknowledge you selected the Equipment and the Supplier and the Supplier is not our agent nor are we its agent. You agree the use of the Equipment will be only for commercial or business purposes and in compliance with law.

**3. Equipment.** You will not modify or change location of the Equipment without our prior consent, and allow us to inspect it upon our request. At your expense you will maintain the Equipment in good operating condition and repair. You will keep the Equipment free and clear from all liens and encumbrances. Titled Equipment will be titled and/or registered as we direct. You are responsible for any damage or destruction of the Equipment. You will at our election repair the Equipment at your expense or pay to us all amounts then due and owing plus the total of all unpaid Payments for the Initial Term plus the Purchase Amount set forth above discounted to their then present value (determined at a discount rate of 3% per annum) as of the date such amount is received by us. You will indemnify and hold us, our members, managers and employees harmless from and against any claims, costs, expenses, damages and liabilities, in any way relating to the Equipment.

**4. Fees and Taxes.** You agree to pay when due and to hold us harmless from all taxes, interest and penalties relating to this Lease and the Equipment ("Taxes") and reimburse us for those Taxes we pay on your behalf. We will pay any Personal Property, Excise and/or Sales Taxes relating to the equipment and you will reimburse us plus fees for administration costs. You agree to pay us documentation fees and all other fees we deem necessary.

**5. Insurance.** During the Term you will maintain insurance we specify on the Equipment. If you do not provide us satisfactory proof of insurance we may, but are not required to, buy such insurance for our benefit and add charges which may result in a higher premium you would pay if you obtained insurance, plus an interest charge.

**6. Default and Remedies.** If any one of the following occurs, you will be in default: (i) you fail to pay any amount due under this Agreement or any other agreement entered into by you and

held or serviced by us, (ii) you cease doing business, admit your inability to pay your debts, or you file or have filed against you a petition under the Bankruptcy Code, (iii) you breach any other obligation of yours contained in this Lease, or (iv) any of the above events of default occur with respect to any guarantor. Upon your default, we can do any or all of the following: (a) terminate this Lease, (b) take possession of the Equipment; you irrevocably waive any security required of us in the event we take possession of the Equipment and require you to deliver it to us at your expense to a location designated by us, (c) declare all sums due and to become due hereunder immediately due and payable, all remaining future payments, including the Purchase Amount set forth above, discounted to their then present value (determined at a discount rate of 3% per annum) as calculated by us., (d) sell, dispose of, hold, or lease the Equipment, (e) exercise any other right or remedy which may be available to us under applicable law. You shall reimburse us for all costs we incur in enforcing our rights including our attorneys' fees and costs of repossession, repair, storage and remarketing of the Equipment. A waiver of default will not be a waiver of any other or subsequent default. Default interest will be charged on the amount calculated in clause (c) above in this Section at the lower of 18% per annum or the highest amount allowed by law from the due date thereof until received by us.

**7. General.** This Lease shall be governed and construed under the laws of the State of Nebraska without reference to its principles of conflicts of laws. You consent to the non-exclusive jurisdiction of courts located in Nebraska in any action relating to this Lease. You waive any objection based on improper venue and/or forum non conveniens and waive any right to a jury trial. You hereby grant us a security interest in the Equipment, and all proceeds, as security for all of your obligations under this Lease. You irrevocably grant us the right to make such filings under the UCC as we deem necessary. You will not assign your rights under this Lease, sublease or permit the Equipment to be used by anyone other than you. We may assign this Lease, in whole or in part, without notice to you or your consent. You agree that our assignee will have the same rights and benefits that we have now, but will not be subject to any claims, defenses or set offs that you may have against us. This Lease sets forth the entire understanding of the parties with respect to its subject matter and may only be amended in writing signed by both parties. You represent and warrant to us that all information conveyed to us in connection with this Lease and all related documents whether by you, a guarantor, the supplier or any other person, is true, accurate, complete and not misleading. This Lease may be executed in separate counterparts which together shall be the same instrument. All fees may not only cover our costs but may include a profit. If Lessee constitutes more than one person, the liability of each shall be joint and several. Lessee authorizes Lessor or their assigns to obtain a personal credit report on all principals and guarantors for credit purposes. Lessee also agrees to release any credit information requested by Lessor, which may include business or personal banking, mortgage, tax returns, landlord, trade or lease information. A facsimile of this Lease may be the equivalent of an original. Lessee authorizes AXIS Capital, Inc. to insert or correct the Lessee name, address, equipment location or signature date. If the cost of the equipment varies from the amount initially quoted, Lessee authorizes us to increase the payment up to 15% or decrease without limit. **THIS LEASE WILL BE NON-CANCELABLE FOR THE FULL LEASE TERM.** Any notice given hereunder shall be in writing and deemed given two business days after being deposited with the US Postal Service, first class postage prepaid, and addressed to the recipient at its address set forth above or such other address given to the sender by written notice.

*By execution of this agreement, the undersigned certifies that he/she is elected and authorized to negotiate, procure, and execute an Equipment Lease and any documentation covering such equipment lease.*

*By signing below Lessee hereby irrevocably accepts delivery of the Equipment under the Lease and irrevocably authorizes Lessor to pay the Supplier on behalf of the Lessee.*

| Lessee Name: | | ACCEPTED BY LESSOR: | AXIS CAPITAL, INC. Date: |
|---|---|---|---|
| Signature: | | By: | |
| Printed Name and Title: | | Printed Name and Title: | |

**GUARANTY:** You (jointly and severally if more than one) unconditionally guarantee to us and our assigns the payment and performance when due of all of the obligations of the Lessee under this Lease and all related documents executed by the Lessee ("Agreements"). We may proceed against you before proceeding against the Lessee, the Equipment or enforce any other remedy. Notwithstanding any changes made to the Agreements in our dealings with Lessee, this Guaranty will remain in effect as changed even if you are not notified of the changes and will remain in effect even if the Agreements are no longer enforceable against the Lessee. You waive all notices to which you may have a right. You agree to pay us all our expenses in enforcing this Guaranty. You may not assign this Guaranty without our written consent. The governing law and venue provisions of the Lease shall apply to any action to enforce this Guaranty. You consent to our conducting a credit evaluation of you from all sources, periodically updating it and sharing the results with others.

| Guarantor Signature: | | Guarantor Signature: | |
|---|---|---|---|
| Printed Name: (no titles) | | Printed Name: (no titles) | |

**AUTHORIZATION FOR ACH PAYMENTS:** Lessee authorizes you, your successors and assigns to automatically initiate and make debit entry charges to Lessee's bank account indicated below for the payment of all amounts owed by you from time to time under the Lease. This Authorization is to remain in effect during the Term of the Lease. Any incorrect charge will be corrected upon notification to us, by either a credit or debit to Lessee's account.

| Bank Name: | | Acct Holder Name: | |
|---|---|---|---|
| Account No: | | Routing No: | |
| Authorized Signature: | | Printed Name and Title: | |

**LEASE AGREEMENT**

LEASE # _____  CUSTOMER # _____
www.axiscapitalinc.com

308 N LOCUST ST
GRAND ISLAND NE 68801
308-398-4140
308-398-4141 FAX



| LESSEE | | SUPPLIER and EQUIPMENT: | See Schedule A |
|---|---|---|---|

**EQUIPMENT LOCATION**

| Initial Term (in months) | Payment Schedule (Plus Applicable Taxes) | End of Lease Purchase Amount |
|---|---|---|
| | $ | $1.00, $101.00, 10% PUT |

**1. Lease:** Lessor, AXIS Capital, INC. ("Lessor", "we", "us" or "our") agrees to lease to Lessee ("you" or "your") and you agree to lease from us the equipment, products and/or services described above (the "Equipment". All amounts received from you under this Lease shall be applied to amounts owed by you hereunder as we determine at our sole discretion.

**2. Term:** The term of this Lease shall consist of an interim term ("Interim Term") and initial term ("Initial Term"). The Interim Term and Initial Term are referred to collectively as the "Term". The Interim Term shall commence on the date ("Commencement Date") we fund the purchase price of the Equipment following the acceptance of the Equipment by you for all purposes under this Lease, and shall terminate on the day prior to the commencement of our applicable monthly billing cycle, which latter date shall be the date the Initial Term commences as designated by us. Upon your acceptance of the Equipment, your obligations under this Lease become irrevocable.

**3. Payment; Interim Rent:** You request that we purchase the Equipment you selected. We shall have no liability under this Lease whatsoever until the satisfaction in our sole discretion of all conditions we may specify. You agree to pay us the periodic rent payments (each a "Payment") shown above for each month during the Initial Term and all other amounts that become due from time to time under this Lease. The amount of each Payment is based upon the total estimated cost of the Equipment you have provided to us. If the final cost of the Equipment we pay the Supplier is higher or lower from that estimate, we will increase the amount of the Payment up to 15% or lower without limit. The first Payment other than an advance payment shall be due and payable on the date specified by us in our sole discretion ("First Payment Date") and all subsequent Payments are due on the same date of each subsequent month during the Term regardless of whether you receive an invoice for such Payment. On the First Payment Date you also agree to pay us Interim Rent in an amount equal to 1/30th of the amount of each Payment for each day of the Interim Term.

**4. Security Deposit:** If you are in default of your obligations under this Lease, we may apply the Security Deposit to any amounts due hereunder and you will promptly upon demand by us replenish any such amount. If upon the expiration of the Term and provided you are not then in default hereunder, if you have either returned the Equipment to us in good working condition and appearance or if you have duly exercised any purchase option with respect to the Equipment in your favor as provided herein and the purchase price has been received in cash by us, we shall thereafter promptly pay any security deposit held by us, without interest, to you at your written direction. You agree that we may commingle the security deposit with our other assets.

**5. Collection Charges:** Whenever any amount due under this Lease is not made within 10 days of the due date, you will pay the following, or if less, the maximum allowed by law: (a) a late charge equal to 10% of such amount or $25 whichever is greater, and (b) $25.00 for each check returned or ACH debit not honored for any reason and (c) if we have had to perform collection activities in connection with such late payment, our specified collection charges then in effect for such activities. The foregoing will not be construed as interest but as reimbursement to us to cover administrative and overhead expenses related to the processing and collection of the late amount on your account.

**6. Statutory Finance Lease; Agency and Selection of Equipment; Computer Software:** You agree that it is the intent of both parties that it qualify as a statutory finance lease under Article 2A of the Uniform Commercial Code ("UCC") and, to the extent permitted by applicable law, you waive any right you may have under Sections 2A-303 and 2A-508 through 2A-522 of the UCC. You acknowledge that you have selected both the Equipment, and the Supplier and we have not participated in their selection, nor have we manufactured or supplied the Equipment. We hereby assign to you, so long as you are not in default hereunder, our assignable rights under any contract of ours with the Supplier relating to the Equipment; you should contact the Supplier directly for a statement of those rights, if any. You agree that no representative of the manufacturer of the Equipment ("Manufacturer") or the Supplier is acting on behalf of AXIS Capital, INC. or our assigns. You agree that as to any software constituting Equipment: (a) we have no title to such software, (b) you have executed or will execute a separate software license agreement and we are not party to and have no responsibilities whatsoever in regards to such license agreement, (c) you have selected such software, and WE MAKE NO REPRESENTATION OR WARRANTY REGARDING SUCH SOFTWARE.

**7. Warranties and Limitation of Liability; Non-cancelable Lease:** WE MAKE NO REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, AS TO ANY MATTER WHATSOEVER, INCLUDING WITHOUT LIMITATION THE DESIGN OR CONDITION OF THE EQUIPMENT, ITS MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE. WE WILL HAVE NO LIABILITY BY REASON OF ANY ACT OR OMISSION RELATING TO THE EQUIPMENT OR ITS LEASE, DELIVERY, INSTALLATION, MAINTENANCE, OPERATION, PERFORMANCE, OR USE, INCLUDING WITHOUT LIMITATION ANY LOSS OF USE, LOST REVENUE, LOST PROFITS. LESSEE UNDERSTANDS THAT LESSOR IS A SEPARATE AND INDEPENDENT COMPANY FROM SUPPLIER OR ANY VENDOR, MANUFACTURER, DISTRIBUTOR OR LICENSOR OF SOFTWARE, AND THAT NONE OF THEM NOR ANY AGENT OF EMPLOYEE OF ANY OF THEM IS AGENT FOR LESSOR. LESSEE AGREES THAT NO REPRESENTATION, GUARANTEE OR WARRANTY BY ANY SUCH ENTITY OR PERSON IS BINDING ON LESSOR, AND NO BREACH BY ANY SUCH ENTITY OR PERSON WILL EXCUSE OR OTHERWISE AFFECT LESSEE'S OBLIGATIONS TO LESSOR. You also acknowledge and agree that (i) you have fully inspected and accepted the Equipment hereunder and the Equipment is in good condition and to your complete satisfaction; and (ii) you lease the Equipment "as is" and with all faults. THIS LEASE IS IRREVOCABLE FOR THE FULL TERM. YOUR OBLIGATION TO PAY ALL AMOUNTS PAYABLE BY YOU UNDER THIS LEASE, IS ABSOLUTE AND UNCONDITIONAL AND IS NOT SUBJECT TO ANY ABATEMENT, REDUCTION, SETOFF, DEFENSE, COUNTERCLAIM, INTERRUPTION, DEFERMENT OR RECOUPMENT FOR REASON WHATSOEVER, INCLUDING ANY DEFECT IN THE EQUIPMENT.

**8. Location; Use; Maintenance:** You agree that the Equipment will be used solely for business or commercial purposes. You will not alter, modify or make additions or improvements to the Equipment without our prior written consent. Any additions to the Equipment shall become our property. You agree not to change the location of the Equipment without our advance written consent, and you agree to provide us access to inspect the equipment at our request. You will, at your sole expense, maintain the Equipment in good operating condition and repair as specified by the Manufacturer using in every case Manufacturer approved replacement parts. You agree to maintain the Equipment's appearance, free of nicks, dents, tears and other blemishes and protect the Equipment from deterioration, other than normal wear and tear from proper use. If the Manufacturer provides a maintenance plan for the Equipment, the Equipment will at all times be maintained in such a condition as to be eligible for such program.

**9. Title; Registration:** You will at all times and at your sole cost and expense keep the Equipment and the Collateral free and clear from all liens and encumbrances whatsoever (except any placed thereon by us) and will give us immediate written notice of any claims against the Equipment or the Collateral. Each item of Equipment subject to title and registration laws will at all times be titled and/or registered in such a manner and in the jurisdiction as we direct.

**10. Taxes and Fees:** You agree to pay when due, and to indemnify and hold us harmless from, all taxes, fees, fines and any related interest and penalties relating to this Lease and the Equipment ("Taxes") or to reimburse us on our demand for those Taxes we agree, in our sole discretion, to pay on your behalf. Unless and until we advise you to the contrary we will pay any personal property Taxes relating to the Equipment directly to the applicable taxing authority. If any taxing authority requires any Taxes to be paid in advance, you authorize us to advance the Tax and increase the Equipment cost by such amount and increase the amount of each Payment as described in Section 3 above. With respect to personal property, excise, sales and any other Tax we have elected to pay directly on your behalf, you also agree to pay us a processing fee. You agree to pay us fees in connection with the documentation of this Lease, any site inspections for Equipment or any additional collateral, and/or lien search we deem necessary. You agree that all such fees may not only cover our costs they may also include a profit.

**11. Risk of Loss; Indemnity; Insurance:** You are responsible for any loss, damage or destruction of the Equipment. No such loss, damage or destruction will relieve you from the payment obligations under this Lease. You agree to promptly notify us in writing of any loss, damage or destruction and you will then at our election promptly repair the Equipment at your sole cost and expense or pay to us in addition to all amounts then due and owing, the total of all remaining unpaid Payments for the Initial Term plus the Purchase Amount set forth above all discounted to their then present value (determined at a discount rate of 3% per annum) as of the date such amount is received by us. Any proceeds of insurance will be paid to us and credited to any amount owed by you hereunder. You agree to indemnify and hold us, our members, directors, officers and employees or assigns harmless from and against any and all claims, costs, expenses, damages and liabilities, including reasonable attorneys' fees, arising out of your selection, possession, operation, use or disposition of the Equipment. During the Term, you will, at your expense, procure and maintain comprehensive general liability and casualty insurance acceptable to us on the Equipment. Each insurance policy will name us as loss payee and additional insured. You will furnish to us a certificate of insurance that such insurance coverage is in effect. If you do not provide us with acceptable evidence of insurance, we may, but will not be required to, buy such insurance for our sole benefit and add a charge to the Payments which will include all costs associated with obtaining such insurance to include (i) premium expense, and (ii) fees for billing and other administrative services.

**12. Assignment; Representations & Warranties:** You agree that without our prior written consent, you will not assign or transfer your rights under this Lease, or sublease or permit the Equipment to be used by anyone other than you. We may assign this Lease, in whole or in part, without notice to you or your consent. You agree that the assignee will have the same rights and benefits that we have now and will not have to perform our obligations. You agree that the rights of the assignee will not be subject to any claims, defenses or set offs that you may have against us. You represent and warrant to us that all information conveyed to us in connection with this Lease and all related documents whether by you, a guarantor, the supplier or any other person, is true, accurate, complete and not misleading. If you are an entity, the person executing this Lease on your behalf represents to us they are authorized to do so making the Lease the valid and binding act of the entity.

Case 1:18-cv-00070   Document 1-6   Filed 09/13/18   Page 58 of 89 PageID #: 212

**13. Default; Remedies:** If any one of the following events occurs, you will be in default and we can exercise any of the remedies described below: (i) you fail to pay any Payment or other amount due under this Lease or under any other agreement entered into by you and held or serviced by us when due, (ii) you cease doing business as a going concern, make an assignment for the benefit of creditors, admit your inability to pay your debts as they become due or are insolvent, you file or have filed against you a petition under the Bankruptcy Code, or Lessee's or its guarantor's death has occurred, (iii) you breach any covenant contained in this Lease or any representation or warranty made in connection with this Lease was false or misleading when made, or (iv) any guarantor of this Lease defaults on any obligation to us or any of the above-listed events of default occur with respect to any guarantor. Upon the occurrence of a default, we can at our option do any or all of the following: (a) by notice to you, terminate this Lease; (b) whether or not this Lease is so terminated, take possession of the Equipment, and for such purpose, enter upon any premises without liability for so doing; you irrevocably waive to the fullest extent permitted by law any bonds, surety or security required of us by statute, court rule or otherwise in the event we seek to take possession of the Equipment, (c) declare immediately due and payable all accrued unpaid payments due hereunder and all remaining future Payments together with the Purchase Amount set forth above, discounted to their then present value (determined at a discount rate of 3% per annum as calculated by us, together with any unpaid fees; (d) sell, dispose of, hold, use or lease any of the Equipment; (e) exercise any other right or remedy which may be available to us under the UCC or other applicable law including without limitation the right to recover damages for breach hereof. In the event we are required to enforce the Lease, you are responsible for reimbursing us for all costs we incur including attorneys' fees and all costs of repossession, repair, storage and remarketing of the Equipment. The rights afforded us in this Lease are in addition to any rights or remedies provided by law. The selection of one remedy does not preclude the exercise of any other remedy. A waiver of default will not be a waiver of any other or subsequent default. Default interest will be charged on the amount calculated in clause (c) above in this Section at 18% per annum or the highest amount allowed by law from the due date thereof until received by us.

**14. Purchase of Equipment:** You are contractually obligated to pay us the Purchase Amount set forth above as a final payment at the expiration of the Term. Provided that we have received the Purchase Amount along with any other amounts that may be due hereunder on or before the end of the Term, plus applicable taxes and you are not otherwise then in default hereunder, AXIS Capital, INC. or our Assigns will convey our entire right, title and interest to you in the Equipment, "AS-IS", "WHERE-IS", without representation or warranty of any kind except only that the Equipment is free and clear of liens and encumbrances placed thereon by us. Any provision in this Lease referring to an end of term "PUT" or "Purchase Upon Termination" or similar requirement is an absolute contractual obligation requiring you to pay any such specified amount, plus applicable taxes, as your final periodic rent payment. Upon the payment of any such PUT or purchase amount and the discharge of your other obligations under this Lease, you shall become the owner of the Equipment as provided above in this Section.

**15. Governing Law:** Lessee consents this Lease shall be governed by, construed and interpreted under the laws of the State of Nebraska without reference to its principles of conflicts of laws. Lessee hereby agrees that all actions or proceedings arising directly or indirectly from or in connection with this Lease shall be litigated only in the state and county of Lessor's principal place of business or Lessor shall elect. Lessee consents to the jurisdiction and venue of the foregoing courts and consents that any process or notice of motion or other application to either of such courts or a judge thereof may be served inside or outside the state of Lessor's principal place of business by registered or certified mail, return receipt requested, directed to Lessee at its address set forth in this Lease (and service so made shall be deemed complete five (5) days after the same has been posted as aforesaid) or by personal service, or in such other manner as may be permissible under the rules of such courts. YOU CONSENT TO THE NON-EXCLUSIVE JURISDICTION OF THE FEDERAL AND STATE COURTS LOCATED IN THE STATE OF NEBRASKA IN ANY ACTION OR PROCEEDING RELATING TO THIS LEASE AND YOU AGREE THAT NEITHER YOU NOR US WILL BE LIABLE FOR SPECIAL, INCIDENTAL, PUNITIVE OR CONSEQUENTIAL DAMAGES IN ANY SUCH ACTION OR PROCEEDING. YOU WAIVE ANY OBJECTION BASED ON IMPROPER VENUE AND/OR FORUM NON CONVENIENS WITH RESPECT TO ANY SUCH ACTION OR PROCEEDING AND THE PARTIES WAIVE ANY RIGHT EITHER MAY HAVE TO A TRIAL BY JURY IN ANY SUCH ACTION OR PROCEEDING.

**16. General Provisions:** All of your covenants herein will survive the termination of this Lease. This Lease shall not become effective until accepted by Lessor, upon such acceptance all representations, warranties, indemnities and agreement of the Lessee contained in this Lease shall survive and continue in full force and effect until the termination of this Lease. You agree Lessor or our Assigns can obtain a personal credit report on all principals and guarantors for credit purposes. Lessee also agrees to provide during the term updated financial statements, business and personal tax returns, bank statements, mortgage, landlord and trade information as we may request from time to time. If this Lease is deemed to be a lease intended as security, to secure your obligations hereunder, you hereby grant to us a security interest in the Equipment, and all proceeds thereof, as security for all of your indebtedness and obligations owing under this Lease, and the irrevocable right to make such filings under the Uniform Commercial Code or other law naming you as debtor as we deem necessary to establish or perfect our security interest. If this Lease is deemed to be a lease intended as security, as additional collateral, you and each guarantor hereby grant us a first priority security interest in all receivables, general intangibles, life insurance policies, chattel paper, instruments, goods, equipment, machinery, fixtures, furnishings, and all other personal and real property together with all other accessories, accessions, attachments thereto, whether now owned or hereafter acquired, and all other substitutions, renewals, replacements and improvements and all proceeds of the foregoing, including proceeds in the form of goods, accounts, chattel paper, documents, instruments, general intangibles, investment property, deposit accounts, letter of credit rights and supporting obligations (collectively together with the Equipment, the "Collateral"). If this Lease is intended as security the parties agree that each Payment includes compensation that constitutes interest. You agree that by providing us with an email address or a telephone number for a wireless device, you expressly consent to receiving communications including voice and text messages from us or our affiliates or assigns at that number or email address, and this express consent applies to each such email address or telephone number that you provide to us now or in the future and permits such calls and emails regardless of their purpose. These calls and messages may incur access fees from your Internet or wireless provider. Section headings are for convenience and are not a part of this Lease. This Lease will be binding upon and inure to the benefit of the heirs, executors, administrators, successors and permitted assigns of the parties hereto. This Lease sets forth the entire understanding of the parties with respect to its subject matter and may only be amended by a written instrument executed by both parties and any other purported amendment shall be void. Lessee does authorize AXIS Capital, INC. to either insert or correct the Lease number, Lease name, address, equipment location and signature date. This Lease may be executed in separate counterparts, which together shall constitute one and the same instrument. Any notice given under this Lease shall be in writing and be deemed given two business days after being delivered to a reputable overnight delivery service, postage prepaid, addressed to the recipient at its address set forth above or such other address as a party may hereafter designate by written notice. A facsimile or other image of this Lease shall be admissible in any action or proceeding relating to this Lease and may be deemed an original for all purposes. Any restrictive endorsement on any check you give us in payment of any amount due here under shall be void. You may not prepay this Lease without our prior written consent. Time is of the essence with respect to your obligations under this Lease. If Lessee constitutes more than one person, you agree that the liability of each such person hereunder shall be joint and several.

Once Lessee signs this Agreement and AXIS CAPITAL, INC. accepts it by counter signature, this Lease becomes non- cancelable for the full term.

*By execution of this agreement, the undersigned certifies that he/she is elected and authorized to negotiate, procure, and execute an Equipment Lease and any documentation covering such equipment lease, By signing below Lessee hereby irrevocably accepts delivery of the Equipment under the Lease and irrevocably authorizes Lessor to pay the Supplier on behalf of the Lessee.*

| Lessee Name: | ACCEPTED BY LESSOR: **AXIS CAPITAL, INC.** | |
|---|---|---|
| Signature: | By: | Date: |
| Printed Name & Title: | Printed Name & Title: | |

**CONTINUING GUARANTY:** The undersigned ("you", "your", jointly and severally if more than one) unconditionally guarantee to AXIS Capital, INC. or its assigns the prompt payment and performance when due of all of the obligations of the Lessee under the Lease referenced above and all related documents executed by the Lessee in connection with it (collectively "Agreements"). AXIS Capital, INC. shall not be obligated to proceed against the Lessee, the equipment being leased under the agreement or enforce any other remedy before proceeding against you to enforce this Guaranty. Notwithstanding any changes made to the agreement in the course of AXIS Capital, INC.'s dealings with the Lessee, this Guaranty will remain in full effect with respect to the Agreement as so changed even if you are not notified of the changes and will remain in effect even if the Agreements are no longer enforceable against the Lessee. You waive all presentments, demand for performance, notices of protest, notices of dishonor, and notices of acceptance of this Guaranty and all other notices to which you may have a right. You agree to pay AXIS Capital, INC. all the expenses incurred by us to enforce this Guaranty. You may not assign this Guaranty without our written consent. This Guaranty shall be governed by the laws of the state of Nebraska and you consent to the non-exclusive jurisdiction of the federal and state courts located in Nebraska in any action to enforce this Guaranty; you waive any right to assert this is an inconvenient forum. You consent to AXIS Capital, INC. conducting a credit evaluation of you from all sources, periodically and sharing the results with others.

| Guarantor Signature | | Home Phone No.: | |
|---|---|---|---|
| Printed Name: *(co titles)* | | Cell Phone No.: | |
| Guarantor Signature | | Home Phone No.: | |
| Printed Name: *(co titles)* | | Cell Phone No.: | |

**AUTHORIZATION FOR PRE-AUTHORIZED PAYMENTS:** Lessee hereby authorizes Lessor, its successors and assigns to automatically initiate and make debit entries (charges) to Lessee's bank account (and for Lessee's bank to accept and post such debit entries) indicated below for payment of all amounts owed by Lessee to Lessor from time to time under or in connection with the above-referenced Lease. Lessee understands and agrees that Lessor may impose a fee in the event Lessee's bank does not pay a debit entry. This authority granted under this Authorization for Pre-authorized Payments is to remain in effect during the term of the Lease, including all renewals and extensions, and Lessee acknowledges that if Lessee revokes such authority during the term of the Lease, Lessee shall be in default under the Lease without the requirement of any prior notice from Lessor as a precondition for such default. Any erroneous or incorrect charge will be corrected upon notification to Lessor. If corrections in the debit account are necessary, it may involve a credit or debit to Lessee's account. Lessee agrees that a facsimile or other copy of this Authorization, as executed, shall be deemed the equivalent of the originally executed copy for all purposes.

| Bank Name: | | Account Holder Name: | |
|---|---|---|---|
| Account No: | | Routing No.: | |
| Authorized Signature: | | Printed Name and Title: | |

# LEASE WITH OPTION TO PURCHASE



axis
Capital, Inc.
Personalized Commercial Finance

308 N. LOCUST ST
GRAND ISLAND, NE 68801
308-398-4140
308-398-4140 Fax
www.axiscapitalinc.com

Lease No. _____

Customer No. _____

| LESSEE ("you" or "your"): | | STREET ADDRESS | CITY | STATE | ZIP CODE | SUPPLIER: See Schedule A |
|---|---|---|---|---|---|---|
| EQUIPMENT LOCATION | | | BUSINESS PHONE | EMAIL ADDRESS | | EQUIPMENT ("Equipment"): See Schedule A |

| LEASE TERM (in months) | LEASE PAYMENT AMOUNT (plus applicable tax) $ | END OF LEASE PURCHASE OPTION FMV |
|---|---|---|

**1. Agreement.** AXIS Capital, INC. ("Lessor", "we", "us" or "our") agrees to lease to Lessee and you agree to lease from us the Equipment. Amounts received by us under this Lease shall be applied as we determine. This Lease has an interim term ("Interim Term") and an initial term ("Initial Term"). The foregoing collectively the "Term". The Interim Term starts on the date we fund the purchase price of the Equipment following your acceptance of it. The Initial Term starts on the billing date specified by us ("Commencement Date"). You agree to pay us: (a) payments (each a "Payment") shown above during each month of the Initial Term and any Renewal Term; the first Payment is due on the Commencement Date, and (b) all other amounts that become due under this Lease, including 1/30th of a Payment for each day of the Interim Term. This Lease will automatically renew for successive one year renewal terms ("Renewal Term"), unless we receive written notice from you no earlier than 120 days but no later than 60 days prior to the expiration of the Initial Term that either (a) you do not want to renew the Lease, in which case you shall return the Equipment in good working condition, at your expense and to a location determined by Lessor, or (b) you are exercising the purchase option set forth above to purchase all but not less than all of the Equipment. During any Renewal Term, the payments under this Lease will remain the same as during the Initial Term. If you choose to exercise the option to purchase you will pay the amount set forth above. Any amount not paid within 10 days of when due is subject to a late charge of either (i) the greater of 10% or $25.00, or (ii) the highest amount allowed by law.

**2. Net Lease.** We assign to you during the Term any warranties we have in the Equipment and you should contact the Supplier for a description of those warranties. **We make no representation or warranty as to any matter whatsoever including the merchantability or fitness for a particular purpose of the Equipment. This Lease is irrevocable. Your obligation to pay all amounts payable hereunder is absolute and unconditional and will not be subject to any reduction, setoff, defense, counterclaim, deferment or recoupment for any reason.** You acknowledge you selected the Equipment and the Supplier and the Supplier is not our agent nor are we its agent. You agree to use of the Equipment will be only for commercial or business purposes and in compliance with law.

**3. Equipment.** You will not modify or change location of the Equipment without our prior consent, and allow us to inspect it upon our request. At your expense you will maintain the Equipment in good operating condition and repair. You will keep the Equipment free and clear from all liens and encumbrances. Titled Equipment will be titled and/or registered as we direct. You are responsible for any damage or destruction of the Equipment. You will at our election repair the Equipment at your expense or pay to us all amounts then due and owing plus the total of all unpaid Payments for the Initial Term plus our booked residual interest in the Equipment discounted to their then present value (at a discount rate of 3% per annum). You will indemnify and hold us, our members, managers and employees harmless from and against any claims, costs, expenses, damages and liabilities, in any way relating to the Equipment.

**4. Fees and Taxes.** You agree to pay when due and to hold us harmless from all taxes, interest and penalties relating to this Lease and the Equipment ("Taxes") and reimburse us for those Taxes we pay on your behalf. We will pay any Personal Property, Excise and/or Sales Taxes relating to the equipment and you will reimburse us plus fees for administration costs. You agree to pay us documentation fees and all other fees we deem necessary.

**5. Insurance.** During the Term you will maintain insurance we specify on the Equipment with Loss Payee and Additional Insured as we direct. If you do not provide us satisfactory proof of insurance we may, but are not required, to buy such insurance for our benefit and add charges which may

result in a higher premium you would pay if you obtained insurance, plus an interest charge.

**6. Default and Remedies.** If any one of the following occurs, you will be in default: (i) you fail to pay any amount due under this Agreement or any other agreement entered into by you and held or serviced by us, (ii) you cease doing business, admit your inability to pay your debts, or you file or have filed against you a petition under the Bankruptcy Code, (iii) you breach any other obligation of yours contained in this Lease, or (iv) any of the above events of default occur with respect to any guarantor. Upon your default, we may do any or all of the following: (a) terminate this Lease, (b) take possession of the Equipment; you irrevocably waive any security required of us in the event we take possession of the Equipment and require you to deliver it to us at your expense to a location designated by us, (c) declare all sums due and to become due hereunder immediately due and payable, all future payments together with our booked residual interest in the Equipment discounted to their then present value (at a discount rate of 3% per annum) as calculated by us, (d) sell, dispose of, hold, or lease the Equipment, (d) sell, dispose of, hold, or lease the Equipment, (e) exercise any other right or remedy which may be available to us under applicable law. You shall reimburse us for all costs we incur in enforcing our rights including our attorneys' fees and costs of repossession, repair, storage and remarketing of the Equipment. A waiver of default will not be a waiver of any other or subsequent default. Default interest will be charged on the amount calculated in clause (c) above in this Section at the lower of (i) 18% per annum or (ii) the highest amount allowed by law.

**7. General.** This Lease shall be governed and construed under the laws of the State of Nebraska without reference to its principles of conflicts of laws. **You consent to the non-exclusive jurisdiction of courts located in Nebraska in any action relating to this Lease. You waive any objection based on improper venue and/or forum non conveniens and waive any right to a jury trial.** You hereby grant us a security interest in the Equipment, and all proceeds, as security for all of your obligations under this Lease. You irrevocably grant us the right to make such filings under the UCC as we deem necessary. You will not assign your rights under this Lease, sublease or permit the Equipment to be used by anyone other than you. We may assign this Lease, in whole or in part, without notice to you or your consent. You agree that our assignee will have the same rights and benefits that we have now, but will not be subject to any claims, defenses or set offs that you may have against us. This Lease sets forth the entire understanding of the parties with respect to its subject matter and may only be amended in writing signed by both parties. You represent and warrant to us that all information conveyed to us in connection with this Lease and all related documents whether by you, a guarantor, the supplier or any other person, is true, accurate, complete and not misleading. This Lease may be executed in separate counterparts which together shall be the same instrument. All fees may not only cover our costs but may include a profit. If Lessee constitutes more than one person, the liability of each shall be joint and several. Lessee authorizes Lessor or their assigns to obtain a personal credit report on all principals and guarantors for credit purposes. Lessee also agrees to release any credit information requested by Lessor, which may include business or personal banking, mortgage, tax returns, landlord, trade or lease information. A facsimile of this Lease may be the equivalent of an original. Lessee authorizes AXIS Capital, Inc. to insert or correct the Lessee name, address, equipment location or signature date. If the cost of the equipment varies from the amount initially quoted, Lessee authorizes us to increase the payment up to 15% or discount w/out limit. THIS LEASE IS NON-CANCELABLE FOR THE FULL LEASE TERM. Any notice given hereunder shall be in writing and deemed given two business days after being deposited with the US Postal Service, first class postage prepaid, and addressed to the recipient at its address set forth above or such other address given to the sender by written notice.

*By execution of this agreement, the undersigned certifies that he/she is elected and authorized to negotiate, procure, and execute an Equipment Lease and any documentation covering such equipment lease. By signing below Lessee hereby irrevocably accepts delivery of the Equipment under the Lease and irrevocably authorizes Lessor to pay the Supplier on behalf of the Lessee.*

| Lessee Name: | | ACCEPTED BY LESSOR: | AXIS CAPITAL, INC. |
|---|---|---|---|
| Signature: | | By: | |
| Printed Name and Title: | | Printed Name and Title: | |

**GUARANTY: You** (jointly and severally if more than one) unconditionally guarantee to us and our assigns the payment and performance when due of all of the obligations of the Lessee under this Lease and all related documents executed by the Lessee ("Agreements"). We may proceed against you before proceeding against the Lessee, the Equipment or enforce any other remedy. Notwithstanding any changes made to the Agreements in our dealings with Lessee, this Guaranty will remain in effect as changed even if you are not notified of the changes and will remain in effect even if the Agreements are no longer enforceable against the Lessee. You waive all notices to which you may have a right. You agree to pay us all our expenses in enforcing this Guaranty. You may not assign this Guaranty without our written consent. The governing law and venue provisions of the Lease shall apply to any action to enforce this Guaranty. You consent to our conducting a credit evaluation of you from all sources, periodically updating it and sharing the results with others.

| Guarantor Signature: | | Printed Name: (no titles) | |
|---|---|---|---|
| Guarantor Signature: | | Printed Name: (no titles) | |

**AUTHORIZATION FOR ACH PAYMENTS:** Lessee authorizes you, your successors and assigns to automatically initiate and make debit entry charges to Lessee's bank account indicated below for the payment of all amounts owed by you from time to time under the Lease. This Authorization is to remain in effect during the Term of the Lease. Any incorrect charge will be corrected upon notification to us, by either a credit or debit to Lessee's account.

| Bank Name: | | Acct Holder Name: | |
|---|---|---|---|
| Account No: | | Routing No: | |
| Authorized Signature: | | Printed Name and Title: | |

Page 1 of 1

# LEASE WITH OPTION TO PURCHASE

LEASE # _____     CUSTOMER # _____

www.axiscapitalinc.com

**axis** Capital, Inc.

| LESSEE | | SUPPLIER and EQUIPMENT: | See Schedule A |
|---|---|---|---|
| EQUIPMENT LOCATION | | | |

| Initial Term (in months) | Payment Schedule (Plus Applicable Taxes) | End of Lease Purchase Option |
|---|---|---|
| | $ | FMV |

**1. Lease:** Lessor, AXIS Capital, Inc. ("Lessor", "we", "us" or "our") agrees to lease to Lessee ("you" or "your") and you agree to lease from us the equipment, products and/or services described above (the "Equipment"). All amounts received from you under this Lease shall be applied to amounts owed by you hereunder as we determine at our sole discretion.

**2. Term:** The term of this Lease shall consist of an interim term ("Interim Term") and Initial term ("Initial Term"). The Interim Term and Initial Term are referred to collectively as the "Term". The Interim Term shall commence on the date ("Commencement Date") we fund the purchase price of the Equipment following the acceptance of the Equipment by you for all purposes under this Lease, and shall terminate on the day prior to the commencement of our applicable monthly billing cycle, which latter date shall be the date the Initial Term commences as designated by us. Upon your acceptance of the Equipment, your obligations under this Lease become irrevocable.

**3. Payment; Interim Rent:** You request that we purchase the Equipment you selected. We shall have no liability under this Lease whatsoever until the satisfaction in our sole discretion of all conditions we may specify. You agree to pay us the periodic rent payments (each a "Payment") shown above for each month during the Initial Term and all other amounts that become due from time to time under this Lease. The amount of each Payment is based upon the total estimated cost of the Equipment you have provided to us. If the final cost of the Equipment we pay the Supplier is higher or lower from that estimate, we will increase the amount of the Payment up to 15% or lower without limit. The first Payment other than an advance payment shall be due and payable on the date specified by us in our sole discretion ("First Payment Date") and all subsequent Payments are due on the same date of each subsequent month during the Term regardless of whether you receive an invoice for such Payment. On the First Payment Date you also agree to pay us Interim Rent in an amount equal to 1/30th of the amount of each Payment for each day of the Interim Term.

**4. Security Deposit:** If you are in default of your obligations under this Lease, we may apply the Security Deposit to any amounts due hereunder and you will promptly upon demand by us replenish any such amount. If upon the expiration of the Term and provided you are not then in default hereunder, if you have either returned the Equipment to us in good working condition and appearance or if you have duly exercised any purchase option with respect to the Equipment in your favor as provided herein and the purchase price has been received in cash by us, we shall thereafter promptly pay any security deposit held by us, without interest, to you at your written direction. You agree that we may commingle the security deposit with our other assets.

**5. Collection Charges:** Whenever any amount due under this Lease is not made within 10 days of the due date, you will pay the following, or if less, the maximum allowed by law: (a) a late charge equal to 10% of such amount or $25 whichever is greater, and (b) $25.00 for each check returned or ACH debit not honored for any reason and (c) if we have had to perform collection activities in connection with such late payment, our specified collection charges then in effect for such activities. The foregoing will not be construed as interest but as reimbursement to us to cover administrative and overhead expenses related to the processing and collection of the late amount on your account.

**6. Statutory Finance Lease; Agency and Selection of Equipment; Computer Software:** You agree that it is the intent of both parties that it qualify as a statutory finance lease under Article 2A of the Uniform Commercial Code ("UCC") and, to the extent permitted by applicable law, you waive any right you may have under Sections 2A-303 and 2A-508 through 2A-522 of the UCC. You acknowledge that you have selected both the Equipment and the Supplier and we have not participated in their selection, nor have we manufactured or supplied the Equipment. We hereby assign to you, so long as you are not in default hereunder, our assignable rights under any contract of ours with the Supplier relating to the Equipment; you should contact the Supplier directly for a statement of those rights, if any. You agree that no representation of the manufacturer of the Equipment ("Manufacturer") or the Supplier is acting on behalf of AXIS Capital, Inc. or our assigns. You agree that as to any software constituting Equipment: (a) we have no title to such software, (b) you have executed or will execute a separate software license agreement and we are not party to and have no responsibilities whatsoever in regards to such license agreement, (c) you have selected such software, and WE MAKE NO REPRESENTATION OR WARRANTY REGARDING SUCH SOFTWARE.

**7. Warranties and Limitation of Liability; Non-cancelable Lease:** WE MAKE NO REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, AS TO ANY MATTER WHATSOEVER, INCLUDING WITHOUT LIMITATION THE DESIGN OR CONDITION OF THE EQUIPMENT, ITS MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE. WE WILL HAVE NO LIABILITY BY REASON OF ANY ACT OR OMISSION RELATING TO THE EQUIPMENT OR ITS LEASE, DELIVERY, INSTALLATION, MAINTENANCE, OPERATION, PERFORMANCE, OR USE, INCLUDING WITHOUT LIMITATION ANY LOSS OF USE, LOST REVENUE, LOST PROFITS. LESSEE UNDERSTANDS THAT LESSOR IS A SEPARATE AND INDEPENDENT COMPANY FROM SUPPLIER OR ANY VENDOR, MANUFACTURER, DISTRIBUTOR OR LICENSOR OF SOFTWARE, AND THAT NONE OF THEM NOR ANY AGENT OR EMPLOYEE OF ANY OF THEM IS AGENT FOR LESSOR. LESSEE AGREES THAT NO REPRESENTATION, GUARANTEE OR WARRANTY BY ANY SUCH ENTITY OR PERSON IS BINDING ON LESSOR, AND NO BREACH BY ANY SUCH ENTITY OR PERSON WILL EXCUSE OR OTHERWISE AFFECT LESSEE'S OBLIGATIONS TO LESSOR. You also acknowledge and agree that (i) you have fully inspected and accepted the Equipment hereunder and the Equipment is in good condition and to your complete satisfaction; and (ii) you lease the Equipment "as is" and with all faults. THIS LEASE IS IRREVOCABLE FOR THE FULL TERM. YOUR OBLIGATION TO PAY ALL AMOUNTS PAYABLE BY YOU UNDER THIS LEASE, IS ABSOLUTE AND UNCONDITIONAL AND NOT BE SUBJECT TO ANY ABATEMENT, REDUCTION, SETOFF, DEFENSE, COUNTERCLAIM, INTERRUPTION, DEFERMENT OR RECOUPMENT FOR REASON WHATSOEVER, INCLUDING ANY DEFECT IN THE EQUIPMENT.

**8. Location; Use; Maintenance:** You agree that the Equipment will be used solely for business or commercial purposes. You will not alter, modify or make additions or improvements to the Equipment without our prior written consent. Any additions to the Equipment shall become our property. You agree not to change the location of the Equipment without our advance written consent, and you agree to provide us access to inspect the equipment at our request. You will, at your sole expense, maintain the Equipment in good operating condition and repair as specified by the Manufacturer using in every case Manufacturer approved replacement parts. You agree to maintain the Equipment's appearance, free of nicks, dents, tears and other blemishes and protect the Equipment from deterioration, other than normal wear and tear from proper use. If the Manufacturer provides a maintenance plan for the Equipment, the Equipment will at all times be maintained in such a condition as to be eligible for such program.

**9. Title; Registration:** You will at all times and at your sole cost and expense keep the Equipment and the Collateral free and clear from all liens and encumbrances whatsoever (except any placed thereon by us) and will give us immediate written notice of any claims against the Equipment or the Collateral. Each item of Equipment subject to title and registration laws will at all times be titled and/or registered in such a manner and in the jurisdiction as we direct.

**10. Taxes and Fees:** You agree to pay when due, and to indemnify and hold us harmless from, all taxes, fees, fines and any related interest and penalties relating to this Lease and the Equipment ("Taxes") or to reimburse us on our demand for those Taxes we agree, in our sole discretion, to pay on your behalf. Unless and until we advise you to the contrary we will pay any personal property Taxes relating to the Equipment directly to the applicable taxing authority. If any taxing authority requires any Taxes to be paid in advance, you authorize us to advance the Tax and increase the Equipment cost by such amount and increase the amount of each Payment as described in Section 3 above. With respect to personal property, excise, sales and any other Tax we have elected to pay directly on your behalf, you also agree to pay us a processing fee. You agree to pay us fees in connection with the documentation of this Lease, any site inspections for Equipment or any additional collateral, and/or lien search we deem necessary. You agree that all such fees may not only cover our costs they may also include a profit.

**11. Risk of Loss; Indemnity; Insurance:** You are responsible for any loss, damage or destruction of the Equipment. No such loss, damage or destruction will relieve you from the payment obligations under this Lease. You agree to promptly notify us in writing of any loss, damage or destruction and you will then at our election promptly repair the Equipment at your sole cost and expense or pay to us in addition to all amounts then due and owing, the total of all remaining unpaid Payments for the Initial Term plus the Purchase Amount set forth above all discounted to their then present value (determined at a discount rate of 3% per annum) as of the date such amount is received by us. Any proceeds of insurance will be paid to us and credited to any amount owed by you hereunder. You agree to indemnify and hold us, our members, directors, officers and employees or assigns harmless from and against any and all claims, costs, expenses, damages and liabilities, including reasonable attorneys' fees, arising out of your selection, possession, operation, use or disposition of the Equipment. During the Term, you will, at your expense, procure and maintain comprehensive general liability and casualty insurance acceptable to us on the Equipment. Each insurance policy will name us as loss payee and additional insured. You will furnish to us a certificate of insurance that such insurance coverage is in effect. If you do not provide us with acceptable evidence of insurance, we may, but will not be required to, buy such insurance for our sole benefit and add a charge to the Payments which will include all costs associated with obtaining such insurance to include (i) premium expense, and (ii) fees for billing and other administrative services.

**12. Assignment; Representations & Warranties:** You agree that without our prior written consent, you will not assign or transfer your rights under this Lease, or sublease or permit the Equipment to be used by anyone other than you. We may assign this Lease, in whole or in part, without notice to you or your consent. You agree that the assignee will have the same rights and benefits that we have now and will not have to perform our obligations. You agree that the rights of the assignee will not be subject to any claims, defenses or set offs that you may have against us. You represent and warrant to us that all information conveyed to us in connection with this Lease and all related documents whether by you, a guarantor, the supplier or any other person, is true, accurate, complete and not misleading. If you are an entity, the person executing this Lease on your behalf represents to us that they are authorized to do so making the Lease the valid and binding act of the entity.

Page 1 of 2

**13. Default; Remedies:** If any one of the following events occurs, you will be in default and we can exercise any of the remedies described below: (i) you fail to pay a Payment or other amount due under this Lease or under any other agreement entered into by you and held or serviced by us when due, (ii) you cease doing business as a going concern, make an assignment for the benefit of creditors, admit your inability to pay your debts as they become due or are insolvent, you file or have filed against you a petition under the Bankruptcy Code, or Lessee's or its guarantor's death has occurred, (iii) you breach any covenant contained in this Lease or any representation or warranty made in connection with this Lease was false or misleading when made, or (iv) any guarantor of this Lease defaults on any obligation to us or any of the above-listed events of default occur with respect to any guarantor. Upon the occurrence of a default, we can at our option do any or all of the following: (a) by notice to you, terminate this Lease; (b) whether or not this Lease is so terminated, take possession of the Equipment, and for such purpose, enter upon any premises without liability for so doing; you irrevocably waive to the fullest extent permitted by law any bonds, surety or security required of us by statute, court rule or otherwise in the event we seek to take possession of the Equipment, (c) declare immediately due and payable all accrued unpaid payments due hereunder and all remaining future Payments together with the Purchase Amount set forth above, discounted to their then present value (determined at a discount rate of 3% per annum) as calculated by us, together with any unpaid fees; (d) sell, dispose of, hold, use or lease any of the Equipment; (e) exercise any other right or remedy which may be available to us under the UCC or other applicable law including without limitation the right to recover damages for breach hereof. In the event we are required to enforce the Lease, you are responsible for all costs we incur including attorneys' fees and all costs of repossession, repair, storage and remarketing of the Equipment. The rights afforded us in this Lease are in addition to any rights or remedies provided by law. The selection of one remedy does not preclude the exercise of any other remedy. A waiver of default will not be a waiver of any other or subsequent default. Default interest will be charged on the amount calculated in clause (c) above in this Section at 18% per annum or the highest amount allowed by law from the due date thereof until received by us.

**14. Automatic Renewal; Purchase Option:** This Lease will automatically renew for successive one year Renewal Terms unless you send us written notice no earlier than 120 days but no later than 60 days before the expiration of the Initial Term (or any Renewal Term) that you either (a) do not want to renew the Lease, in which case you shall return the Equipment as specified in Section 8 above, or (b) you will exercise the purchase option set forth above to purchase all but not less than all of the Equipment. During any Renewal Term, the payments under this Lease will remain the same as during the Initial Term. Provided you have timely exercised the option and we have received in cash the purchase option amount along with any other amounts that may be due, plus applicable taxes, and you are not in default under this Lease, AXIS Capital, Inc. or our assigns will convey our entire right, title and interest to you in the Equipment, "AS-IS", "WHERE-IS", without representation or warranty of any kind except only that the Equipment is free and clear of liens and encumbrances placed thereon by us. If you have the right to purchase the Equipment for its then Fair Market Value, upon your exercise of that option we shall provide you with our purchase option amount at which we shall sell the Equipment to you as provided in this Section 14; if you do not agree with that price, the price shall be conclusively established by an independent equipment appraiser selected by us but whose fees are paid by you. The independent appraiser shall establish the cash price you shall pay us with the Equipment assumed to be in place and in the condition required under this Lease. Any provision in this Lease referring to an end of term Fair Market Value, plus applicable taxes once paid to AXIS Capital, Inc. by certified funds will discharge you of the obligations under this Lease and you shall become the owner of the Equipment as stated above.

**15. Governing Law:** Lessee consents this Lease shall be governed by, construed and interpreted under the laws of the State of Nebraska without reference to its principles of conflicts of laws. Lessee hereby agrees that all actions or proceedings arising directly or indirectly from or in connection with this Lease shall be litigated only in the state and county of Lessor's principal place of business or such other forum as Lessor shall elect. Lessee consents to the jurisdiction and venue of the foregoing courts and consents that any process or notice of motion or other application to either of such courts or a judge thereof may be served inside or outside the state of Lessor's principal place of business by registered or certified mail, return receipt requested, directed to Lessee at its address set forth in this Lease (and service so made shall be deemed complete five (5) days after the same has been posted as aforesaid) or by personal service, or in such other manner as may be permissible under the rules of such courts. YOU CONSENT TO THE NON-EXCLUSIVE JURISDICTION OF THE FEDERAL AND STATE COURTS LOCATED IN THE STATE OF NEBRASKA IN ANY ACTION OR PROCEEDING RELATING TO THIS LEASE AND YOU AGREE THAT NEITHER YOU NOR US WILL BE LIABLE FOR SPECIAL, INCIDENTAL, PUNITIVE OR CONSEQUENTIAL DAMAGES IN ANY SUCH ACTION OR PROCEEDING. YOU WAIVE ANY OBJECTION BASED ON IMPROPER VENUE AND/OR FORUM NON CONVENIENS WITH RESPECT TO ANY SUCH ACTION OR PROCEEDING AND THE PARTIES WAIVE ANY RIGHT EITHER MAY HAVE TO A TRIAL BY JURY IN ANY SUCH ACTION OR PROCEEDING.

**16. General Provisions:** All of your covenants herein will survive the termination of this Lease. This Lease shall not become effective until accepted by Lessor, upon such acceptance all representations, warranties, indemnities and agreement of the Lessee contained in this Lease shall survive and continue in full force and effect until the termination of this Lease. You agree Lessor or our Assigns can obtain a personal credit report on all principals and guarantors for credit purposes. Lessee also agrees to provide during the term updated financial statements, business and personal tax returns, bank statements, mortgage, landlord and trade information as we may request from time to time. If this Lease is deemed to be a lease intended as security, to secure your obligations hereunder, you hereby grant to us a security interest in the Equipment, and all proceeds thereof, as security for all of your indebtedness and obligations owing under this Lease, and the irrevocable right to make such filings under the Uniform Commercial Code or other law naming you as debtor as we deem necessary to establish or perfect our security interest. If this Lease is deemed to be a lease intended as security, as additional collateral, you each guarantor hereby grant us a first priority security interest in all receivables, general intangibles, life insurance policies, chattel paper, instruments, goods, equipment, machinery, fixtures, furnishings, and all other personal and real property together with all other accessories, accessions, attachments thereto, whether now owned or hereafter acquired, and all other substitutions, renewals, replacements and improvements and all proceeds of the foregoing, including proceeds in the form of goods, accounts, chattel paper, documents, instruments, general intangibles, investment property, deposit accounts, letter of credit rights and supporting obligations (collectively together with the Equipment, the "Collateral"). If this Lease is intended as security the parties agree that each Payment includes compensation that constitutes interest. You agree that by providing us with an email address or a telephone number for a wireless device, you expressly consent to receiving communications including voice and text messages from us or our affiliates or assigns at that number or email address, and this express consent applies to each such email address or telephone number that you provide to us now or in the future and permits such calls and emails regardless of their purpose. These calls and messages may incur access fees from your internet or wireless provider. Section headings are for convenience and are not a part of this Lease. This Lease will be binding upon and inure to the benefit of the heirs, executors, administrators, successors and permitted assigns of the parties hereto. This Lease sets forth the entire understanding of the parties with respect to its subject matter and may only be amended by a written instrument executed by both parties and any other purported amendment shall be void. Lessee does authorize AXIS Capital, Inc. to either insert or correct the Lease number, Lease name, address, equipment location and signature date. This Lease may be executed in separate counterparts, which together shall constitute one and the same instrument. Any notice given under this Lease shall be in writing and be deemed given two business days after being delivered to a reputable overnight delivery service, postage prepaid, addressed to the recipient at its address set forth above or such other address as a party may hereafter designate by written notice. A facsimile or other image of this Lease shall be admissible in any action or proceeding relating to this Lease and may be deemed an original for all purposes. Any restrictive endorsement on any check you give us in payment of any amount due here under shall be void. You may not prepay this Lease without our prior written consent. Time is of the essence with respect to your obligations under this Lease. If Lessee constitutes more than one person, you agree that the liability of each such person hereunder shall be joint and several. Once Lessee signs this Agreement and AXIS CAPITAL, INC. accepts it by counter signature, this Lease becomes non- cancelable for the full term. *By execution of this agreement, the undersigned certifies that he/she is elected and authorized to negotiate, procure, and execute an Equipment Lease and any documentation covering such equipment lease. By signing below Lessee hereby irrevocably accepts delivery of the Equipment under the Lease and irrevocably authorizes Lessor to pay the Supplier on behalf of the Lessee.*

| Lessee Name: | | | |
| --- | --- | --- | --- |
| | | ACCEPTED BY LESSOR: **AXIS CAPITAL, INC.** | |
| Signature: | | By: | Date: |
| Printed Name & Title: | | Printed Name: | |

CONTINUING GUARANTY: The undersigned ("you", "your", jointly and severally if more than one) unconditionally guarantee to AXIS Capital, Inc. or its assigns the prompt payment and performance when due of all of the obligations of the Lessee under the Lease referenced above and all related documents executed by the Lessee in connection with it (collectively "Agreements"). AXIS Capital, Inc. shall not be obligated to proceed against the Lessee, the equipment being leased under the agreement or enforce any other remedy before proceeding against you to enforce this Guaranty. Notwithstanding any changes made to the agreement in the course of AXIS Capital, Inc.'s dealings with the Lessee, this Guaranty will remain in full effect with respect to the Agreement as so changed even if you are not notified of the changes and will remain in effect even if the Agreements are no longer enforceable against the Lessee. You waive all presentments, demand for performance, notices of protest, notices of dishonor, and notices of acceptance of this Guaranty and all other notices to which you may have a right. You agree to pay AXIS Capital, Inc. all the expenses incurred by us to enforce this Guaranty. You may not assign this Guaranty without our written consent. This Guaranty shall be governed by the laws of the state of Nebraska and you consent to the non-exclusive jurisdiction of the federal and state courts located in Nebraska in any action to enforce this Guaranty; you waive any right to assert this is an inconvenient forum. You consent to AXIS Capital, Inc. conducting a credit evaluation of you from all sources, periodically and sharing the results with others.

| Guarantor Signature | | Cell Phone No.: | Home Phone No.: |
| --- | --- | --- | --- |
| Printed Name: | | | |
| Guarantor Signature | | Cell Phone No.: | Home Phone No.: |
| Printed Name: | | | |

AUTHORIZATION FOR PRE-AUTHORIZED PAYMENTS: Lessee hereby authorizes Lessor, its successors and assigns to automatically initiate and make debit entries (charges) to Lessee's bank account (and for Lessee's bank to accept and post such debit entries) indicated below for the payment of all amounts owed by Lessee to Lessor from time to time under or in connection with the above-referenced Lease. Lessee understands and agrees that Lessor may impose a fee in the event Lessee's bank does not pay a debit entry. This authority granted under this Authorization for Pre-authorized Payments is to remain in effect during the term of the Lease, including all renewals and extensions, and Lessee acknowledges that if Lessee revokes such authority during the term of the Lease, Lessee shall be in default under the Lease without the requirement of any prior notice from Lessor as a precondition for such default. Any erroneous or incorrect charge will be corrected upon notification to Lessor. If corrections in the debit account are necessary, it may involve a credit or debit to Lessee's account. Lessee agrees that a facsimile or other copy of this Authorization, as executed, shall be deemed the equivalent of the originally executed copy for all purposes.

| Bank Name: | | Account Holder Name: | |
| --- | --- | --- | --- |
| Account No: | | Routing No: | |
| Authorized Signature: | | Printed Name and Title: | |

295981



**RENTAL AGREEMENT**

No. _1615-0057_ A

930896



| RENTER: | VALLEY PACKAGING CORP | | SUPPLIER and EQUIPMENT: | See Schedule A |
|---|---|---|---|---|

| EQUIPMENT ADDRESS: | 275 INDUSTRIAL BOULEVARD PULASKI, TN 38478 | | |
|---|---|---|---|
| | INITIAL TERM (in months) | | RENTAL PAYMENT SCHEDULE (plus applicable taxes) |
| | 48 | | 48 @ $ 3,000.00 |

**1. Rental Agreement:** KMH Systems, Inc. ("we", "us" or "our") agrees to rent to Renter ("you" or "your") and you agree to rent from us the equipment, products and/or services described above (the "Equipment"). All amounts received from you under this Rental Agreement ("Agreement") shall be applied to amounts owed by you hereunder as we determine in our sole discretion.

**2. Term:** The term of this Agreement shall consist of an Interim term ("Interim Term"), Initial term ("Initial Term") and one or more renewal terms, if any ("Renewal Term"). The Interim Term, Initial Term and Renewal Term are referred to collectively as the "Term". The Interim Term shall commence on the date ("Commencement Date") we fund the purchase price of the Equipment following the acceptance of the Equipment by you for all purposes under this Agreement, and shall terminate on the day prior to the commencement of our applicable monthly billing cycle, which falls after the day the Initial Term commences as designated by us. Upon your acceptance of the Equipment, your obligations under this Agreement become irrevocable.

**3. Payment; Interim Rent:** You request that we purchase the Equipment you specified. We shall have no liability under this Agreement whatsoever until the satisfaction in our sole discretion of all conditions we may specify. You agree to pay us the periodic rental payments (each a "Payment") shown above for each month during the Initial Term and all other amounts that become due from time to time under this Agreement. The amount of each Payment is based upon the total estimated cost of the Equipment you have provided to us. If the final cost of the Equipment we pay the Supplier is higher (or lower than that estimate, we will adjust the amount of each Payment proportionately higher or lower than the Payment amount set forth above. The first Payment other than an advance payment shall be due and payable on the date specified by us in our sole discretion ("First Payment Date") and all subsequent Payments are due on the same date of each subsequent month during the Term regardless of whether you receive an invoice for such Payment. On the First Payment Date you also agree to pay us Interim Rent in an amount equal to 1/30th of the amount of each Payment for each day of the Interim Term.

**4. Collection Charges:** Whenever any amount due under this Agreement is not paid when due, you will upon our demand pay a late charge equal to the greater of 10% of such amount or $25, or if less, the maximum late charge allowed by applicable law. You also agree to pay a charge of $30 for each check returned or ACH debit not honored for non-sufficient funds or other reasons. Such charges will not be construed as interest but as reimbursement to us to cover administrative and overhead expenses related to the processing and collection of the late amount.

**5. Statutory Finance Lease; Agency and Selection of Equipment; Computer Software:** You agree that it is the intent of both parties that this qualify as a statutory finance lease under Article 2A of the Uniform Commercial Code ("UCC"); you waive any right you may have under Sections 2A-303 and 2A-508 through 2A-522 of the UCC. You acknowledge that you have selected both the Equipment and its supplier ("Supplier") and that we have not participated in their selection. We hereby assign to you, so long as you are not in default hereunder, our assignable rights under any contract of ours with the Supplier relating to the Equipment; you should contact the Supplier directly for a statement of those rights, if any. You agree that no representative of the manufacturer of the Equipment ("Manufacturer") or the Supplier is acting on our behalf and we are not acting on their behalf. You agree that as to any software constituting Equipment: (a) we have no title to such software, (b) you have executed or will execute a separate software license agreement and we are not party to and have no responsibilities whatsoever in regards to such license agreement, (c) you have rejected such software, and WE MAKE NO REPRESENTATION OR WARRANTY REGARDING SUCH SOFTWARE.

**6. Warranties and Limitation of Liability; Non-cancelable Agreement:** WE MAKE NO REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, AS TO ANY MATTER WHATSOEVER, INCLUDING WITHOUT LIMITATION THE DESIGN OR CONDITION OF THE EQUIPMENT ITS MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE. WE WILL HAVE NO LIABILITY BY REASON OF ANY ACT OR OMISSION RELATING TO THE EQUIPMENT OR ITS RENTAL, DELIVERY, INSTALLATION, MAINTENANCE, OPERATION, PERFORMANCE, OR USE, INCLUDING WITHOUT LIMITATION ANY LOSS OF USE, LOST REVENUE, LOST PROFITS. RENTER UNDERSTANDS THAT ONCE THE CONTRACT IS ASSIGNED, THE ASSIGNEE IS A SEPARATE AND INDEPENDENT COMPANY FROM SUPPLIER OR ANY VENDOR, MANUFACTURER, DISTRIBUTOR OR LICENSOR OF SOFTWARE, AND THAT NONE OF THEM NOR ANY AGENT OR EMPLOYEE OF ANY OF THEM IS AN AGENT FOR THE ASSIGNEE. RENTER AGREES THAT NO REPRESENTATION, GUARANTEE OR WARRANTY BY ANY SUCH ENTITY OR PERSON IS BINDING ON THE ASSIGNEE, AND NO BREACH BY ANY SUCH ENTITY OR PERSON WILL EXCUSE OR OTHERWISE AFFECT RENTER'S OBLIGATIONS TO ASSIGNEE. You also acknowledge and agree that (i) you have fully inspected and accepted the Equipment hereunder and the Equipment is in good condition and to your complete satisfaction; and (ii) you rent the Equipment "as is" and with all faults. THIS AGREEMENT IS IRREVOCABLE FOR THE FULL TERM, YOUR OBLIGATION TO PAY ALL PAYMENTS AND OTHER AMOUNTS IS ABSOLUTE AND UNCONDITIONAL AND WILL NOT BE SUBJECT TO ANY ABATEMENT, REDUCTION, SETOFF, DEFENSE, COUNTERCLAIM, INTERRUPTION, DEFERMENT OR RECOUPMENT FOR ANY REASON WHATSOEVER, INCLUDING ANY DEFECT IN THE EQUIPMENT.

**7. Location; User; Maintenance and Return of Equipment:** You agree that the Equipment will be used solely for business or commercial purposes. You will not alter, modify or make additions or improvements to the Equipment without our prior written consent. Any additions to the Equipment shall become our property. You agree not to change the location of the Equipment without our advance written consent. You will, at your sole expense, maintain the Equipment in good operating condition and repair as specified by its Manufacturer using in every case Manufacturer approved replacement parts. You agree to maintain the Equipment's appearance, free of nicks, dents, tears and other blemishes and protect the Equipment from deterioration, other than normal wear and tear. If the Manufacturer provides a maintenance program for the Equipment, the Equipment will at all times be maintained in such a condition as to be eligible for such program. Upon the expiration or other termination of this Agreement, you will return possession of the Equipment, along with all manuals and any other related documents, to us in the condition required above, packed and shipped as recommended by the Manufacturer to any location designated by us. The Equipment must be returned in a condition whereby it can immediately be placed into revenue producing service at its original designated function or capacity. All costs and expenses of the return shall be borne by you, including but not limited to: disassembly, packing, transportation, insurance and unloading the Equipment.

**8. Title; Registration:** You will at all times and at your sole cost and expense keep the Equipment free and clear from all liens and encumbrances (except any placed thereon by us) and will give us immediate written notice of any claims against the Equipment. Each item of Equipment subject to title registration laws will at all times be filed and/or registered in such a manner and jurisdiction as we direct.

**9. Taxes and Fees:** You agree to pay when due, and to indemnify and hold us harmless from, all taxes, fees, fines and any related interest and penalties relating to this Agreement and the Equipment ("Taxes") or to reimburse us on our demand for those Taxes we elect, in our sole discretion, to pay on your behalf. Unless and until we advise you to the contrary we will pay any personal property Taxes relating to the applicable taxing authority. With respect to personal property and any other Tax we have elected to pay directly on your behalf, you also agree to pay to us processing fees of ours. If any taxing authority requires any Taxes to be paid in advance, you authorize us to advance the Tax and increase the Equipment cost by such amount and increase the amount of each Payment as described in Section 3 above. You agree to pay us fees in an amount in effect from time to time in connection with the documentation of this Agreement and any title inspection and lien search as we deem necessary. You agree that all such fees may not only cover our costs they may include a profit.

**10. Risk of Loss; Indemnity; Insurance:** You are responsible for any loss, damage or destruction of the Equipment. No such loss, damage or destruction will relieve you from the payment obligations under this Agreement. You agree to promptly notify us in writing of any loss, damage or destruction and you will then at our election (irrespective of your sole cost and expense or pay to us in addition to all amounts then due and owing, the total of all unpaid Payments for the Term plus our residual interest in the Equipment, all discounted to their then present value at four percent (4%) per annum. Any proceeds of insurance will be paid to us and credited to any amount owed by you hereunder. You agree to indemnify and hold us, our members, managers, officers, employees and agents harmless from and against any and all claims, and against any and all costs, expenses, damages and liabilities, including reasonable attorneys' fees, arising out of your selection, possession, operation, use or disposition of the Equipment. During the Term, you will, at your expense, procure and maintain comprehensive general liability and casualty insurance acceptable to us on the Equipment. Each insurance policy will name us as additional insured and loss payee as applicable. You will furnish to us a certificate of insurance that such insurance coverage is in effect. If you do not provide us with acceptable evidence of insurance, we may, but will not be required to, buy such insurance for our sole benefit and add a charge to the Payments which will include all costs associated with obtaining such insurance, including (i) premium expense, and (ii) fees for billing and other administrative services.

**11. Assignment:** You agree that without our prior written consent, you will not assign or transfer your rights under this Agreement, or sublease or permit the Equipment to be used by anyone other than you. We may assign this Agreement, in whole or in part, without notice to you or your consent. You agree that the assignee will have the same rights and benefits that we have now and will not have to perform our obligations. You agree that the rights of the assignee will not be subject to any claims, defenses or set offs that you may have against us.

Case 1:18-cv-00070   Document 1-6   Filed 09/13/18   Page 63 of 89 PageID #: 217

**12. Default; Remedies:** If any one of the following events occurs, you will be in default: (i) you fail to pay any Payment or other amount due under this Agreement, when due, (ii) you cease doing business as a going concern, make an assignment for the benefit of creditors, admit your inability to pay your debts as they become due or are insolvent, or you file or have filed against you a petition under the Bankruptcy Code, (iii) you breach any representation, warranty or covenant contained in this Agreement, or (iv) any guarantor of this Agreement defaults on any obligation to us or any of the above-listed events of default occur with respect to any guarantor. Upon the occurrence of a default, we may at our option do any or all of the following: (a) by notice to you, terminate this Agreement; (b) whether or not this Agreement is so terminated, take possession of the Equipment, and for such purpose, enter upon any premises without liability for so doing; you irrevocably waive to the fullest extent permitted by law any bonds, surety or security required of us in the event we seek to take possession of the Equipment, (c) declare all sums due and to become due hereunder immediately due and payable together with our residual interest in the Equipment, all such accelerated sums to be discounted to their present value using a discount rate of 4% per annum as calculated by us, (d) sell, dispose of, hold, use or lease any of the Equipment; (e) exercise any other right or remedy which may be available to us under the UCC or other applicable law. In the event we enforce our rights under this Agreement, you shall reimburse us for all costs we incur in so doing including but not limited to our attorneys' fees and all costs of repossession, repair, storage and remarketing of the Equipment. The rights afforded us in this Agreement are in addition to any rights or remedies provided by law. The selection of one remedy does not preclude the exercise of any other remedy. A waiver of default will not be a waiver of any other or subsequent default.

**13. Automatic Renewal:** This Agreement will automatically renew for successive one year Renewal Terms unless you send us written notice at least 90 (but not more than 360) days before the expiration of the Initial Term or any Renewal Term that you do not want to renew this Agreement. During any Renewal Term, the payments under this Agreement will remain the same as during the Initial Term. Notwithstanding the foregoing, we may by written notice to you require you to redeliver the Equipment to us as specified in Section 7 above on the later of 10 days following such notice or the last day of the Initial Term and you shall redelivery your obligation to pay Rent will respect to any period following such redelivery shall cease.

**14. Governing Law:** This Agreement shall be governed by and construed in accordance with the laws of the state of New Jersey. YOU CONSENT TO THE NON-EXCLUSIVE JURISDICTION OF THE FEDERAL AND STATE COURTS LOCATED IN NEW JERSEY IN ANY ACTION OR PROCEEDING RELATING TO THIS AGREEMENT AND YOU AGREE THAT NEITHER YOU NOR US WILL BE LIABLE FOR SPECIAL, INCIDENTAL, PUNITIVE OR CONSEQUENTIAL DAMAGES IN ANY SUCH ACTION OR PROCEEDING. YOU WAIVE ANY OBJECTION BASED ON IMPROPER VENUE AND/OR FORUM NON CONVENIENS WITH RESPECT TO ANY SUCH ACTION OR PROCEEDING AND THE PARTIES WAIVE ANY RIGHT EITHER MAY HAVE TO A TRIAL BY JURY IN ANY SUCH ACTION OR PROCEEDING.

**15. General Provisions:** All of your covenants herein will survive the termination of this Agreement and the return of the Equipment. Any amount not paid when due hereunder shall accrue interest at the lower of 18% per annum or the highest rate allowed by applicable law if fees and paid to us upon demand. You agree to provide us during the Term with updated financial statements and copies of your tax returns as we may request from time to time. If this Agreement is deemed to be a lease intended as security, you hereby grant to us a security interest in the Equipment, and all proceeds, as security for all of your obligations under this Agreement. You hereby irrevocably grant us the right to make such filings under the Uniform Commercial Code or other law naming you as debtor as we deem necessary to establish or perfect and protect our interest in the Equipment. If this Agreement is intended as security the parties agree that each Payment includes compensation that constitutes interest. Section headings are for convenience and are not a part of this Agreement. You agree that a waiver of breach will not be a waiver of any other subsequent breach, and that any delay or failure to enforce our rights under this Agreement does not prevent us from enforcing any rights at a later time. This Agreement will be binding upon and inure to the benefit of the heirs, executors, administrators, successors and permitted assigns of the parties hereto. This Agreement sets forth the entire understanding of the parties with respect to its subject matter and may only be amended by a written instrument executed by both parties and any other purported amendment shall be void. This Agreement may be executed in separate counterparts which together shall constitute one and the same instrument. Any notice given under this Agreement shall be in writing and be deemed given 2 business days after being deposited with the U.S. Postal Service, postage prepaid, addressed to the recipient at its address set forth above or such other address as a party may hereafter designate by written notice. A facsimile or other image of this Agreement shall be admissible in any action or proceeding relating to this Agreement and shall be deemed an original for all purposes. Any restrictive endorsement on any check you give us in payment of any amount due hereunder shall be void. You may not prepay this Agreement without our prior written consent. Time is of the essence with respect to your obligations under this Agreement. If Renter constitutes more than one person, you agree that the liability of each such person hereunder shall be joint and several.

| | |
|---|---|
| Renter Name: VALLEY PACKAGING CORP | ACCEPTED BY LESSOR: KMH SYSTEMS, INC. |
| Signature: X _Carter G. Moore_ | Signature _[signature]_ |
| Printed Name: X _Carter G. Moore_ | Printed Name: _Michael Guerin_ |
| Title: X VP, Finance | Title: _CEO_ |

**ACH AUTHORIZATION**

**AUTHORIZATION FOR PRE-AUTHORIZED PAYMENTS:** Renter hereby authorizes KMH Systems, Inc., its successors and assigns to automatically initiate and make debit entries (charges) to Renter's bank account (and for Renter's bank to accept and post such debit entries) indicated below for the payment of all amounts owed by Renter to KMH Systems, Inc. from time to time under or in connection with this Agreement. Renter understands and agrees that KMH Systems, Inc. may impose a fee in the event Renter's bank does not pay a debit entry. This authority granted under this Authorization for Pre-authorized Payments is to remain in effect during the Term of the Agreement, including all renewals and extensions, and Renter acknowledges that if Renter revokes such authority during the term of the Agreement Renter shall be in default under this Agreement without the requirement of any prior notice from KMH Systems, Inc. as a precondition for such default. Any erroneous or incorrect charge will be corrected upon notification to KMH Systems, Inc. If corrections to the debit account are necessary, it may involve a credit or debit to Renter's account. Renter agrees that a facsimile or other copy of this Authorization for Pre-authorized Payments, as executed, shall be deemed the equivalent of the originally executed copy for all purposes.

| | | |
|---|---|---|
| Bank Name: | | Acct Holder Name: |
| Account No: | | ABA No: |

Page 2 of 2

## DELIVERY AND ACCEPTANCE CERTIFICATE

Agreement No. 1015-009.4

To:     KMH SYSTEMS INC

The undersigned hereby certifies: (i) that all of the property described in Schedule "A" and the invoices supplied by KMH Systems, Inc., which is to be financed pursuant to the rental agreement referenced above (the "Agreement") between KMH SYSTEMS INC as lessor and the undersigned as lessee, debtor or other obligor, (the "Equipment") has been delivered to, and received by, the undersigned, (ii) the Equipment conforms in all respects to that ordered by the undersigned, (iii) its condition is satisfactory in all respects to the undersigned and (iv) that the Equipment is accepted by the undersigned under the Agreement in all respects, and the undersigned hereby irrevocably directs KMH SYSTEMS INC to pay the equipment suppliers the purchase price of the Equipment.

Equipment:  See Equipment "Schedule A" attached hereto and made a part hereof

The undersigned agrees that a facsimile or other copy of this Delivery and Acceptance Certificate, as executed, shall be deemed the equivalent of the originally executed copy for all purposes. By executing this Delivery and Acceptance Certificate the undersigned irrevocably acknowledges and agrees that the undersigned's non-terminable installment payment and other obligations under the Agreement have commenced.


CUSTOMER:       VALLEY PACKAGING CORP.

Signature:      X _Joe Parker_____

Printed Name:   X _Joe Parker_____

Title:          X _Production Manager_____

Date Signed:    X _10/29/15_____

SCHEDULE "A"

KMH Systems, Inc. will deliver the following equipment attached to and made part of
Rental Agreement # 1015-C09A between KMH SYSTEMS, INC. and VALLEY PACKAGING CORP.

Quantity and Description:

(5) NISSAN/UNICARRIER 5000LB LPG FORKLIFTS

SERIAL #'S    CP1F2-9W8880
             CP1F2-9W8891
             CP1F2-9W8883
             CP1F2-9W8898
             CP1F2-9W8874

CUSTOMER: VALLEY PACKAGING CORP.

Signature:    X  Joe Parker
Printed Name: X  Joe Parker
Title:        X  Production Manager
Date Signed:  X  10/29/15

# ASSIGNMENT

THIS ASSIGNMENT (this "Assignment") is entered into as of _October 29_, 2015, by KMH SYSTEMS, INC. ("Assignor"), in favor of AXIS CAPITAL, INC. (together with its successors and assigns, "AXIS CAPITAL, INC."), a NE company.

## Recitals

Assignor and AXIS CAPITAL, INC. are parties to that certain Master Discounting Agreement dated as of December 29th, 2014 (the "Master Agreement"), pursuant to which Assignor's right, title and interest in lease agreements, equipment finance agreements, secured loan agreements ("Contracts") entered into from time to time by Assignor with Assignor's customers and rights to the personal property acquired by or leased by such customers pursuant to Leases ("Collateral") may be assigned and conveyed to AXIS CAPITAL, INC. pursuant to the terms and conditions of the Master Agreement and Assignments entered into pursuant thereto such as this Assignment.

Assignor desires to assign to AXIS CAPITAL, INC. and AXIS CAPITAL, INC. desires to acquire from Assignor the Payments, as hereinafter defined, due from the Lessee under that certain Lease Agreement, Contract # _____ ("Assigned Contract") between Assignor as Lessor and Valley Packaging Corp, 275 Industrial Boulevard, Pulaski, TN. 38478 as Renter, Customer or Lessee ("Obligor"). The Assigned Contract is a True Lease as defined in the Master Agreement but Assignor is not making an absolute assignment of Assignor's right, title and interest therein but only a collateral assignment of such right, title and interest as hereinafter provided. Assignor hereby sells, assigns and transfers to AXIS Capital, Inc. the Payments and assigns its other rights in the Assigned Contract pursuant to the following.

NOW, THEREFORE, in consideration of the foregoing and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

1. **Definitions.** Unless otherwise defined herein, capitalized terms used herein shall have the meanings ascribed to such terms in the Master Agreement.

2. **Assignment and Assumption.** Effective as of the date hereof, and in accordance with the terms and conditions of the Master Agreement (which are incorporated herein by this reference) and this Assignment, Assignor hereby irrevocably and unconditionally assigns, sells and transfers to AXIS CAPITAL, INC. and its successors and assigns 48 payments of monthly Lease Payments as defined in the Assigned Contract each in the amount of $3,000.00 ("Payments") commencing with the Payment due and owing by the Obligor on _____; and Assignor's right to receive the same, as and when such Payments are payable by the Obligor under the terms of the Assigned Contract, together with any and all damages, late charges, indemnification payments, insurance payments, condemnation awards, payments arising out of the Loss or Damage of the Equipment (the foregoing could change with each deal) as defined in the Assigned Contract, proceeds arising out of the sale or other disposition of the Equipment, interest and reimbursements and any other sum payable or realized under the terms of the Assigned Contract arising out of (a) the loss or destruction of the Equipment, or (b) the late payment or non-payment of the Payments or other breach of the Assigned Contract by Lessee ("Assigned Interest"). Assignor acknowledges that AXIS CAPITAL, INC. has not assumed and shall not be bound to perform any duty or obligation of Assignor under the Assigned Contract which Assignor shall be and remain responsible for and liable to perform. Assignor acknowledges and agrees that its rights in and to the Assigned Contract and the Equipment are subject and subordinate in all respects to those of AXIS CAPITAL, INC.

3. **Grant of Security Interest.** To secure the obligations of (a) the Obligor under the Assigned Contract, including, without limitation its obligation to make the Payments and other amounts specified as part of the Assigned Interest, and (b) the obligations of Assignor under this Assignment, Assignor hereby: collaterally assigns and hereby grants in favor of AXIS CAPITAL, INC. a first priority perfected lien and security interest in (i) Assignor's entire right, title, interest and remedies in and to the Assigned Contract (including all schedules, riders, exhibits, addenda, amendments, supplements to the Assigned Contract) and any other related documents including, without limitation, guarantees and other credit enhancements); and (ii) the Equipment as defined in the Assigned Contract, and any proceeds of the foregoing. By its execution below, AXIS CAPITAL, INC. hereby purchases and assumes the Payments and the Assigned Interest.

4. **Rights of AXIS CAPITAL, INC.** Until such time as AXIS CAPITAL, INC. has received all of the Payments in full together with all payments specified and in and constituting the Assigned Interest in the event of the late payment or non-payment of the Payments, AXIS CAPITAL, INC. shall have and enjoy (a) all of the rights of a secured party under the Uniform Commercial Code and (b) the rights of Assignor under the Assigned Contract and Assignor shall exercise any such rights only with the prior written consent of AXIS CAPITAL, INC.. Without limiting the generality of the foregoing, AXIS CAPITAL, INC. shall have the right to (i) collect, compromise and release any and all Payments and other monies payable under the Assigned Contract, (ii) deal with the Assigned Contract, any related documents and the Equipment in such a manner as Assignor could have in the absence of this Assignment and at such times as AXIS CAPITAL, INC. shall, in its sole discretion deem advisable, (iii) and take all legal or other proceedings which Assignor could have taken with respect to the Assigned Contract and related documents, including, without limitation the enforcement of rights and remedies under the Assigned Contract following an event of default thereunder. No exercise of the foregoing rights by AXIS CAPITAL, INC. shall relieve Assignor of its obligation to perform its obligations under the Assigned Contract or its indemnification obligations to AXIS CAPITAL, INC. set forth below and in the Master Agreement. Assignor shall authorize and irrevocably direct the Lessee under the Assigned Contract to make all Payments and other sums due from time to time under the Assigned Contract to or at the direction of AXIS CAPITAL, INC..

5. **Indemnification by Assignor.** In addition to any other indemnification obligation of Assignor, Assignor shall indemnify, defend and hold AXIS CAPITAL, INC. harmless against any loss, liability, damages, cost or expense (including, without limitation, reasonable attorneys' fees) incurred by AXIS CAPITAL, INC. by reason of or arising out of any breach by Assignor of its obligations set forth in this Assignment or the Assigned Contract or any related document.

6. **Release of Lien.** If and only if: (a) Obligor has indefeasibly paid to AXIS CAPITAL, INC. all of the Payments in accordance with the provisions of the Assigned Contract, and (b) the Obligor is not then in default or in breach of any of its obligations under the Assigned Contract, AXIS CAPITAL, INC. shall at the request of Assignor release its lien on the Assigned Contract, any related document and the Equipment and execute such documents as may be reasonably requested by Assignor to evidence such release.

7. <u>Transfer.</u> To facilitate the transfer provided by this Assignment, AXIS CAPITAL, INC. shall have the right to endorse in its name or in the name of Assignor, and to deposit in any AXIS CAPITAL, INC. account, all checks and drafts for payment made by Lessee or any guarantor under the Assigned Contract or any related guaranty plus applicable taxes and fees. Assignor agrees to take such further action at its expense to effectuate the assignment of its right to receive the Payments and its interest in the Assigned Contract as may be requested by AXIS CAPITAL, INC. from time to time. Assignor hereby authorizes AXIS CAPITAL, INC. to execute and file all financing statements, title applications, registrations and any and all other documents deemed by AXIS CAPITAL, INC. as necessary or convenient to accomplish or evidence the transfer of the Assigned Interest set forth herein and perfect the security interest granted pursuant to Section 3 above and all instruments necessary to reflect the assignment of any existing financing statements or other documents covering the related Collateral in favor of Assignor. Assignor agrees that a photocopy of this Assignment is sufficient as a financing statement. AXIS CAPITAL, INC. is hereby granted a power of attorney to sign Assignor's name on any financing statements or other documents referenced above as Assignor's true and lawful attorney. The foregoing power of attorney is coupled with an interest and is irrevocable.

8. <u>Successors and Assigns.</u> This Assignment shall inure to the benefit of AXIS CAPITAL, INC. and its successors and assigns.

IN WITNESS WHEREOF, Assignor has executed this Assignment by its duly authorized officer as of the date first above written.

AXIS CAPITAL, INC. LLC

By: _____

Name: _____

Title: _____

KMH SYSTEMS, INC.

By: _____

Name: Michael Quenin

Title: President.

# AUTHORITY AND INCUMBENCY CERTIFICATE

Agreement No. _1015~6878_

COMPANY:
KMH SYSTEMS INC
6900 POE AVENUE
DAYTON, OH 45414

CUSTOMER:
VALLEY PACKAGING CORP
275 INDUSTRIAL BOULIVARD
PULASKI, TN 38478

VALLEY PACKAGING CORP ("Customer") and KMH SYSTEMS INC ("Company") intend to enter into from time to time rental agreements (each an "Agreement") pursuant to which Company will provide financing to the Customer and the Customer will either lease from Company items of personal property owned by Company or grant a security interest in favor of Company in Customer's property to secure its obligations under any such Agreement.

The undersigned person executing this Authority and Incumbency Certificate ("Certificate") hereby certifies to Company as follows:

1. The undersigned person is duly appointed officer, manager, partner, member or other party with the power and authority to act on behalf of Customer and, in particular, with the power and authority to execute and deliver this Certificate.

2. Customer has taken and will take such action as may be necessary to authorize Customer to enter into and perform its obligations under the Agreements including, without limitation, the taking of all necessary action under Customer's organization documents or otherwise including, without limitation, the adoption of resolutions and obtaining all necessary consents.

3. Each of the individuals listed below has the official capacity with Customer as indicated below opposite such person's name and is authorized and empowered to execute and deliver Agreements and to execute and deliver such other instruments and documents on behalf of Customer as may be deemed necessary or appropriate by such individual in connection therewith and that any such Agreement and other instruments and documents executed by any such person are the valid and binding obligation of the Customer. The signature opposite each such individual's name is the true signature of such individual.

| NAME | OFFICIAL CAPACITY-TITLE | SIGNATURE |
|------|------------------------|-----------|
| Joe Parker | Production Manager | Joe Parker |
|  |  |  |

4. Company shall rely upon this Certificate and statements contained herein until such time as Customer has given to Company written notice specifically revoking this Certificate; provided, no such revocation shall in any manner affect the obligations of Customer to Company under Agreements entered into by Customer with Company prior to the receipt by Company of such notice of revocation.

Customer agrees that a facsimile or other copy of this Certificate, as executed, shall be deemed the equivalent of the originally executed copy for all purposes.

IN WITNESS WHEREOF the undersigned has executed this Certificate as of ____Oct. 21____, 2014

Signature: _____

Printed Name: ___Carder G. Moore___

Title: ___VP, Finance___



# INVOICE

**BILL TO:**

VALLEY PACKAGING
275 INDUSTRIAL BLVD
PULASKI, TN 38478

**SHIP TO:**

Valley Packaging
275 Industrial Blvd
Pulaski TN 38478

**Total Amount: $134,649.00**

New 2015 Unicarriers Forklifts Model
#CF50

Serial Numbers:

CP1F2-9W8880
CP1F2-9W8881
CP1F2-9W8883
CP1F2-9W8898
CP1F2-9W8874

|  |  |
|---|---|
|  | $134,649.00 |
| Less Doc Fee | - $295.00 |

**Total Amount : ........................................................ $134,354.00**

Wiring Instructions:
Fifth Third Bank
Account # 07700535508
Routing # 042000314
Brian Ritchey – 630-290-2070 cell

<table>
<tr><td colspan="2">

**Alliance** FUNDING GROUP

3745 W. Chapman Ave., Ste. 200
Orange, CA 92868
</td><td>

Phone (800) 978.8817
Fax (800) 257.0395
Url www.alliancefunds.com
</td><td>

Lease Number: 930025
</td></tr>
</table>

| Full Legal Name and Address of Lessee | Name and address of Equipment Supplier |
|---|---|
| NORTHEAST CONCRETE PUMPING CORPORATION<br>7 Border Rd.<br>Scarborough, ME 04074 | Alliance Concrete Pumps INC.<br>26162 30A Ave<br>Aldergrove, BC Canada V4W 2W5 |

| Lessee Phone Number | Lessee Tax ID | Equipment Supplier Phone Number |
|---|---|---|
| 207-773-3161 | 01-0383738 | 604-607-0908 |

| Quantity | Equipment Description |
|---|---|
| | See attached Exhibit 'A' |

| Monthly Rent (Plus applicable taxes, if any) | Base Term in Months | Deposit Applied To | Security Deposit (if any) |
|---|---|---|---|
| $4,680.70 | 60 | First and Last Payment | $0.00 |

| Equipment Location (if other than billing address) | City | State | Zip |
|---|---|---|---|
| | | | |

Please read the Lease Agreement and any schedules attached (Lease) carefully since it represents the entire agreement. We have written the Lease in plain language because we want you to fully understand its terms. For purposes of this Lease, you and your shall mean the Lessee indicated above, and we, us and our refer to Lessor, Alliance Funding Group, its agents and employees, successors and assigns.

**END OF LEASE OPTIONS:** You will have the following options at the end of the original term, provided the Lease has not terminated and any event of default under the Lease has occurred and is continuing. **1.** Purchase the equipment for fair market value. **2.** Renew the Lease per Paragraph 16. **3.** Return the equipment as provided in Paragraph 16 of this Lease.

<table>
<tr>
<td>

The undersigned agrees that this lease reflects the agreement of the parties, including all terms of the reverse side of this document.

**AGREED: NORTHEAST CONCRETE PUMPING CORPORATION**

By: X _Daniel Laughlin_     Date: 7/9/2015
    Daniel Laughlin , President

**AGREED: Alliance Funding Group**

By: X _____     Date: 7/17/15
    Funding Manager
</td>
<td>

**Company Resolution:** The undersigned certifies that he/she the duly elected and qualified Secretary of NORTHEAST CONCRETE PUMPING CORPORATION (the "Company"), hereby certify that Company's exact legal name, state of incorporation/organization, location of its chief executive officer and/or its place of residence, are properly listed herein, and have correctly identified to Lessor, and that at a duly constituted meeting of the Board of Directors/Members/Partners of the Company, the Board resolved that Daniel Laughlin, in his/her capacity as President, is authorized for, on behalf of the company, to negotiate, procure and execute such Lease Agreements and any other documents in connection with same, which is his / her opinion are necessary or advisable to effectuate the most favorable interests of the Company, and the execution of such documents by said officer shall be conclusive evidence of his/her approval thereof.

IN WITNESS WHEREOF, I have affixed my name as Secretary of the Company on 7/9/2015

Legal Name _____

NORTHEAST CONCRETE PUMPING CORPORATION    Date: 7/9/2015

Signature

X _____     Title: Corporate Secretary
CORPORATE SECRETARY SIGNATURE
</td>
</tr>
</table>

**LEASE GUARANTY:** For the purposes of this Guaranty, I/ME/MY shall mean the person making the guaranty and if married, his or her marital community. YOU/YOUR shall mean the Lessor. I agree that I have an interest in the Lessee, economic or otherwise, and that you would not enter into this Lease without this guaranty. I unconditionally guaranty that the Lessee will fully and promptly pay all its Obligations under the Lease and any future leases with you when they are due and will perform all its other obligations under the Lease even if you modify or renew the Lease, or if any payments made by the Lessee are rescinded or returned upon the insolvency, bankruptcy or reorganization of the lessee, as if the payment had not been made. You do not have to notify me if the Lessee is in default under the Lease. You may obtain any information from credit reporting agencies you deem necessary to enforce this guaranty. If the Lessee defaults, I will immediately pay in accordance with the default provisions of the Lease all obligations due under the Lease. I agree that I will not be released or discharged if you: (i) fail to perfect a security interest in the Equipment or any other property which secures the Obligations of Lessee or me to you (Collateral); (ii) fail to protect the Collateral; or (iii) abandon or release the Collateral. I agree that you do not have to proceed first against the Lessee or any Collateral. I hereby waive notice of acceptance of this guaranty and of all other notices or demands of any kind in which I may be entitled to except for demand for payment. I will reimburse all expenses you incur in enforcing your rights against Lessee or me, including, without limitation attorney's fees and costs. I acknowledge that I have read and understood the Lease and this Guaranty. This is an irrevocable, continuing guaranty and binds my heirs, administrators and representatives. I CONSENT TO THE JURISDICTION OF THE COURTS HAVING JURISDICTION OVER DISPUTES ARISING UNDER THE LEASE FOR THE DETERMINATION OF ALL DISPUTES UNDER THE LEASE AND THIS GUARANTY. I agree and consent that you may serve legal papers on you by registered or certified mail, which shall be sufficient to obtain jurisdiction. WE EACH WAIVE TRIAL BY JURY IN ANY ACTION RELATING TO THE LEASE OR THIS GUARANTY.

Signature

X _Daniel Laughlin_        X _Joseph Croteau_
    Daniel Laughlin            Joseph Croteau

Date: 7/9/2015        Date: 7/9/2015

**1. LEASE:** You agree to Lease from us and we agree to Lease to you, the equipment listed above or on any schedule to this Lease (Equipment). You unconditionally promise to pay us the sum of all of the rental and other payments indicated above or on any schedule to this Lease (Rent). You authorize us to insert in this Lease any serial numbers and other identification data about the Equipment, as well as any other omitted factual matters or correct obvious errors. All Rent and other payments under this Lease or any other agreement with us (collectively Obligation) are payable in U.S. dollars, and may be adjusted upward or downward no more than ten percent (10%) to reflect actual costs.

**2. TERM OF LEASE:** This Lease shall become effective upon acceptance by us signing and dating this Lease. A Prorated portion of the aggregated average of the Rent based on a daily charge of one-thirtieth (1/30) of the Rent from the date of the Equipment has been delivered to you ("Commencement Date") to the end of the month shall be payable at the Commencement Date. The Base Term of this Lease shall begin on the first day of the month following the Commencement Date and terminate upon the expiration of the Base Term above. Following the Commencement Date, Rent and other Obligation payments are due on the first of each month, payable to a location to be designated in writing. YOUR OBLIGATION TO PAY RENT TO US IS UNCONDITIONAL AND NOT SUBJECT TO ANY REDUCTION, SET-OFF, DEFENSE OR COUNTERCLAIM AND MAY NOT BE CANCELED FOR ANY REASON WHATSOEVER. In the event this Lease is not fully completed for any reason beyond our control, all deposits made by you will be retained by us as compensation for documentation, processing and other expenses. We have the right, but not the obligation, to electronically withdraw funds from your bank account to pay for any unpaid Rents, taxes, fees, charges and assessments. You will provide us with any bank account information we request in order to process electronic payments. You may revoke our authorization to electronically withdraw funds by giving us ten (10) days prior written notice.

**3. SECURITY DEPOSIT:** As security for the payment of Rent, and performance of all the Obligations, you deposit with us the amount set forth in the section shown as "Security Deposit". In the event you shall default in the performance of any of the Obligations, we shall have the right, but shall not be obligated to apply the security deposit to the curing of such default. On the expiration or earlier termination of this Lease, or any extension or renewal hereof, provided you have fully performed all of the provisions of this Lease, we will return to you and then remaining balance of the security deposit. We shall not be required to keep the security deposit separate from our general funds and you shall not be entitled to any interest on the security deposit.

**4. NO WARRANTIES; NO AGENCY:** You are LEASING THE EQUIPMENT TO YOU AS IS. WE MAKE NO WARRANTIES, EXPRESS OR IMPLIED, INCLUDING WARRANTIES OF NON-INFRINGEMENT, MERCHANTABILITY, OR FITNESS FOR A PARTICULAR PURPOSE OR ORDINARY USE IN CONNECTION WITH THIS LEASE. You understand and agree that we are independent from the vendor, manufacturer and/or supplier (Supplier) of the Equipment and that neither the Supplier nor any other person is our agent, nor are they authorized to waive or change any term or condition of this Lease. You agree that no representation, guaranty or warranty by the Supplier or other person is binding on us. So long as you are not in default under any of the terms of this Lease, we transfer to you any warranties made to us, as the owner of the Equipment by the Supplier. You agree that any breach by the Supplier will not relieve or excuse your obligations to us. Regardless of cause, you will not assert any claims whatsoever against us for loss of profits you expected to make or any other direct, consequential, special or indirect damages. If you have entered into a maintenance agreement for the Equipment and the cost of the maintenance is included in the Rent, you acknowledged that we are not responsible for any service, repairs, or maintenance of the Equipment, and that we are not a party to the maintenance agreement. If you have a dispute regarding maintenance or service, then you will nevertheless continue to pay all Obligations as they become due.

**5. UCC-ARTICLE-2A:** You agree that this Lease is a "Finance Lease" under Article 2A of the Uniform Commercial Code as adopted by the State of California (UCC). You acknowledge that: (a) we did not select, manufacture or supply the Equipment, but at your request we have purchased the Equipment that you are leasing from us. You agree that you have approved any purchase or supply contract between us and the Supplier before signing this Lease; or, if you have entered in to a purchase contract for the Equipment, you agree to assign it to us effective when we pay for the Equipment. You may have rights under the supply or purchase contract, and you may contact the Supplier for a description of those rights or any warranties. To the extent permitted by applicable law, YOU WAIVE ANY AND ALL RIGHTS AND REMEDIES CONFERRED UPON YOU UNDER UCC 2A-303 AND 2A-508 THROUGH 2A-522, INCLUDING WITHOUT LIMITATION, THE RIGHT TO: (i) REPUDIATE THE LEASE AND REJECT THE EQUIPMENT; (ii) REVOKE ACCEPTANCE OF THE LEASE; OR (iii) RECOVER DAMAGES FROM US FOR ANY BREACH OF WARRANTY.

**6. DELIVERY OF EQUIPMENT:** You agree to accept the Equipment when it is delivered and to sign the Equipment Acceptance required by us. We may at our discretion confirm by telephone that you have accepted the Equipment and this telephone verification of your acceptance of the Equipment shall have the same effect as a signed Equipment Acceptance.

**7. ASSIGNMENT:** YOU MAY NOT SELL, TRANSFER, ASSIGN OR SUBLEASE THE EQUIPMENT WITHOUT OUR PRIOR WRITTEN APPROVAL. We may sell, assign or transfer this Lease, or any part of it, and/or ownership of the Equipment without notifying you; and you agree that if we do, the new Lessor will have the same rights and benefits that we now have, and will not have to perform any of our obligations. You agree that the rights of the new Lessor will not be subject to any claims, defenses or setoffs that you may have against us. However, any such assignment, sale, or transfer of this Lease or the Equipment will not affect any of our obligations to you under this Lease.

**8. OWNERSHIP, RIGHTS, AND QUIET ENJOYMENT:** You agree that we are the owner of and have title to the Equipment. You agree, at your expense, to protect and defend our title and other rights to the Equipment. Further, you agree that you will at all times keep the Equipment free from all legal process or lien if asserted or made against you or the Equipment. You shall have the right to quiet use and enjoyment of the Equipment for the Term of this Lease, provided you are not in default. We also have the right, at reasonable times, to inspect the Equipment at your expense.

**9. CARE, USE AND LOCATION; LOSS OF EQUIPMENT:** You are responsible for installing and keeping the Equipment in good working order and repair. You will keep and use the Equipment only at your address shown on this Lease, only for business or commercial purposes and in compliance with all applicable laws, ordinances or regulations. You will not make any alterations to the Equipment without our prior written consent, nor will you permanently attach the equipment to any real estate. You are responsible for protecting the Equipment from damage, and from any other kind of loss while you have the Equipment or while it is being delivered to you. In the event the equipment was lost, stolen or damaged, as long as you are not in default under this Lease, then you shall have the option within one week of such event to: (a) repair or replace the Equipment or (b) pay to us the unpaid balance of the remaining Rent under this Lease and our residual interest in the Equipment, discounted to present value at the rate of five percent (5%) plus any other Obligations.

**10. TAXES AND FEES:** You agree to pay when due all taxes, fees, fines, assessments and penalties relating to this Lease, including, without limitation, documentation fees, filing fees, credit fees, equipment inspection fees, early termination or assumption fees, title fees, name change fees, sales or property taxes, use taxes and business taxes. You also agree that we may estimate the yearly personal property taxes that will be due for the Equipment, and you agree to pay us the estimated taxes together with a processing fee as invoiced by us. If we pay any taxes, fines or penalties for you, you agree to reimburse us, together with a processing fee, on demand.

**11. INDEMNITY:** We are not responsible for any injuries or losses to you or any other person or property caused by the installation, operation, maintenance or use of the Equipment. You agree to reimburse us for and defend us against any claims for such losses or injuries, including, without limitation, those arising out of the negligence, tort, strict liability claims or any claim for patent, trademark or copyright infringement. This indemnity shall continue even after the term of this Lease has expired.

**12. INSURANCE:** During the term of this Lease, you will keep the Equipment insured against all risks of loss or damage in an amount not less than the replacement cost of the Equipment, without deductible and with no co-insurance. At our request, you will also obtain and maintain for the term of the Lease, comprehensive public liability insurance in amounts acceptable to us. We will be the sole lender loss payee named on the property insurance and named as additional insured on the public liability policy. You will pay all premiums for such insurance. If you do not provide such insurance, you agree that we have the right, but not the obligation, to secure insurance on the Equipment in this Lease or any other agreement with us that we deem reasonable to protect our interests. You understand that, if we secure insurance on the Equipment the insurance may not name you as an insured and may not fully protect your interests. You agree that, if we secure insurance on the Equipment, you will pay an insurance charge that may be substantially higher than the premium that you would pay if you placed said insurance independently. You agree that, in addition to the premium, the insurance charge you are required to pay us will include an interest charge, administrative and processing fees, which will result in profit to us. You will give us certificates or other evidence of insurance when we request same, and such certificates shall provide that we shall be given 30 days advance notice of any cancellation, nonrenewable or other material change in the insurance. You grant us and our agents power-of-attorney in your name to apply for insurance benefits and endorse checks received in payment of insurance claims.

**13. DEFAULT AND REMEDIES:** If you: (A) do not pay any Obligation when due; (B) break any of your promises, representations or covenants under this Lease or any other agreement with us; (C) become insolvent, assign your assets for the benefit of your creditors; (D) you or any guarantor enters (voluntarily or involuntarily) into a bankruptcy proceeding; (E) default on any obligations to any of your other creditors; (F) have made any representations to us with respect to your financial or other information provided in connection with this Lease or any other agreement with us that is not truthful at the time it is made or have omitted any material information with respect to your asset or liabilities, or any other information that would be considered material in the extension of credit; (G) are a corporation and more than 20% of the issued and outstanding voting capital stock is transferred to or acquired by any person or entity that is not an owner as of the date of this Lease; (H) any guarantor dies; or (I) you change your name, state of incorporation, chief executive office and/or place of residence without providing us with 30 days prior written notice of such change, you will be in default. In the event of a default by you, we can require that you return the Equipment to us and pay to us the remaining balance of all of the Rent due under this Lease, discounted to present value at the percent (5%) , together with any other amounts due under this Lease. We can also require that you pay to us our residual interest in the Equipment. Interest shall accrue on all Obligations due us from the date of default until paid at the rate of eighteen percent (18%) per annum, but only to the extent permitted by law. We shall also be entitled to recover from you all damages caused by that default, including any of our income tax benefits. We can also use any of the remedies available to us under the UCC or any other law, including repossession of the Equipment or other Collateral. You agree to reimburse us for all charges, costs, expenses and attorney's fees that we have to pay to enforce this Lease or collect the Obligations under this Lease and in any lawsuit or other legal proceeding which we are required to bring or defend because of your default. You also agree that in the event of a dispute related to or arising out of this Lease, the Lessor in such dispute shall be entitled to recover its reasonable attorney's fees and costs. If we have to take possession of the Equipment, you agree to pay the cost of repossession, storing, shipping, repairing and selling the Equipment. You agree that we do not have to notify you that we are selling the Equipment. You also agree that we are entitled to abandon the Equipment if we reasonably believe it to be in our best interests.

**14. OTHER RIGHTS:** Time is of the essence in this Lease. You agree that any delay or failure by us to enforce our rights under this Lease or any other agreements shall not prevent us from enforcing any rights at a later time. Both parties intend this Lease to be a valid and legal obligation, and agree that if any part is determined to be unenforceable, all other parts will remain in full force and effect. You also grant us a security interest in the Equipment and any proceeds of, accessions and attachments to the Equipment as a security for your Obligations. You agree that we may obtain information from credit reporting agencies at any time. You agree that, at your expense, we may file, with or without your signature, financing statements or other related filings in our name or in the name of any agent designated by us or our assigns in the form and content and from time to time as we deem proper, listing you as Lessor or Debtor. You appoint us or our designee as your attorney-in-fact to execute and file, on your behalf, financing statements covering the equipment or any other collateral. Any notice required by this Lease or the UCC shall be deemed to be delivered when a record properly directed to the intended recipient has been (a) deposited with the US Postal Service, (b) transmitted by facsimile, (c) transmitted through the internet; or (d) has been personally delivered.

**15. LESSEE REPRESENTATIONS AND WARRANTIES:** You hereby represent and warrant that at the time you sign this Lease you are and shall remain a business entity duly organized, validly existing and in good standing under the laws of the state of your organization, duly qualified to conduct business in every jurisdiction where you conduct business and are not subject to any bankruptcy proceeding and that your exact legal name, state of incorporation, location of your chief executive office and/or your place of residence is correctly identified to us. You further represent and warrant that at the time you sign this Lease the person executing the Lease or any related document on behalf of you or any related guarantor shall be authorized to take such action and bind you and the guarantor to the Lease, and that the execution, delivery and performance of this Lease is duly authorized by your organizational documents and, if necessary, resolutions of your directors and/or shareholders, partners, or managers and/or members.

**16. RETURN OF EQUIPMENT; RENEWAL:** If no default exists or has occurred under this Lease, you may, at the end of the original or any renewal term, purchase all (not less than all) of the Equipment for its then fair market value, plus any applicable taxes unless a different End of Lease Option is granted to you in a separate addendum. At least 120 days prior to the end of the original term you must give us written notice via certified mail that you will purchase the Equipment or that you will return the Equipment to us. If you do not give us such written notice or if you do not purchase or deliver the Equipment in accordance with the terms and conditions of this Lease, then this Lease shall automatically renew for a 12 month term, and thereafter for successive 6 month terms until you deliver the Equipment to us. During such renewal(s), the Rent shall be the highest monthly rate set forth in this Lease. We may cancel the renewal by sending you a written notice 20 days prior to the effective date of the cancellation. If this Fair Market Value Purchase Option is available to you, we will use our reasonable judgment to determine the Equipment's fair market value. Any Purchase Option may become null and void at our discretion if any event of default occurs or continues at any time during the original term of the Lease. Upon payment of End of Lease Option price, and if no default exists, we shall transfer our interest in the Equipment to your "AS IS, WHERE IS" without any representation or warranty whatsoever and this Lease will terminate. Provided you have given the required notice, and are not then in default, you shall return the Equipment, freight and insurance prepaid, to us in good repair, condition and working order, ordinary wear and tear expected, in a manner and to a location designated by us. Until the End of Lease Option price is actually paid, your obligation to continue to pay rent at the highest monthly rate set forth in this lease.

**17. LATE CHARGE; FEES:** If any part of any payment obligation is not made by you within (3) days of the due date, you agree to pay us up to fifteen percent (15%) of each such late payment (to the extent permitted by law). You agree to pay us the late charge not later than one month following the date that the obligation was first due. You agree to reimburse us for our reasonable expenses incurred in connection with this Lease, including but not limited to, a documentation fee based on our current fee schedule which is available upon your request.

**18. ENTIRE AGREEMENT; CHANGES:** This Lease contains the entire agreement between you and us, and it may not be altered, modified, terminated or otherwise changed except in writing by both of us. A limiting endorsement on a check or other form of payment will not be effective to modify the Obligations or any of the other terms and conditions of this Lease, and we may apply any payment received without it being bound by such limiting endorsements.

**19. COMPLIANCE; NOTICES:** In the event you fail to comply with any terms of this Lease, we can, but we do not have to, take any action necessary to effect your compliance upon ten (10) days prior written notice to you. If we are required to pay any amount to obtain your compliance, the amount we pay plus all of our expense in causing your compliance, shall become additional obligations and shall be paid by you together with the next due rent payment. If any notices are required under this Lease, they shall be sufficient if given personally or mailed to the address set forth in this Lease by certified or registered mail, postage prepaid. This Lease is for the benefit of and is binding upon you and your personal representatives, successors and assigns.

**20. CHOICE OF LAW; JURISDICTION:** YOU AND WE AGREE THAT THIS LEASE SHALL BE DEEMED WHEN ACCEPTED IN WRITING BY US AT OUR OFFICE AND GOVERNED BY THE LAWS OF THE STATE OF CALIFORNIA OR SHOULD WE ASSIGN THIS LEASE, THAT THIS LEASE SHALL BE INTERPRETED, AT OPTION OF THE ASSIGNEE, IN ACCORDANCE WITH THE LAWS AND REGULATIONS OF THE STATE OF ASSIGNEE'S PRINCIPAL PLACE OF BUSINESS. YOU AND WE EACH CONSENT TO THE JURISDICTION OF THE COURTS IN THE STATE AND COUNTY WHERE WE OR OUR ASSIGNEE MAY HAVE THEIR PRINCIPAL PLACE OF BUSINESS. YOU UNDERSTAND THAT YOUR SUBMISSION TO JURISDICTION DIRECTLY BENEFITS US AND RESULTS IN A REDUCED RENT. YOU ACKNOWLEDGE YOUR PAYMENTS TO US OR TO OUR ASSIGNEE AS A DELIBERATE ENGAGEMENT OF SIGNIFICANT BUSINESS ACTIVITY WITHIN THE STATE AND COUNTY OF THE PAYEE SUCH THAT YOU WOULD ANTICIPATE BEING SUMMONED INTO COURT WITHIN SUCH STATE AND COUNTY, SHOULD YOU BREACH ANY TERMS OR CONDITIONS OF THIS LEASE. UPON REQUEST OF OUR ASSIGNEE YOU AGREE TO EXECUTE A WRITTEN ACKNOWLEDGEMENT IDENTIFYING AT OPTION OF THE LAW OF THE STATE IN WHICH OUR ASSIGNEE'S PRINCIPAL PLACE OF BUSINESS IS LOCATED AND THE JURISDICTION OF THE COURTS OF SUCH STATE OVER DISPUTES ARISING UNDER THIS LEASE. HOWEVER, YOU AGREE THAT WE WILL HAVE THE RIGHT TO COMMENCE ANY ACTION IN ANY COURT HAVING THE PROPER JURISDICTION FOR THAT ACTION. YOU AGREE AND CONSENT THAT WE MAY SERVE LEGAL PAPERS ON YOU BY REGISTERED OR CERTIFIED MAIL, WHICH SHALL BE SUFFICIENT TO OBTAIN JURISDICTION. WE EACH WAIVE TRIAL BY JURY IN ANY ACTION BETWEEN US.

**21. REPRESENTATIONS AND WARRANTIES OF LESSEE:** You represent that all financial and other information furnished to us was, at the time of delivery, true and correct. During the term of this Lease, you shall provide us with such interim or annual financial statements and filed tax returns or any other document that we deem necessary under normal course of business.

**22. If this document was sent electronically, you hereby warrant that this document has not been altered in any way. Any alteration or revision to any part of this or any attached documents will make all such alterations or revisions non-binding and void. A facsimile of this agreement or related documents with signature may be considered to be original.**

Lease No. 930025                                          INITIAL HERE: X



**Alliance**
FUNDING GROUP

Alliance Funding Group
3745 W. Chapman Ave., Ste. 200
Orange, CA 92868
P: 714-704-1440
F: 714-704-1448
www.alliancefunds.com

## Exhibit 'A'
### Equipment Description

Lease Agreement #: _930005_

The following invoice(s) are referenced, and hereby incorporated, solely for the purpose of describing the equipment subject to lease agreement number referenced above. Capitalized terms not defined herein shall have the meaning given them in the Lease. By Signing below, lessee acknowledges that it is leasing the Equipment listed on the invoices(s) with all attachments, accessories and inclusions per invoice pursuant to the terms and conditions set out in the Lease.

| Equipment | Invoice # | Date | Vendor |
|-----------|-----------|------|--------|
| YEAR: 2016<br>MAKE: FREIGHTLINER<br>VIN: 3ALHCYCY6GDGX9341 | | | Alliance Concrete Pumps |

All equipment, general intangibles and all modifications and attachments thereto and replacements therefore now and hereafter covered by the Equipment Lease Agreement dated as of 7/9/2015 between Alliance Funding Group as Lessor and NORTHEAST CONCRETE PUMPING CORPORATION as Lessee and all additional commitments related thereto.

Lessee: NORTHEAST CONCRETE PUMPING CORPORATION

By: X _David Laughlin_

Daniel Laughlin, President

Date: _7/9/2015_

AN ELECTRONIC VERSION OF THIS DOCUMENT SHALL BE CONSIDERED AN ORIGINAL.



**Alliance Funding Group**
3745 W. Chapman Ave., Ste. 200
Orange, CA 92868
P: 714-704-1440
F: 714-704-1448
www.alliancefunds.com

**Alliance**
FUNDING GROUP

NORTHEAST CONCRETE PUMPING CORPORATION
7 Border Rd.
Scarborough, ME 04074

Re: **AUTHORIZATION FOR PAYMENT TO SUPPLIER(S) PRIOR TO LEASE COMMENCEMENT DATE AND DELIVERY AND INSTALLATION (the "Funding Agreement")**

Ladies and Gentlemen:

Reference is made to that Lease Agreement # 930025 dated as of 7/8/2015 by and between NORTHEAST CONCRETE PUMPING CORPORATION ("You" or "Your"), as Lessee, and Alliance Funding Group. ("Alliance"), as Lessor, and all related supplementary documents (collectively the "Lease"). To the limited extent hereof, this Funding Agreement amends and supersedes the Lease and is hereby incorporated by reference therein. Capitalized terms used in this Funding Agreement without definition shall have the meanings set forth in the Lease. You have requested that Alliance provide payment to suppliers for certain items of Equipment (including progress payments and/or deposits) prior to Your notification to Alliance that the Equipment has been completely delivered, installed, received, tested and accepted as satisfactory by You. Alliance will agree to this request on the terms and conditions set forth herein. As valuable consideration for Alliance advancing funds to Supplier(s) on Your behalf prior to Your notification in writing to Alliance that all of the Equipment has been completely delivered, installed, received, tested and accepted as satisfactory, You agree to make the following terms and conditions mutually binding under the Lease:

1.  You shall pay to Alliance a daily installation period rental fee (which is separate from and in addition to the Monthly Rent under the Lease and which will not be applied to any of the payments or other amounts owed under the Lease) from the date any portion of the Equipment has been certified in writing by You to be completely delivered, received, installed, tested and accepted as satisfactory (or the date You authorize Alliance in writing to make a progress payment or deposit payment to the Supplier(s) up to the date the final item of Equipment is completely delivered, received, installed, tested and accepted as satisfactory by You, which is the "Commencement Date" as defined in the Lease. The agreed upon daily installation period rental fee will be calculated as follows: one/thirtieth (1/30th) of the monthly rental payment amount set forth in Lease (notwithstanding that only a portion of the Equipment has been delivered) from the date Alliance has made a payment hereunder until the Commencement Date of the Lease, plus applicable taxes. All daily installation period rental fees shall be payable on the first day of each calendar month after the date makes a payment hereunder to the Supplier(s), with the final payment due on the Commencement Date. You hereby acknowledge and agree that the amount of the installation period rental fee is reasonable, acceptable and supported by consideration, including the agreement by Alliance to advance funds under the Lease prior to Lessee's confirmed acceptance of all of the Equipment. You hereby grant Alliance the right, but not the obligation, to electronically withdraw funds from Your bank account to pay for any daily installation period rental fees owed hereunder. You shall provide Alliance with any bank account information Alliance requests in order to process electronic payments.

2.  All payments to Supplier(s) under this Funding Agreement are at the sole discretion of Alliance. Approval for all payments under this Funding Agreement is subject to no material adverse change in Your financial condition, which will be determined at Alliance's discretion. You shall provide Alliance with updated financial related information as requested by Alliance. Alliance will not be required to fund hereunder if any items of Equipment have not been completely delivered, received, installed, tested and accepted as satisfactory by You within ninety (90) days after You execute the Lease (the "Funding Expiration Date").

3.  If all the Equipment anticipated to be included in the Lease is not certified in writing to Alliance to be completely delivered, received, installed, tested and accepted as satisfactory by You on or before the Funding Expiration Date, or if for any reason the Commencement Date under the Lease with respect to Equipment upon which Alliance has made payments hereunder shall not occur within ninety (90) days after Your execution of the Lease, or if You shall default hereunder at any time prior to the Commencement Date, or if Alliance has determined that there has been a material adverse change in Your creditworthiness; then Alliance may pursue, at its sole option, any of the following alternatives: (a) Alliance may extend or shorten the allowed installation period and establish a new Funding Expiration Date; (b) Alliance may commence the Lease based on the portion of Equipment that has been completely delivered, received, installed, tested and accepted as satisfactory and all unpaid installation period rental fees, taxes, late fees, out-of-pocket expenses and other charges due and owing, or (3) Alliance may demand that You pay to Alliance an amount equal to that which Alliance has paid to Supplier(s) on Your behalf, plus all accrued and unpaid installation period rental fees, taxes, late fees, out-of-pocket expenses and all other charges which are due and owing under the terms and conditions of the Lease. Should Alliance make a demand for payment as defined in Section c of this paragraph (3), You unconditionally agree to reimburse said funds to Alliance in full within ten (10) business days of said demand, and Alliance, upon receipt of payment in full in good funds, shall release You from further payment obligations under the Lease.

4.  You hereby assign to Alliance all right, title and interest which You may have in any Supplier invoices or purchase orders pertaining to the Equipment and in any Equipment for which Alliance has made payments hereunder.

5.  While the Equipment is in transit and for the duration of the Lease, including while the Equipment is in possession of a third party, so long as You have an insurable interest therein, You shall maintain insurance in accordance with the terms and conditions of the Lease.

6.  You shall indemnify, defend and hold Alliance harmless from and against any and all losses, liabilities, costs and expenses (including attorneys' fees) arising directly or indirectly out of any claims by any Suppliers or others in connection with or on account of the Equipment or the acquisition thereof by Alliance.

7.  If (a) the Equipment is not delivered, (b) there is a delay in delivery of the Equipment, (c) the Equipment is in any manner whatsoever lost, stolen, destroyed or damaged prior to delivery thereof, (d) the Equipment does not operate as represented by the Supplier(s), or (e) the Equipment is unsatisfactory for any reason whatsoever, then, in any such event, You shall make any and all claims in respect thereof solely against the Supplier(s) and shall nevertheless pay Alliance (or its assigns) all sums due or to become due under the Lease. You waive any and all rights, claims and set-offs of every kind whatsoever which You have or may have against Alliance (or its assigns) in connection with, or as a result of, Alliance's payment to the Supplier(s) prior to the delivery of the Equipment.

The Lease is hereby amended to incorporate the foregoing revisions. Irrespective of this Funding Agreement, all other terms and conditions (including all payment obligations by You under the Lease) shall remain without regard to the installation period rental obligations for the installation period set forth herein. The installation rental fees under this Funding Agreement do not apply to or offset rentals due from the Commencement Date forward as defined in the Lease.

Please acknowledge Your acceptance of this Funding Agreement by Your authorized signature below and return this Funding Agreement to Alliance within five (5) days from the date hereof, retaining a copy for Your records. A FACSIMILE OF THIS AGREEMET WITH SIGNATURE SHALL BE CONSIDERED TO BE AN ORIGINAL.

ACKNOWLEDGE AND ACCEPTED

7/8/2015

NORTHEAST CONCRETE PUMPING CORPORATION

Sign: _____

Title: President _____

Alliance Funding Group

Sign: _____

Title _____



**Alliance**
FUNDING GROUP

Alliance Funding Group
3745 W. Chapman Ave., Ste. 200
Orange, CA 92868
P: 714-704-1440
F: 714-704-1448
www.alliancefunds.com

# LESSEE'S ACKNOWLEDGEMENT & DELIVERY ACCEPTANCE RECEIPT

Lessee:   NORTHEAST CONCRETE PUMPING CORPORATION
7 Border Rd.
Scarborough, ME  04074

## EQUIPMENT DESCRIPTION:

Please See Exhibit "A" Attached Hereto and Made A Part Hereof.

The undersigned hereby acknowledges receipt in good condition of all the above listed property and accepts the same in accordance with all the terms and conditions of the lease agreement between Lessor and the undersigned Lessee.  The undersigned Lessee acknowledges with full understanding that the above described equipment lease in NON-CANCELLABLE for any reason for the term indicated and according to the terms and provisions thereof.  Lessee recognizes and agrees that the Lessor HAS NO RESPONSIBILITY AS TO SATISFACTION, PERFORMANCE OR MAINTENANCE of the lease equipment covered therein.  Further, Lessee acknowledges that, after the execution to this Delivery Receipt and Acceptance Certificate, it waives its rights to cover, reject or revoke acceptance of the lease equipment,  In reliance upon this representation, Lessor will execute the necessary drafts in payment for the equipment.

Lessee states, warrants and agrees that the equipment is to be used solely for business or commercial purposes and is not for personal, or consumer use in any manner

Lessee:  NORTHEAST CONCRETE PUMPING CORPORATION

X _____ , President
AUTHORIZED SIGNATURE, Daniel Laughlin        TITLE

DATE EXECUTED BY LESSEE ___July 10___ , 20 15

I hereby authorize __Joseph Croteau__ , in his/her capacity as __Vice President__ to orally verify my/our
                              (Name)                                                              (Title)

acceptance of the above referenced equipment in my absence.

### AN ELECTRONIC VERSION OF THIS DOCUMENT SHALL BE CONSIDERED AN ORIGINAL.



Alliance Funding Gro
3745 W. Chapman Ave., Ste. 2
Orange, CA 928
P: 714-704-14
F: 714-704-14
www.alliancefunds.c

**Alliance**
FUNDING GROUP

# UNCONDITIONAL GUARANTY BY BUSINESS ENTITY

To induce Alliance Funding Group, Inc. ("Lessor") to lease equipment to NORTHEAST CONCRETE PUMPING CORPORATION (the "Lessee") pursuant to Lease No. 930025 and all Supplements thereto (the "Lease").

1. The undersigned hereby absolutely and unconditionally Guarantees to Lessor full and prompt payment and performance when due of each and every obligation of Lessee under the Lease.
2. The undersigned hereby waives (i) notice of the acceptance hereof by Lessor and of the creation and existence of the Lease and (ii) any and all defenses otherwise available to a guarantor or accommodation party.
3. This Guaranty is absolute and unconditional, and the liability of the undersigned hereunder shall not be affected or impaired in any way by any of the following, each of which Lessor may agree to without the consent of the undersigned: (a) any extension or renewal of the Lease whether or not for longer than the original period; (b) any change in the terms of payment or other terms of the Lease or any collateral therefor or any exchange, release of, or failure to obtain any collateral therefor; (c) any waiver of forbearance granted to Lessee or any other person liable with respect to the Lease or any release of, compromise with, or failure to assert rights against Lessee or any such other person; and (d) the application or failure to apply in any particular manner any payments or credits on the Lease or any other obligation Lessee may owe to Lessor.
4. Lessor shall not be required before exercising and enforcing its rights under this Guaranty to first resort for payment under the Lease to Lessee or to any other person or to any collateral. The undersigned agrees not to obtain reimbursement or payment from Lessee or any other person obligated with respect to the Lease or from any collateral for the Lease until the obligations under the Lease have been fully satisfied.
5. The undersigned shall be and remain liable for any deficiency following foreclosure of any mortgage or security interest securing the Lease whether or not the liability of Lessee under the Lease is discharged by such foreclosure.
6. The undersigned shall be and remain liable for any deficiency following the initiation of bankruptcy or other insolvency actions affecting the Lease or the Lessee, whether or not the liability of the Lessee is discharged in whole or in part by such action.
7. The undersigned agrees to pay all costs, expenses and attorneys' fees paid or incurred by Lessor in endeavoring to enforce the Lease and this Guaranty.
8. If any payment from the Lessee or anyone else is applied to the Lease and is thereafter set aside, recovered, rescinded, or required to be returned for any reason (including as a preference in the bankruptcy of Lessee), the obligations under the Lease to which such payment was applied shall for purposes of this Guaranty be deemed to have continued in existence notwithstanding such application, and this Guaranty shall be enforceable as to such obligations as fully as if such applications had never been made.
9. If more than one person signs this Guaranty, then the liability of the undersigned hereunder shall be joint and several, and this Guaranty shall be enforceable in full against each of the undersigned.
10. This Guaranty shall be binding upon the estate, heirs, successors and assigns of the undersigned, shall not be discharged by the death or dissolution of the Lessee and shall inure to the benefit of the successors and assigns of Lessor.

CONSENT TO LAW, JURISDICTION AND VENUE. THE LEASE SHALL BE DEEMED FULLY EXECUTED AND PERFORMED IN THE STATE OF LESSOR'S C ITS ASSIGNEE'S PRINCIPAL PLACE OF BUSINESS AND SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAW THEREOF. IF THE LESSOR OR ITS ASSIGNEE SHALL BRING ANY JUDICIAL PROCEEDING IN RELATION TO ANY MATTER ARISING UNDER THE LEASE AND/OR THIS GUARANTY, THE UNDERSIGNED HEREBY IRREVOCABLY AGREES THAT ANY SUCH MATTER MAY BE ADJUDGED OR DETERMINED IN ANY STATE O FEDERAL COURT LOCATED IN THE STATE OF THE LESSOR'S OR ITS ASSIGNEE'S PRINCIPAL PLACE OF BUSINESS, OR IN ANY OTHER COURT HAVING JURISDICTION OVER THE LESSEE OR ASSETS OF THE LESSEE, ALL AT THE SOLE ELECTION OF THE LESSOR. THE UNDERSIGNED HEREB' IRREVOCABLY SUBMITS GENERALLY AND UNCONDITIONALLY TO THE JURISDICTION OF ANY SUCH COURT SO ELECTED BY LESSOR OR ITS ASSIGNEE IN RELATION TO SUCH MATTERS. THE UNDERSIGNED IRREVOCABLLY WAIVES THE RIGHT TO REQUEST A JURY IN ANY JUDICIAL PROCEEDING COMMENCED BY THE LESSOR OR ITS ASSIGNEE WITH RESPECT TO THE LEASE AND/OR THIS GUARANTY.

Dated 7/8/2015

NORTHEAST CRANE SERVICES, INC.
Company Name

*David Laflin* (signature)
Signature

*President.*
Title

7 Border Rd. Scarborough, ME 04074
Address

# CORPORATE RESOLUTION

### MASTER LEASE AGREEMENT NO.

The Undersigned hereby certifies that he/she is the Secretary of **NORTHEAST CRANE SERVICES, INC.** a corporation validly existing and organized under the laws of the State of **ME** which Corporation is presently subsisting and in good standing under the laws of such State and is duly qualified to conduct its business within the State of **ME** that the following is a true, accurate and compared transcript of resolutions duly adopted at a meeting of the Board of Directors of said Corporation duly held on the day of **7/9/2015**, at which meeting a quorum was present, and that the proceedings were in accordance with the Articles and bylaws of said Corporation, and that said resolutions have not been amended, rescinded, modified or revoked, and are in full force and effect.

"**RESOLVED,** that each of the officers of this Corporation, whose name appears below, or the duly elected or appointed successor in office of any or all of them, be and is hereby authorized and empowered in the name and on behalf of this Corporation to enter into, execute and deliver a Master Lease Agreement between Alliance Funding Group (hereinafter called the "Lessor") as Lessor and this Corporation as lessee and providing for the leasing to this Corporation of equipment and further providing for this Corporation to indemnify said Lessor against certain occurrences, and to enter into, execute and deliver any Lease Schedules which are now attached thereto as part thereof and any Lease Schedules executed from time to time hereafter which may hereafter become a part thereof; and

**FURTHER RESOLVED,** that each designated officer of this Corporation is hereby authorized to do and perform all other acts and deeds that may be requisite or necessary to carry fully into effect the foregoing resolution; and

**FURTHER RESOLVED,** that said Lessor is authorized to rely upon the aforesaid resolutions until receipt by it of written notice of any change, which changes of whatever nature shall not be effective as to said Lessor to the extent that it has theretofore relied upon the aforesaid resolutions in the above form."

President

Treasurer

Vice-President

Secretary

I **FURTHER CERTIFY** that the duly elected officers of this Corporation named in the foregoing resolution continue to hold their respective offices.

I **FURTHER CERTIY,** I have set my hand and affixed the seal of said Corporation this _____**9th** day of **July**, **2015**.

(CORPORATE SEAL)

Corporate Secretary / Clerk
Jeffrey W. Jones

CONTRACT ELIGIBILITY CRITERIA

"Eligible Contract" means a Contract:

(1) that is duly authorized and executed by all related Obligors and is valid and enforceable in accordance with its terms, except that enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance or similar law affecting creditor's rights generally, by applicable laws (including any applicable common law and equity) and judicial decisions which may affect the remedies provided therein, and any limitation imposed by general equity principles, including principles of commercial reasonableness, good faith and fair dealing (regardless of whether enforcement is sought in a proceeding at law or in equity);

(2) that contains a clause that has the effect of unconditionally obligating the related Obligor to make periodic contract payments (including taxes, if any) to any assignee of such Contract, notwithstanding any rights or claims such Obligor may have against the "lessor" or financing source under such Contract;

(3) that is in full force and effect and has not been satisfied, subordinated or rescinded;

(4) that is noncancellable by the related Obligor, and except as specifically set forth in the Contract, does not contain early termination options and does not permit prepayment either in full or in part;

(5) the payments under which are fixed in amount and are absolute, unconditional obligations of the related Obligor, that does not provide for offset of any amount payable thereunder for any reason and that provides for acceleration of the related Scheduled Payments upon default by the related Obligor;

(6) that requires the related Obligor to maintain the related Equipment in good working order, to bear all the costs of operating such Equipment, including taxes, if any, to maintain insurance relating to such Equipment and to assume all risk of loss or malfunction of such Equipment;

(7) that complies (and that complied at the time of origination) with all material requirements of federal, state and local laws, and all material regulations thereunder, including, without limitation, all usury laws, if any, and all legal requirements of the jurisdiction in which it was originated and the jurisdiction which laws govern the Contract;

(8) that was not originated in and is not subject to the laws of any jurisdiction which would make unlawful the sale, transfer and assignment of such Contract under the Agreement;

(9) that requires the related Obligor to obtain (i) casualty insurance and list Seller, its successors and/or assigns, as the loss payee in an amount not less than the replacement cost and/or casualty loss value of the related Equipment and (ii) liability insurance and name Seller,

- 31 -

its successor or assigns, as additional insured, and that such insurance is required to be in full force and effect during the term of the Contract;

(10)  that is assignable without the prior written consent of the related Obligor (or as to which such consent has been obtained);

(11)  that does not provide for or permit the substitution, addition or exchange of any item of related Equipment;

(12)  as to which the Obligor has made at least one regularly scheduled payment under the Contract (not including advance payments);

(13)  that is a U.S. dollar-denominated obligation and that related, at origination, to an Obligor and Equipment that were located in one of the fifty states of the United States and that requires that the Equipment continue to be located in one of the fifty states of the United States;

(14)  that is evidenced by a schedule that either contains all of the terms of such Contract or incorporates the terms of a master lease agreement or a master note and security agreement, as the case may be, which schedule constitutes "chattel paper" or an "instrument" as defined under the UCC, and as to which schedule there is only one "original" signed counterpart (provided that such Contract may provide that the "original" of the schedule may be received by Seller by facsimile with Seller's original "wet ink" signature), which "original" counterpart is in the possession of Seller prior to the Closing Date, is not subject to any custodial or other similar agreement, and which "original" counterpart Seller will deliver to TCFEF on or before the Closing Date and the delivery of which, by itself, is effective and sufficient to effect assignment and perfection of such Contract;

(15)  that is not a consumer contract or a "consumer lease" as defined in Section 2A-103(1)(e) of the UCC;

(16)  that relates to an Obligor that is an individual, corporation, partnership, limited liability company or unincorporated business association not using the related Equipment for personal, family or household purposes and which is not a federal, state or municipal governmental entity or unit or a foreign or other sovereign nation or government;

(17)  that relates to Equipment that has not been repossessed;

(18)  that is not subject to any guaranty by Seller;

(19)  that relates to an Obligor with respect to which Seller has not established any specific credit reserve;

(20)  that conforms, in all material respects, to one of the forms of contracts attached as Exhibit A to the Agreement, with no material adverse changes or modifications, and no provision of which has been amended, extended, waived, altered or otherwise modified, except only any such immaterial or non-adverse changes made by instruments or documents contained in the related

- 32 -

contract files and delivered to TCFEF in connection with the closing of the purchase of the related Purchased Assets and which instruments or documents are accurately reflected in Schedule 1 to the Agreement, or the information provided in the computer file delivered to TCFEF pursuant to Section 2.7 of the Agreement in connection with the closing of the related Purchased Assets;

(21)  that was originated by Seller in the ordinary course of its business in accordance with its customary underwriting practices and credit policies and that was not selected for sale to TCFEF under an adverse selection procedure;

(22)  with respect to which Seller has duly fulfilled all material obligations on its part to be fulfilled under, or in connection with, such Contract and has done nothing to materially impair the rights of TCFEF in such Contract, the related Equipment, the Supporting Documents, the related Scheduled Payments or any income or proceeds with respect thereto;

(23)  that has been originated and collected using origination and collection practices complying in all material respects with Seller's customary underwriting practice and credit policies;

(24)  that relates to an Obligor that, to the best of Seller's knowledge, has accepted the related Equipment as being in good working condition, after adequate opportunity to test and inspect, and has not notified Seller of any defects therein, and with respect to which Seller has no knowledge of any material equipment malfunction or other claim by such Obligor with respect to the material performance of such Equipment;

(25)  that relates to Equipment that has not suffered any loss or damage except for such Equipment that has been restored to its original value, ordinary wear and tear excepted, and such repair has been paid for in full;

(26)  except as disclosed to TCFEF in writing, that is not and has not been the subject of any litigation actually commenced that names Seller as a party and in respect of which Seller has been served with process or otherwise has Knowledge;

(27)  as to which neither the Obligor thereunder nor any guarantor or other Person providing credit support therefor is subject to an Insolvency Proceeding;

(28)  that is not subject to a material default (other than a payment default) or an event of default (other than a payment event of default) (as defined in such Contract) and no event (other than a payment default) which with the giving of notice, passage of time, or both would become a default has occurred and is continuing under such Contract;

(29)  that was not more than thirty (30) days past due as of the Closing Date and that has not been more than thirty (30) days past due at any time during the 3-month period prior to the Closing Date or more than sixty (60) days past due at any time since the inception of such Contract;

- 33 -

(30)  with respect to which no right of rescission, set-off, counterclaim or defense has been asserted in writing delivered to Seller or of which Seller otherwise has Knowledge;

(31)  that relates to the item of Equipment identified therein;

(32)  that, to Seller's Knowledge, has not been relocated from the state set forth in the Contract;

(33)  that may be sold, transferred, assigned, set-over and otherwise conveyed to TCFEF, and the Equipment under which may be transferred to TCFEF, without violating the terms or provisions of, or rendering unenforceable, such Contract, any Supporting Document therefor or any other agreement to which Seller is a party or by which Seller is bound relating thereto; and

(34)  that provides for rental payments as set forth in <u>Schedule 1</u>.



Re: Contract Number:

Axis Capital, Inc. ("Creditor") hereby gives notice to you that it has assigned to TCF Equipment Finance, a division of TCF National Bank ("TCFEF"), pursuant to a Purchase and Sale Agreement, dated as of March 28, 2016 (the "Agreement"), all of Creditor's right, title and interest in, to and under the Contract and all payments owing thereunder.

Creditor hereby irrevocably directs you to make any and all payments required or permitted to be made under the Contract directly to TCFEF at the following address:

A copy of each notice which you are required to give to Lessor under the terms of the Contract should be sent by you to TCFEF (instead of Creditor) at its address set forth above or at such other address as TCFEF may hereafter notify you.

Axis Capital, Inc.

By: _____

Name: Shauna Heckathorn

Title: CFO

**EXHIBIT C**
**TO PURCHASE AND SALE AGREEMENT**

Notice of Assignment

| Lease # | Lessee Name | Purchase Price |
|---------|-------------|----------------|
| 930025 | NORTHEAST CONCRETE PUMPING CORPORATION | 216,001.41 |
| 930458 | GENESIS INVESTMENTS, INCORPORATED d/b/a | 36,782.50 |
| 930858 | HUMBLE HOLDINGS, INC. d/b/a | 27,090.84 |
| 930896 | VALLEY PACKAGING CORP. | 146,871.93 |
| 930942 | ANDREWS SITE PREP INCORPORATED | 103,040.43 |
| 930962 | TOMMY WAYNE WILSON d/b/a | 75,951.72 |
| 931012 | LINCOLN SANDS HOTEL PARTNERS LLC d/b/a | 58,293.21 |
| 931051 | TRINETRA HOTELS, LLC d/b/a | 221,724.32 |
| 931065 | VIVA HOLDINGS, LLC | 56,713.99 |
| 931094 | COMMONWEALTH DODGE, LLC | 28,322.33 |
| 931143 | CAREY'S LAWNSCAPE, INC. | 39,832.19 |
| 931155 | DON ROSE OIL CO., INC. | 73,767.66 |
| 931160 | SOUTHEASTERN MEDICAL EQUIPMENT COMPANY | 62,111.35 |
| 931164 | A-QUICK BINDERY, LLC | 15,201.61 |
| 931193 | A AFFORDABLE STRIPING & SEALING, LLC | 81,842.64 |
| 931204 | CLEAR SIGN & DESIGN INC. | 108,953.87 |
| 931283 | COPY PLUS, LLC | 28,645.30 |
| 931299 | CARMINE N PATRIZIO d/b/a | 17,703.57 |
| 931352 | CAL ENTERPRISES, INC. d/b/a | 15,936.04 |
| 931365 | BRIAN MUNDAY TRUCKING, LLC | 25,223.37 |
| 931366 | BRIAN MUNDAY TRUCKING, LLC | 21,016.33 |
| 931375 | AMBER CHEMICAL, INC | 82,477.46 |
| 931419 | CODAY ENTERPRISES, INC. d/b/a | 44,442.33 |
| 931610 | THURSTON COUNTY SHERIFF'S DEPARTMENT | 26,738.20 |
| 931619 | THURSTON COUNTY SHERIFF'S DEPARTMENT | 33,116.78 |
| 931676 | CLARIPHY COMMUNICATIONS, INC. | 57,655.75 |
| 931677 | CLARIPHY COMMUNICATIONS, INC. | 57,906.72 |
| 929773-5 | SYNERGY SOFTWARE & CONSULTING, L.L.C. d/b/a | 40,437.17 |
| 930352-1 | STERLING FOOD MART, INC. | 40,433.16 |

## BILL OF SALE AND ASSIGNMENT

By this Bill of Sale and Assignment given on the date set forth below by Axis Capital, Inc., a Nebraska corporation (together with its successors and assigns, "Seller"), for and in consideration of the purchase price provided in Section 2.3 of the Purchase and Sale Agreement, dated as of March 28, 2016 (the "Purchase and Sale Agreement" and all capitalized terms not defined in this Bill of Sale and Assignment shall have the meanings assigned to such terms in the Purchase and Sale Agreement, as applicable) among Seller and TCF Equipment Finance, a division of TCF National Bank, a national bank (together with its successors and assigns, "TCFEF"), the receipt and sufficiency of which is hereby acknowledged, Seller hereby sells, assigns, endorses and transfers to TCFEF all of Seller's rights and remedies in, under and to the following (collectively, the "Purchased Assets"):

    (i)        the Purchased Contracts identified on Schedule 1;

    (ii)      all amounts becoming due on or after the Cut-Off Date under the Purchased Contracts and all Collections with respect to such amounts;

    (iii)    all Equipment leased or financed under the Purchased Contracts and all proceeds of such Equipment (including without limitation all proceeds received on or after the earlier of the Cut-Off Date or the Closing Date in connection with any sale or other disposition of such Equipment and all Insurance Proceeds received on or after the earlier of the Cut-Off Date or the Closing Date with respect to such Equipment), and any Additional Collateral;

    (iv)    all Records related to the Purchased Contracts;

    (v)     all Supporting Documents for the Purchased Contracts and all amounts received with respect to such Supporting Documents on or after the Cut-Off Date;

    (vi)    on and after the Cut-Off Date, all rights as additional insured under any insurance policies required by the Purchased Contracts; and

    (vii)   all of Seller's rights and remedies under the Purchased Contract Documents arising on or after the Cut-Off Date, including, without limitation, the right to initiate and conclude any and all proceedings, legal, equitable or otherwise, that Seller might otherwise take, save for this Agreement, together with all income and proceeds from the Equipment and the Purchased Contract Documents; and

To have and to hold the same unto TCFEF and its successors and assigns, forever and free and clear of any Adverse Claim. The representations, warranties, covenants, agreements and indemnities contained in this Bill of Sale and Assignment are not in lieu of and do not supersede or modify the representations, warranties, covenants, agreements and indemnities contained in the Purchase and Sale Agreement.

IN WITNESS WHEREOF, Seller has caused this instrument to be executed by its duly authorized representative as of the 28th day of March, 2016.

SELLER:
AXIS CAPITAL, INC.

By: _____
     Name: Shauna Heckathorn
     Title: CFO

[Attach Schedule 1]

| Lease # | Lessee Name | Purchase Price |
| --- | --- | --- |
| 930025 | NORTHEAST CONCRETE PUMPING CORPORATION | 216,001.41 |
| 930458 | GENESIS INVESTMENTS, INCORPORATED d/b/a | 36,782.50 |
| 930858 | HUMBLE HOLDINGS, INC. d/b/a | 27,090.84 |
| 930896 | VALLEY PACKAGING CORP. | 146,871.93 |
| 930942 | ANDREWS SITE PREP INCORPORATED | 103,040.43 |
| 930962 | TOMMY WAYNE WILSON d/b/a | 75,951.72 |
| 931012 | LINCOLN SANDS HOTEL PARTNERS LLC d/b/a | 58,293.21 |
| 931051 | TRINETRA HOTELS, LLC d/b/a | 221,724.32 |
| 931065 | VIVA HOLDINGS, LLC | 56,713.99 |
| 931094 | COMMONWEALTH DODGE, LLC | 28,322.33 |
| 931143 | CAREY'S LAWNSCAPE, INC. | 39,832.19 |
| 931155 | DON ROSE OIL CO., INC. | 73,767.66 |
| 931160 | SOUTHEASTERN MEDICAL EQUIPMENT COMPANY | 62,111.35 |
| 931164 | A-QUICK BINDERY, LLC | 15,201.61 |
| 931193 | A AFFORDABLE STRIPING & SEALING, LLC | 81,842.64 |
| 931204 | CLEAR SIGN & DESIGN INC. | 108,953.87 |
| 931283 | COPY PLUS, LLC | 28,645.30 |
| 931299 | CARMINE N PATRIZIO d/b/a | 17,703.57 |
| 931352 | CAL ENTERPRISES, INC. d/b/a | 15,936.04 |
| 931365 | BRIAN MUNDAY TRUCKING, LLC | 25,223.37 |
| 931366 | BRIAN MUNDAY TRUCKING, LLC | 21,016.33 |
| 931375 | AMBER CHEMICAL, INC | 82,477.46 |
| 931419 | CODAY ENTERPRISES, INC. d/b/a | 44,442.33 |
| 931610 | THURSTON COUNTY SHERIFF'S DEPARTMENT | 26,738.20 |
| 931619 | THURSTON COUNTY SHERIFF'S DEPARTMENT | 33,116.78 |
| 931676 | CLARIPHY COMMUNICATIONS, INC. | 57,655.75 |
| 931677 | CLARIPHY COMMUNICATIONS, INC. | 57,906.72 |
| 929773-5 | SYNERGY SOFTWARE & CONSULTING, L.L.C. d/b/a | 40,437.17 |
| 930352-1 | STERLING FOOD MART, INC. | 40,433.16 |

<u>Officer's Certificate</u>

I, Shauna Heckathorn, hereby certify that I am the duly elected, qualified and acting CFO of Axis Capital, Inc., a Nebraska corporation ("<u>Seller</u>"), and that, as such, I am authorized to execute this certificate on behalf of Seller. This certificate is being delivered pursuant to the Purchase and Sale Agreement, dated as of March 28, 2016 (the "<u>Agreement</u>") between Seller and TCF Equipment Finance, a division of TCF National Bank ("<u>TCFEF</u>"). I hereby certify that:

1. The representations and warranties of Seller in the Agreement are true, correct and complete as if made on and as of the date hereof;

2. As of the Closing Date, Seller is not subject to an Insolvency Proceeding and Seller is not insolvent;

3. The sale of the Initial Purchased Assets to TCFEF will not result in the insolvency of Seller and has not been made in contemplation of the occurrence of an Insolvency Proceeding involving Seller; and

4. Seller has performed and complied with all of its covenants as set forth in the Agreement.

Capitalized terms used and not otherwise defined herein have the respective meanings assigned to them in the Agreement.

IN WITNESS WHEREOF, I have executed this certificate as of March 28, 2016.

*Name: Shauna Heckathorn*
*Title: CFO*

# CERTIFICATE OF INCUMBENCY AND AUTHORITY

The undersigned, Secretary of Axis Capital, Inc., a Nebraska corporation (the "Corporation"), hereby certifies to TCF Equipment Finance, a division of TCF National Bank ("TCFEF") as follows:

1. That pursuant to the Corporation's By-Laws, as amended, each of the following named persons was designated and appointed to the office(s)/position(s) indicated opposite such person's name and each such person continues to hold the indicated office(s)/position(s) at this time, and that the signature set forth below opposite each such person's name is the genuine signature of such person:

| NAME | SIGNATURE | TITLE |
|------|-----------|-------|
| Shauna Heckathorn | *[signature]* | CFO |
| | | |
| | | |

2. That pursuant to the Corporation's By-Laws, as amended, each of the persons designated to serve in the above-entitled office(s)/position(s) has sufficient and appropriate authority to negotiate, execute and deliver on behalf of and to bind the Corporation, from time to time, with respect to the Purchase and Sale Agreement, dated as of March 28, 2016, by and between TCFEF and the Corporation and all other documents executed or to be executed in connection therewith, including Supplemental Conveyances thereunder, all to be in such form and contain such terms as the officer signing the same shall approve, her/his approval to be conclusively evidenced by her/his signature thereon; and

3. That pursuant to the Corporation's By-Laws, as amended, the undersigned has the power and authority to execute this Certificate on behalf of the Corporation. The undersigned agrees that the Corporation will notify TCFEF in writing of any change in the authorized persons. Unless and until such notice has been received by TCFEF, TCFEF shall be entitled to assume that this Certificate remains in full force and effect, and that all persons named herein as authorized persons shall continue to have full authority as set forth above.

Signature: _____
Secretary & Treasurer

Shauna Heckathorn, Secretary & Treasurer
Please Print Name and Title

March 28th, 2016

Date: _____

**LIMITED POWER OF ATTORNEY**

NOTE TO MOTOR VEHICLE DEPARTMENT

This will authorize the person whose name and specimen signature appears below to act as agent and attorney-in-fact for, in the name of and on behalf of **AXIS CAPITAL, INC. and/or AXIS TITLE, LLC** in all matters pertaining to the certificate of title for the vehicles described below.

The rights and authority of the limited power of attorney granted herein shall be applicable to the following motor vehicles only: **See Attached Schedule A**

<u>Name and Specimen Signature of Attorney-in-Fact</u>

SPECIMEN SIGNATURE: _____ , P/A

NAME: _____ , P/A

COMPANY'S NAME: _____

NOTE: PLEASE ADD "P/A" AFTER YOUR SIGNATURE ON ALL DOCUMENTS EXECUTED PURSUANT TO THIS LIMITED POWER OF ATTORNEY.

In Witness whereof, the corporation has caused this limited power of attorney to be signed by a duly authorized officer.

**AXIS CAPITAL, INC.**

By: _____

Title: _CFO_____

Date: _3/28/16_____

State of Nebraska )

County of _Hall_____ )

Subscribed and sworn to before me this _28_ day of _March_, 20_16_

_Mckayla D. Nelson_

Notary Public

```
MCKAYLA D. NELSON
General Notary
State of Nebraska
My Commission Expires Sep 15, 2019
```

**Schedule A**

3ALHCYCY6GDGX9341 - Northeast Concrete Pumping Corporation      007-0591886-500

1NKDLU0X68J213374 - Andrews Site Prep Incorporated      007-0694128-500

1NKDLU0X68J213374 - Brian Munday Trucking, LLC      007-0694144-501

1D9BG482371609909 - Brian Munday Trucking, LLC      007-0694144-500

5HTSN4228G7T96126 - Amber Chemical, Inc      007-0694127-500

1FM5K8ARXGGB73744 - Thurston County Sheriff's Department      007-0694234-500

1FTEW1EGXGKD34177 - Thurston County Sheriff's Department      007-0694234-501